LEXSEE 2002 CONN PUC LEXIS 23

DPUC INVESTIGATION OF THE PAYMENT OF MUTUAL COMPENSATION FOR LOCAL CALLS CARRIED OVER FOREIGN EXCHANGE SERVICE FACILITIES

DOCKET NO. 01-01-29

Connecticut Department of Public Utility Control

*2002 Conn. PUC LEXIS 23*

January 30, 2002

[*1]   Jack R. Goldberg, John W. Betkoski, III, Donald W. Downes

**OPINION: DECISION**

**I. INTRODUCTION**

**A. SUMMARY**

The Southern New England Telephone Company (Telco or Company) filed a Request for Declaratory Ruling (Request) from the Department of Public Utility Control (Department) requesting that: (1) switch-based competitive local exchange carriers (CLECs) cease and desist accounting for and/or billing the Telco local mutual compensation for calls originated by the Telco within a Local Calling Area (LCA) and terminated by CLECs to its end users outside of that LCA; (2) CLECs inform the Telco of the actual minutes of use (MOU) for all calls terminated outside of the LCA; and (3) CLECs inform the Telco when they are assigning a "foreign" NPA/NXX code in any specific LCA. Specifically, the Telco claims that CLECs were accounting for and/or billing the Company local mutual compensation for calls that terminate outside of an LCA rather than compensating the Telco for originating access pursuant to its Connecticut Access Tariff. The Department solicited comments from interested persons and received comments from several CLECs. Additionally, Verizon - New York (Verizon) filed comments [*2]   supporting the Telco's Request.

The CLECs claim, inter alia, that the Department lacks authority to impose charges on the subject traffic because the Federal Communications Commission (FCC) has ruled that the subject ISP traffic is interstate in nature. They also argue that CLECs have the right to set their own local calling areas and should not be bound by the Telco's local calling area. The CLECs further argue that the Telco has not supported its contention that there is a misuse of NXX codes.

Additionally, by Order on Remand and Report and Order in CC Docket No. 96-98 In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 and CC Docket No. 99-68 Intercarrier Compensation for ISP Bound Traffic (ISP Order), released on April 27, 2001, the FCC reconsidered its ruling regarding the proper treatment of telecommunications traffic delivered to ISPs for purposes of intercarrier compensation. The FCC reaffirmed its previous conclusion that traffic delivered to an ISP is predominantly interstate access traffic subject to § 201 of the Telcom Act, and established an appropriate cost recovery mechanism for the exchange of such traffic. [*3]   The FCC ruling impacts the Departments decision in the instant proceeding in that while the state commissions have not been preempted from issuing decisions regarding compensation for ISP-bound traffic for the period prior to the effective date of the ISP Order, state commissions have been preempted from addressing intercarrier compensation for ISP-bound traffic subsequent to the ISP Order.

The Department reviewed its mutual compensation policies and decisions as well as the ISP Order and concluded that consistent with its mutual compensation those policies and decisions, CLECs have been compensated by the Telco for calls originated within the Telco's local calling area and terminated by the CLECs outside of that area through the use of FX facilities. Accordingly, the Department orders that the Telco be compensated for the FX traffic from January

15, 1999 to the effective date of the ISP Order. The Department declined to implement the remainder of the Telco's requests.

## B. BACKGROUND OF THE PROCEEDING

On January 15, 1999, the Telco filed a Request for Declaratory Ruling (Request) from the Department requesting that: (1) switch-based competitive local exchange carriers (CLECs) [*4] cease and desist accounting for and/or billing the Telco local mutual compensation for calls originated by the Telco within a Local Calling Area (LCA) and terminated by CLECs to its end users outside of that LCA; (2) CLECs inform the Telco of the actual minutes of use (MOU) for all calls terminated outside of the LCA; and (3) CLECs inform the Telco when they are assigning a "foreign" NPA/NXX code in any specific LCA. n1 Docket No. 99-01-15, Application of the Southern New England Telephone Company for a Declaratory Ruling Regarding Local Mutual Compensation, was established by the Department to address the Request.

> n1 A foreign NPA/NXX code is one that is not associated with that LCA.

According to the Telco, it filed the Request because CLECs were accounting for and/or billing the Company local mutual compensation for calls that terminated outside of an LCA rather than compensating the Telco for originating access pursuant to its Connecticut Access Tariff. The Telco also claimed that CLECs assign telephone numbers to their end users from NPA/NXX codes that appear to be associated with a particular LCA; however, these addresses are outside of the LCA associated with the NPA/NXX [*5] codes. Under these circumstances, the Telco maintains that the CLECs are wrongfully accounting for and/or billing the Company local mutual compensation for non-local calls. Request, p. 1.

By Notice of Request for Written Comments (Notice) dated February 2, 1999, all interested persons were given the opportunity to file written comments with the Department addressing the following issues:

1. The Telco's claim that certified local exchange carriers are accounting and billing the Telco local mutual compensation for terminating non-local calls by unilaterally assigning telephone numbers to end users from NPA/NXX codes that make the calls appear to be local.

2. The Telco's argument that the above CLEC billing practice is inconsistent with the Department's Decision in Docket No. 94-10-02, DPUC Investigation into the Unbundling of the Southern New England Telephone Company's Local Telecommunications Network, and Telco/CLEC interconnection agreements and Connecticut Access Tariffs.

3. The Telco's request that the Department order CLECs to properly account for and bill the Telco local mutual compensation pursuant to the Telecommunications Act of 1996 (Telcom Act), Telco/CLEC interconnection [*6] agreements, and the Telco's Connecticut Access tariffs.

4. The Telco's allegation that CLECs are passing interLATA/intraLATA calls to interexchange carriers while wrongfully accounting for and/or billing local mutual compensation to the Telco. n2

> n2 In response to the Notice, the Department received comments from the following: AT&T, the New York Telephone Company d/b/a Bell Atlantic - New York, (now Verizon - New York, Inc. or Verizon); Cablevision Lightpath - CT, Inc. (Cablevision); Cox Connecticut Telcom, L.L.C., (Cox); MCI WorldCom, Inc. (WCI); Prism Operations, LLC (Prism), and RCN Telecom Services of Connecticut, Inc. (RCN). The Department also received reply comments from the Telco, BA-NY, and Cox.

The Department issued an additional Request for Comments dated July 8, 1999. Furthermore, in response to the Telco's Request to Close the Evidentiary Portion of the Proceeding and to Issue an Immediate Ruling, dated August 11, 2000, and the subsequent responses made by various parties to this proceeding, the Department issued a procedural schedule requesting the filing of Briefs and Reply Briefs for the instant proceeding.

AT&T Communications of New England (AT&T), argued [*7] in its October 3, 2000 Brief, inter alia that, pursuant to *Section 4-176 of the General Statutes* of Connecticut (Conn. Gen. Stat.), the matter should be dismissed since the Department did not issue a ruling in this matter within 180 days of the filing of the petition.

In its Decision dated January 31, 2001 in Docket No. 99-01-15, the Department determined that *Conn. Gen. Stat. § 4-176* provides that if an agency does not issue a Declaratory Ruling within 180 days, or within such longer period agreed to by the parties, it shall be deemed to have decided not to issue a ruling. Since no extension of time was authorized by the parties to that proceeding, and more than 180 days had passed since the filing of the Telco petition, the Department determined that pursuant to the provisions of *Conn. Gen. Stat. Section 4-176(i)*, the matter must be dismissed. Accordingly, the Department closed Docket No 99-01-15. The Department also indicated in that Decision that this issue was ripe for further investigation, and initiated the instant docket to facilitate its investigation.

Although [*8] the Department was bound by *Conn. Gen. Stat. § 4-176* to close Docket No. 99-01-15 before issuing the final Decision addressing the Telco's Request, the Department was of the opinion that the record of Docket No. 99-01-15 provided a complete record from which the Department could issue its Decision. Accordingly, the evidentiary record of Docket No. 99-01-15 was incorporated into the record of this proceeding and on March 29, 2001, by Rescheduled Notice of Written Exception, Briefs and Oral Arguments n3 (Notice); the Department issued its draft Decision in this matter. n4

> n3 Oral Arguments were cancelled by Notice of Cancelled Oral Arguments dated April, 20, 2001.
>
> n4 Written exceptions to the draft Decision were submitted by AT&T; Cablevision; Cox; Level 3 Communications, LLC (Level 3); RCN Telecom Services, Inc; PaeTec Communications, Inc. (PaeTec); the Telco; Verizon; MCIW; and Z-Tel Communications, Inc.

In response to the Notice, Level 3 argued that the Department should afford in the instant docket, the same procedural opportunities for interested parties allowed in similar dockets. According to Level 3, the record of Docket No. 99-01-15 [*9] did not include evidence regarding recent changes in law, technology, or industry practice, and did not include input by potential interested parties that had recently entered the market. Level 3 also stated that because Docket No. 99-01-15 had been closed, the Department would be remiss not to consider the issues raised in the instant docket without a complete evidentiary record that reflected trends in the telecommunications industry, developments in the law and the state of competition as these items have evolved since Docket No. 99-01-15 was initiated. Level 3 Written Exceptions, pp. 4 and 5. Additionally, PaeTec argued that any Decision rendered by the Department would be premature given the status of a number of proceedings addressing similar issues currently before the FCC. PaeTec Written Exceptions, p. 4.

In light of the above and the written exceptions submitted in response to the Notice by other parties to this proceeding, the Department reopened the evidentiary record to accept written comments addressing: n5 1) recent changes in law (e.g., the FCC's April 18, 2001 Order on Remand and Report and Order, CC Docket No. 96-98, Implementation of the Local Competition Provisions [*10] in the Telecommunications Act of 1996 and CC Docket No. 96-98, Intercarrier Compensation for ISP-Bound Traffic (ISP Order); the FCC's April 19, 2001 Notice of Proposed Rulemaking in CC Docket No. 01-02, Developing a Unified Intercarrier Compensation Regime (Compensation Regime Order), and state commission decisions/orders addressing the payment of mutual compensation for local calls carried over foreign exchange service facilities; 2) recent changes in technology; 3) recent changes in industry practice; 4) the status of competition in Connecticut since Docket No. 99-01-15 was initiated; 5) the March 29, 2001 draft Decision's reliance on the physical location of the originating and terminating end users to determine how to treat such calls for ratemaking purposes as opposed to the NPA/NXX of the end users involved; and 6) the imposition/collection of access charges for FX calls. n6

> n5 See the Department's May 4, 2001 Notice of Reopening of Evidentiary Record and Request for Written Comments (Reopening Notice).
>
> n6 In response to the Reopening Notice the Department received written comments from the Telco, AT&T, Cablevision, Cox, Global NAPs, Inc.(GNAPs), Level 3, PaeTec, Verizon and WCI. The Department also received reply comments from the Telco, AT&T, Cablevision, Cox, Level 3, PaeTec, and Verizon.

[*11]
## C. CONDUCT OF PROCEEDING

The Department was bound by *Conn. Gen. Stat. § 4-176* to close Docket No. 99-01-15 before fully addressing the issues raised in the Telco's Request. Nevertheless, the Department is of the opinion that the record of Docket No. 99-01-

15 provides sufficient evidence by which the Request may be addressed. Accordingly, by Notice of Taking Administrative Notice dated March 29, 2001, the evidentiary record of Docket No. 99-01-15 was incorporated into the instant proceeding. Consequently, unless indicated otherwise, all references and citations noted below refer to the parties' filings submitted in Docket No. 99-01-15.

The Department issued a draft Decision in this docket on March 29, 2001. All parties and intervenors were provided an opportunity to file written comments to and present oral argument on the draft Decision. In light of the Department's reopening of the evidentiary record of this proceeding to address additional comments from the parties, the Department reissued a draft Decision in this docket on December 13, 2001. All parties and intervenors were again provided an opportunity to file written comments [*12] and to present oral argument on this draft Decision.

### D. PARTIES

A listing of the parties to this proceeding is appended hereto at Attachment A.

### E. ISP ORDER AND COMPENSATION REGIME ORDER

By Order on Remand and Report and Order in CC Docket No. 96-98 In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 and CC Docket No. 99-68 Intercarrier Compensation for ISP Bound Traffic (ISP Order), released on April 27, 2001, the FCC reconsidered the proper treatment of telecommunications traffic delivered to ISPs for purposes of intercarrier compensation. In a previous ruling the FCC determined that such traffic was interstate traffic subject to the jurisdiction of the FCC under § 201 of the Telcom Act and not subject to the reciprocal compensation provisions of § 251(b)(5). However, the Court of Appeals for the District of Columbia Circuit (Court) held on appeal, that the FCC failed to adequately explain why its jurisdictional conclusion was relevant to the applicability of § 251(b)(5) of the Telcom Act. The Court subsequently remanded this issue to the FCC for further consideration. In light of that remand, the FCC [*13] modified the analysis which led to its determination that ISP-bound traffic falls outside the scope of § 251(b)(5) of the Telcom Act and concluded that Congress excluded from the "telecommunications" traffic subject to reciprocal compensation the traffic identified in § 251(g) of the Telcom Act, including traffic destined for ISPs. Having found, although for different reasons than in its earlier ruling, that the provisions of § 251(b)(5) of the Telcom Act do not extend to ISP-bound traffic, the FCC reaffirmed its previous conclusion that traffic delivered to an ISP is predominantly interstate access traffic subject to § 201 of the Telcom Act, and established an appropriate cost recovery mechanism for the exchange of such traffic. The FCC also indicated its intent to take interim steps to limit the perceived regulatory arbitrage opportunity presented by ISP-bound traffic while it investigates the issue of intercarrier compensation in a companion proceeding. n7 ISP Order, PP1 and 2.

n7 Developing a Unified Intercarrier Compensation Regime, CC Docket No. 01-92, Notice of Proposed Rulemaking, FCC 01-132 (Compensation Regime Order).

Specifically, the FCC intends to implement an [*14] interim recovery scheme that: (i) moves aggressively to eliminate arbitrage opportunities presented by the existing recovery mechanism for ISP-bound by lowering payments and capping growth; and (ii) initiates a 36-month transition toward a complete bill and keep recovery mechanism while retaining the ability to adopt an alternative mechanism based upon a more extensive evaluation in the Compensation Regime Order proceeding. In particular, the FCC adopted a gradually declining cap on the amount that carriers may recover from other carriers for delivering ISP-bound traffic. The FCC also capped the amount of traffic for which any such compensation is owed, in order to eliminate incentives to pursue new arbitrage opportunities. ISP Order, P7.

Of key importance from the ISP Order in relation to this proceeding was the FCC's determination concerning compensation for ISP-bound traffic. Specifically, while the state commissions have not been preempted from issuing decisions regarding compensation for ISP-bound traffic for the period prior to the effective date of the ISP Order, the FCC indicated that it would exercise its authority pursuant to § 201 of the Telcom Act and determine the appropriate [*15] intercarrier compensation for ISP-bound traffic. Consequently, pursuant to the ISP Order, state commissions no longer have the authority to address intercarrier compensation for ISP-bound traffic. ISP Order, P82.

### II. TELCO REQUEST

The Telco requests that the Department issue a Declaratory Ruling requiring: (1) switch-based CLECs cease and desist accounting for and/or billing the Telco local mutual compensation for calls originated by the Telco within an LCA and terminated by CLECs to its end users outside of that LCA; (2) CLECs inform the Telco of the actual MOU for all calls terminated outside of the LCA; and (3) CLECs inform the Telco when they are assigning a "foreign" NPA/NXX code in any specific LCA. Telco Request, pp. 1 and 2.

The Telco contends that the CLECs' improper use of NPA/NXX codes was neither contemplated in Docket No. 94-10-02 nor during the negotiations and/or arbitrations involving any of the interconnection agreements signed by the Company. The Telco further contends that CLECs are accounting for and/or billing the Company local mutual compensation for non-local calls. Rather, the Company should be allowed to charge access for these types of calls. In order [*16] for the Company to properly charge access, the Telco requires that CLECs inform it of the actual MOU of calls that are: local; terminated to an end user located outside of the originating end user's LCA; and terminated non-local calls based on the service addresses of the CLEC end users. In addition, the Company request that CLECs: notify the Telco when end users are assigned telephone numbers with NPA/NXX codes that are associated with LCAs that are not located in those LCAs; and cease terminating calls over the "Plain Old Telephone Service" (POTS) interconnection trunks to other networks rather than to its own end users. Request, pp. 19 and 20.

### III. PARTIES' POSITIONS

### A. AT&T COMMUNICATIONS OF NEW ENGLAND (AT&T)

AT&T claims that the Telco is trying to replace the Department's ruling that mutual or reciprocal compensation applies to Internet Service Provider (ISP) bound traffic, n8 with per minute intrastate access charges on ISP traffic. n9 AT&T contends that not only does the Department lack the authority to impose access charges on the jurisdictionally interstate ISP-bound traffic, but to do so, would conflict with the FCC exemption of ISP-bound traffic from access [*17] charges in order to spur the continued development of the Internet. AT&T argues that if the Telco is successful, calls, which are, treated everywhere else as local calls will be treated as toll calls subject to per minute rates or access charges. AT&T contends that the Telco does not impose toll access charges on any of its end user customers who seek to reach ISPs served by the Telco using a seven-digit number, regardless of the location of the ISP.

>   n8 Docket No. 97-05-22, Petition of The Southern New England Telephone Company For A Declaratory Ruling Concerning Internet Services Provider Traffic, September 11, 1997, Decision.
>
>   n9 According to the Telco, AT&T and RCN ignore the Company's statement that it is not focused on Internet traffic, but rather on the accounting and/or billing of mutual compensation for calls that are not local, independent of the particular service. Telco Reply Comments, p. 6.

AT&T also states that the FCC treats ISP-bound calling totally different from the treatment sought in the Request. Specifically, the FCC waived the applicability of access charges for ISP-bound traffic and directed that the dial-up portion of the call to an ISP be treated [*18] as a local call. In so doing, the FCC recognized the public policy goals contained in the Telcom Act to preserve the competitive free market that presently exists for the Internet and other interactive computer services. In the opinion of AT&T, the Telco seeks to have the Department treat what has always been rated a local call, as a toll call. This result would have the effect of making Internet calling in Connecticut prohibitively expensive as compared to every other state in the nation. AT&T Comments, pp. 1-4.

Additionally, AT&T maintains that the FCC has declared that Internet calls are enhanced, interstate calls and under its jurisdiction. Notwithstanding their interstate nature, since 1983 the FCC has exempted enhanced service providers (ESP), including ISPs, from the payment of access charges in connection with these calls. AT&T asserts that the FCC reaffirmed this ISP exemption in its Declaratory Ruling in CC Docket No. 96-98 and Notice of Proposed Rulemaking in CC Docket No. 96-98, February 25, 1999, Re: Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 Inter-Carrier Compensation for ISP-Bound Traffic, CC Docket No. 96-98. The FCC [*19] also continues to discharge its interstate regulatory obligations by treating ISP-bound traffic as though it were local traffic. Therefore, AT&T concludes that LECs may not impose access charges on ISPs under the ESP exemption. AT&T notes that the FCC has directed states to treat ISP traffic as if it were local, by permitting ISPs to purchase their public switched telephone network (PSTN) links through local business tariffs. In the opinion of AT&T, it is not uncommon for the FCC to assert jurisdiction over the local network and to regulate charges when the local network is

used in conjunction with the origination and termination of interstate calls. The FCC has asserted such jurisdiction in connection with ISP-bound calls.

In light of the above, AT&T argues that the Department lacks the jurisdiction to accept the Request, (i.e., to impose access or toll rates on calls originating from a Telco local subscriber to an ISP). AT&T also argues that since the FCC treats the ISP as an end user for access charge purposes, and characterizes ISP-bound traffic as local for certain purposes, the FCC's ability to exercise its jurisdiction over ISP traffic is not affected. In the opinion of AT&T, [*20] ISP-bound traffic is interstate in nature, and only interstate charges can be assessed (absent the FCC's exemption). Therefore, the Department cannot require that intrastate access charges on such calls be imposed.

AT&T further argues that the Department should not permit the imposition of access charges for calls to ISPs because for the most part, they do not terminate within Connecticut and are under the jurisdiction of the FCC. AT&T contends that the geographic location of the ISP server and its relationship to the originating LCA should be irrelevant to the rating of the call. According to AT&T, the FCC has determined that Internet calls must be measured as "one call," (i.e., from the end user to the ultimate Internet destination), making ISP traffic inherently interstate. This is true whether the call originates from a Telco customer and is carried by a CLEC to the ISP or whether the call originates from a CLEC customer and is carried by the Telco to its ISP. In neither case should Internet calls be treated as telecommunications services subject to per minute toll rates. Internet calls are enhanced services subject to regulation by the FCC which has deemed that these calls [*21] be treated as local calls for rating purposes. AT&T Comments, pp. 4-9.

Moreover, AT&T notes that the FCC has established a proceeding to develop federal rules governing intercarrier compensation for ISP-bound traffic. n10 Pending the conclusion of that proceeding, AT&T claims that parties are free to determine in interconnection agreements whether mutual compensation applies to ISP-bound traffic and state commissions may approve such agreements.

> n10 See Declaratory Ruling in CC Docket No. 96-98 and Notice of Proposed Rulemaking in CC Docket No. 96-98, February 25, 1999, Re: Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 Inter-Carrier Compensation for ISP Bound Traffic, CC Docket No. 96-98.

AT&T also claims that the FCC has held that a state commission could determine that reciprocal compensation is appropriate for ISP-bound traffic, even though it may not be the local traffic contemplated by Section 251(b)(5) of the Telcom Act. AT&T notes that while the FCC has not adopted a specific rule governing the matter, its policy of treating ISP-bound traffic as local for purposes of interstate access charges suggests that such compensation [*22] is due for that traffic.

AT&T further notes that the Department has adopted a mutual compensation structure, which is premised on an initial period of Bill and Keep. AT&T concludes that a comprehensive docket on mutual compensation issues is unnecessary at this time. AT&T suggests that questions of interpretation relating to the treatment of ISP-bound traffic are more appropriately addressed in carrier-to-carrier discussions or dispute resolutions, and are not properly the subject of a generic proceeding. Accordingly, AT&T suggests that the Request not form the basis for a generic and unnecessary proceeding. AT&T Comments, pp. 9-12; AT&T Brief, pp. 14-23.

AT&T asserts that the Request is more properly handled in other proceedings before the Department. AT&T cites as an example, Docket No. 97-05-22, wherein the Department advised the Telco that any formal request for reconsideration of the mutual compensation plan outlined in Docket No. 94-10-12 be accompanied by detailed evidence that effective competition has been precluded and/or that the Telco is experiencing excessive or unjust or irreparable harm. In the opinion of AT&T, while the Telco is requesting that the Department overturn [*23] the Decision in Docket No. 97-05-22, it is doing so in the wrong proceeding, substituting a record devoid of any factual content for the Department's requirement of "detailed evidence." AT&T Brief, pp. 2-4, 24 and 25.

Additionally, AT&T maintains that CLECs are not attempting to game the competitive process, but are responding to the economic realities of entry into the local exchange marketplace. Specifically, the CLECs' are serving multiple rate centers, or an entire local access transport area (LATA), through a single switch, which is a rational response to the marketplace. AT&T contends that CLECs must serve a relatively large area to obtain the customer base required to justify the installation of a switch. Virtual FX arrangements are appropriate because they allow a CLEC to offer a local service throughout a LATA without having to establish a point of interconnection (install or lease facilities) in every

local calling area, or assume the entire cost of transporting traffic the full distance from the ILEC end office serving the calling party to its own facilities.

Furthermore, AT&T claims that CLECs are doing nothing more than providing the type of foreign exchange service [*24] that carriers have provided in the past. AT&T also claims that requiring CLECs to reconfigure their network to track the Telco's network is inefficient, unfair and anti-competitive. CLECs should be permitted to configure their local service networks in the most efficient manner, and at the least cost, available to them. AT&T argues that being required to conform to traditional local exchange serving arrangements is economically inefficient, anti-competitive and irrational from an economic point of view. Such a condition in the opinion of AT&T would require CLECs to incorporate into their networks the deficiencies inherent in the incumbent's network, to the detriment both of the CLEC's customers and competition in general.

While acknowledging the Telco's assertion that the fundamental issue in this proceeding is the identification of what is a "local" call as opposed to a "non-local" call, AT&T notes that it is undisputed that the Company treats calls from its end user customers to its own FX service customers as local under its retail tariffs. AT&T also notes that with respect to calls from these same end user customers to a CLEC's foreign exchange service customer, the Telco would [*25] treat these calls as non-local, although neither FX customer is geographically located in the local calling area of the end user customer. AT&T argues that it is not only inconsistent but also discriminatory for the Telco, as the originating carrier, to make this distinction. AT&T suggests that if the Telco treats calls from its own end user customers as "local" under its retail tariffs, then it must treat calls from those end user customers to CLECs' foreign exchange service customers as "local." Consequently, under the Telco/CLEC interconnection agreements, the Company's handling of these types of calls makes them "local" calls for reciprocal compensation purposes.

AT&T asserts that in an attempt to avoid this inconsistency, the Telco contends that it is willing to pay originating access for calls originating from a CLEC customer and terminated by the Company to its FX customers. AT&T notes however, that the Telco has never done this before. AT&T states that the Telco has never provided it with a list of the Company's FX numbers to assure that AT&T would be compensated for the originating access Telco now claims CLECs are owed.

AT&T contends that the Telco and CLECs have always [*26] treated these types of calls as local calls and they should continue to be treated as such for the purpose of determining the appropriate inter-carrier compensation. AT&T also argues that the Telco should not be permitted to discriminate against competitive carriers by denying CLECs access to arrangements the Company offers to commercial customers on a tariffed basis. According to AT&T, the Telco has never sought or paid access for these calls before and only seeks to do so now to make competition in its marketplace as difficult and as costly as possible for new entrants.

Under the Telco's interconnection agreements, the Company is obligated to transport a call to a carrier's designated point of interconnection. AT&T maintains that in those cases where the carrier transports the calls to its end user customers, the Telco's costs do not change. AT&T claims that it is the CLEC and not the ILEC that is transporting the call to the end user customer, whether that called party is located in the same local calling area as the calling party or whether the called party is located in a remote local calling area. AT&T asserts that the Telco has offered no evidence on any cost differences in [*27] transporting traffic to a remote local calling area. In the opinion of AT&T, this proceeding is less about the Telco being compensated for its costs and more about CLECs being forced to compete with an ILEC under the strictures the Company seeks to have the Department impose on CLECs. AT&T Brief, pp. 5-14.

Regarding the Telco's contention that CLECs are depriving the Company of toll and access revenues, AT&T argues that the social pricing schemes supported by the Company create distortions in the local marketplace. In the opinion of AT&T, universal service does not equate to universal subsidy and recommends that cross subsidies embedded in service prices be eliminated. AT&T asserts that all services be priced to recover their underlying costs and subsidies only be provided to subscribers based on their economic need. AT&T claims that the economic distortions brought about by these subsidies significantly increases a risk for new market entrants. AT&T also argues that there is no evidence that local rates are not compensatory in Connecticut. If local rates are not compensatory, AT&T suggests that the Telco is obligated to initiate a proceeding to establish a Universal Service Fund [*28] support mechanism that the law requires. AT&T Brief, pp. 23 and 24.

In response to the Reopening Notice, AT&T states that beyond the formal necessities of a hearing and discovery, there is a need to fully explore the technical and policy implications of any relief the Department may consider ordering in this matter. AT&T maintains that there is a real need for technical sessions to analyze the call flows in these wide area service arrangements that are the subject of this proceeding. Before issuing a final Decision in this matter, AT&T

suggests that it is important that all the implications of any policy determination are fully understood and intended because a Decision in this matter will seriously impact a CLEC's ability to compete in Connecticut. Should the Department, treat these calls as toll calls, AT&T asserts that the Department must understand how these calls differ from traditional toll calls and the affect any Decision will have on the carriers to recover costs for traffic passing over their network. AT&T also asserts that if the Department is considering imposing access charges upon carriers, it must determine how an access regime can be superimposed upon this two carrier [*29] environment and the reporting requirements and competitive impacts such a decision implicates. In the opinion of AT&T, technical meetings will serve to inform the Department of the ramifications of any decision it may consider making in this matter.

AT&T states that the FCC has determined in the ISP Order that inter-carrier compensation for ISP-bound traffic is within the jurisdiction of the FCC under § 201 of the Telcom Act. Based on the FCC's determination that ISP traffic is interstate in nature, the FCC's conclusion that only it has jurisdiction to establish the cost recovery mechanism for the exchange of such traffic, and that its conclusion that ISP-bound traffic is not subject to reciprocal compensation, AT&T contends that the determination of which traffic is subject to reciprocal compensation will no longer depend on whether the traffic can be characterized as "local," but all "telecommunications" except those covered under § 251(g) of the Telcom Act, (i.e., exchange access, information access and exchange service for such access).

AT&T notes that although the ISP Order suggests that ISP-bound traffic should be exchanged under a bill and keep arrangement, the FCC decided [*30] not to "flash cut" to "bill and keep," but instead to establish a transitional cost recovery mechanism. The FCC also determined that the interim compensation scheme is not retroactive and does not preempt any state commission decision regarding compensation for ISP-bound traffic for the period prior to the effective date of the ISP Order. Rather, as of the effective date of the ISP Order, the FCC will exercise jurisdiction over all aspects of ISP-bound traffic. Additionally, the ISP Order does not affect an existing interconnection agreement on a going forward basis unless the agreement can be amended through the application of a "change in law" provision.

AT&T claims that the ISP Order will become effective beginning June 14, 2001. Pursuant to that order, the FCC, and not the states, will exercise jurisdiction over ISP-bound traffic. As such, from the effective date of the ISP Order, the Department can no longer determine the inter-carrier compensation scheme for ISP-bound traffic delivered over the wide area service arrangements that are the subject of this proceeding. AT&T also claims that the Department is prevented from imposing an access charge structure on an ISP-bound call [*31] over which the FCC has unequivocally asserted jurisdiction, both pursuant to the ISP Order and pursuant to the FCC's previous orders on the access charge exemption for enhanced service providers (ESP) and ISPs.

AT&T concludes that the ISP Order removes from the Department's jurisdiction a significant portion of traffic at issue in this proceeding. Moreover, the FCC has implicitly rejected the very basis on which the Telco is attacking the payment of inter-carrier compensation for any traffic delivered under wide area local serving arrangements and not just ISP traffic. AT&T argues that aside from the impracticability of identifying ISP traffic separately from voice traffic, there is no basis for the Department to establish a remedy, which would treat non-ISP, bound traffic any differently than ISP-bound traffic will be treated. AT&T states that as the FCC has determined, there is no cost difference between terminating ISP traffic and terminating voice traffic justifying a difference in the level of compensation for such traffic. AT&T comments that a mutual compensation plan should encourage competitive entry into the Connecticut marketplace by encouraging prospective participants [*32] to enter the marketplace without having to incur significant and perhaps unnecessary administrative costs for measuring, billing and collecting local service traffic at the very critical early stage of market entry. Therefore, AT&T recommends that the Department treat other traffic delivered over these wide area arrangements in the same way ISP-bound traffic will be treated. AT&T May 25, 2001 Letter, pp. 1-8.

### B. CABLEVISION LIGHTPATH - CT, INC. (CABLEVISION)

Cablevision argues that the Request be denied because it offers no evidence of the misuse of NXX codes. According to Cablevision, the interconnection agreements negotiated between the Telco and CLECs contain specific provisions defining how parties are to address billing and accounting grievances. Cablevision suggests that the Telco address any actual abuses through contractual remedies. Cablevision contends that unsubstantiated allegations should not be permitted to jeopardize the Department's procompetitive policies. Cablevision Comments, pp. 1 and 2.

Cablevision also asserts that CLECs are not bound by the Telco's definition of local calling areas. Cablevision notes that the Department has ruled that each CLEC can define [*33] its own local calling area and that the Telco is attempting to undo the Department's ruling and restrict all CLECs to the same local calling areas and rate structures designed by the Telco. n11 Cablevision maintains that contrary to the Telco's allegation, a CLEC's decision to provide

larger local calling zones to its customers does not constitute a misuse of NXX codes. Cablevision Comments, pp. 2 and 3.

n11 The Telco argues that at issue is the definition of local calling area for purposes of mutual compensation. According to the Telco, each carrier defines its own local calling area for calls its end users originate as it applies to mutual compensation. A terminating local calling area does not exist. The Telco also contends that it is the local calling area of the originating subscriber that dictates whether an originating call is local or toll. A call originated from a CLEC end user to a Telco end user would be considered local or toll based on the local calling area of the CLEC's end user, not that of the Telco. Telco Reply Comments, pp. 4 and 5.

Additionally, Cablevision maintains that CLEC customers should not be denied the benefits provided by ILECs to their own customers. [*34] Specifically, as CLECs have been required to pay reciprocal compensation for the termination of local calls by ILECs, Cablevision comments that ILEC-expanded local calling areas have given consumers the benefit of a larger community of interest that may be accessed by a local call. Notwithstanding the Telco's unsubstantiated claims of financial loss, Cablevision suggests that the ability to provide their own customers with these same beneficial service offerings also not be denied.

Cablevision further argues that expanded local calling areas offered by CLECs benefit the public by fostering the competitive environment envisioned by the Department. According to Cablevision, many of these consumers now reach their community of interest through free local calls enabled by CLECs' expanded local calling areas. Cablevision concludes that such services are precisely what the Department expected when adopting its local competition policies. Cablevision Comments, p. 3.

Moreover, Cablevision disagrees with the Telco's allegation that its Feature Group A (FGA) arrangement should apply to certain calls terminated with CLECs. In this regard, Cablevision claims that the Telco is seeking to recover [*35] costs for alleged misuse of NXX codes pursuant to a tariff provision, which was not intended to cover such activity. Unless a CLEC explicitly chooses to employ a FGA arrangement, there is no basis for imposing such tariffed rates. Cablevision Comments, pp. 3 and 4.

In reply to the Reopening Notice, Cablevision states that the FCC's exercise of its regulatory authority over ISP intercarrier compensation means that state commissions will no longer have authority to address this issue. Cablevision also states that although state commissions have been preempted on a going forward basis regarding the issue of intercarrier compensation for ISP traffic, the FCC was careful to note that the ISP Order is not intended to apply retroactively. Cablevision suggests that the Department give effect to its prior decisions requiring payment of mutual compensation for ISP traffic in its interpretation of existing contracts that were negotiated against that regulatory background. Cablevision concludes therefore that the FCC's interim compensation mechanism for ISP traffic applies to all new arrangements between carriers while the Department's prior decisions requiring ISP compensation apply to existing [*36] contracts. Cablevision May 25, 2001 Comments, pp. 3 and 4.

Cablevision argues that classifying calls for ratemaking purposes based on the geographic location of end users is simply incompatible with the Department's past efforts and current obligation to encourage competition in Connecticut's local exchange market. The Department's threatened shift in the method by which mutual compensation obligations are determined conflicts not only with its own precedent, but with the decisions of other state public utility commissions, standard industry practice and the pro-competitive goals of the Telcom Act.

Cablevision also argues that the draft Decision is premised on an outdated and inaccurate model of local exchange service based on the legacy networks of incumbents rather than the systems employed by CLECs. Implementation of the proposed scheme would strip CLECs of the flexibility necessary to structure rates so that the efficiencies of their new technologies and their ability to create unique and innovative services are fully exploited. Cablevision maintains that forcing CLECs to choose either to forgo compensation for the use of their networks (and suffer the imposition of affirmative [*37] charges which are completely unjustified by any new costs incurred by ILECs) or to mirror the legacy ILEC technology at substantial and disproportionate cost would constitute a significant step backwards in the Department's progress in increasing competition in the local exchange market. In the opinion of Cablevision, the anti-competitive results of implementing the draft Decision would be sharply amplified by the fact that the disparate impact that the resulting costs would have on CLECs. Cablevision maintains that unlike ILECs, which constructed their ubiquitous networks under a monopoly regime financed under rate of return regulation, CLECs would have to bear the full cost of establishing physical points of presence in each local calling area. Cablevision also maintains that ILECs,

whose networks generally already have the required points of presence, would be able to provide the same service as CLECs currently do at a much lower price, resulting in an immense and unjustified competitive advantage over their competitors. Cablevision argues that such highly anti-competitive results cannot be justified by any countervailing public policy meriting abdication of the Department's pro-competition [*38] mandate. Cablevision May 25, 2001 Comments, pp. 5 and 6.

Cablevision asserts that the draft Decision creates an artificial distinction between FX calls and other local calls that Department precedent does not recognize. Rather than being saddled with a rigid framework defining local calling areas, CLECs have traditionally been granted the clear right under the Department's rules and the Telcom Act to determine their own local calling areas. Recognizing such flexibility to be a competitive imperative, the Department has expressly acknowledged that incumbent providers cannot be allowed to dictate the definition of local service.

Cablevision states that the Department's treatment of local exchange services has been fully consistent with its determination that CLECs must be able to determine what constitutes local traffic for ratemaking purposes in order to ensure a fully competitive market. Cablevision also notes that the Department has expressly defined FX service and has approved tariffs charging local rates when the NPA/NXX code dialed by the originating caller is the same as that of a CLEC customer using a foreign exchange service. Moreover, it has approved interconnection agreements [*39] between SNET and numerous CLECs expressly defining local traffic in terms of the NPA/NXX code assigned rather than by any reference to the physical location of the end-user. Cablevision May 25, 2001 Comments, pp. 6-8.

Cablevision further states that the draft Decision conflicts with Department precedent, and is contrary to the conclusions of other state public utility commissions. Cablevision cites to various state commission orders that demonstrate that foreign exchange calls are local traffic and should be retained. So long as the originating NPA/NXX is identical to the terminating NPA/NXX, Cablevision contends that traffic should be treated as a local call and CLECs should be made whole for the termination of these calls in the form of mutual compensation. Cablevision May 25, 2001 Comments, pp. 8-11.

Additionally, Cablevision argues that the draft Decision conflicts with industry practice and discourages competition. According to Cablevision, approval of the draft Decision would not only impose substantial and unnecessary transaction costs upon the industry as a whole, but would place a disproportionately severe burden upon CLECs and thus confer a significant competitive advantage [*40] on ILECs. Moreover, in order to make the transition required by the draft Decision, Cablevision claims that CLECs would have to "dumb down" their more advanced systems by constructing unnecessary points of presence within each local calling area, thus mirroring the more costly and less efficient ILEC systems. The introduction of such inefficiencies into the FX services market would dramatically decrease competition, thereby increasing the cost of services to consumers and decreasing the quality and variety of available offerings. Cablevision recommends that such results should be avoided.

Cablevision further contends that the ability to recover costs from carriers who need to utilize its network is critical to its ability to make the significant network investments on an economic basis. Cablevision states that in considering the issues of FX service and intercarrier compensation, it is critical that the Department maintain this fundamental premise or else it will jeopardize the continued development of local competition.

Moreover, Cablevision argues that the draft Decision would hinder the market's effective operation by severely limiting CLECs' ability to provide competitive services [*41] to customers requiring larger local calling areas. Cablevision claims that the draft Decision would require CLECs to duplicate the incumbent's network. Cablevision also claims that CLECs currently employ technology that allows them to use only a single switching node per LATA. In the opinion of Cablevision, it is not efficient to force CLECs to duplicate incumbent legacy networks by placing expensive switching equipment in every ILEC designated local calling area where the CLEC wishes to provide service. Cablevision argues that the draft Decision would permit ILECs to continue to provide FX service at local rates while requiring CLECs to either charge its customers toll rates or absorb those costs. This would, in the opinion of Cablevision, confer a significant competitive advantage upon the ILECs and result in less competition for customers who require these services.

Cablevision suggests that the Department only implement its proposed changes in the treatment of FX services upon a clear demonstration of some countervailing public benefit or need for change. Cablevision argues that no such demonstration has been made here. The Department is not, for instance, attempting to bring [*42] regulatory rules into line with actual industry practices. Cablevision maintains that standard industry practice (engaged in by both CLECs and ILECs) is to rate calls by NPA/NXX numbers as the rules currently allow. Cablevision also maintains that the draft Decision will degrade service and transition from an established industry standard and well-settled regulatory scheme to

a new and untested model would impose a wide range of transaction costs upon the industry as a whole, which would ultimately be passed on to consumers.

Furthermore, Cablevision argues that the adoption of the draft Decision would constitute a departure from standard industry practice and result in substantial and unnecessary transaction costs. Because industry practice is to rate calls based upon rate centers designated by NPA/NXX prefixes of the calling and called parties and not by the physical location of those parties, current rating and routing databases such as the Local Exchange Rating Guide are designed to provide the information traditionally necessary to accomplish those goals. According to Cablevision, such systems are not equipped to recognize and use the information that would be required to comply [*43] with the Department's proposed rating regime. Nor are current industry billing procedures capable of handling this new rating regime. Transition to the draft Decision requirements, would in the opinion of Cablevision, require a vast investment of financial resources and time, which may not be possible for many companies in light of current economic circumstances.

Cablevision also claims that significant costs are likely to result from the disruption of a settled legal and regulatory scheme. Cablevision contends that time and money would be wasted as parties renegotiate contracts with other carriers, explain changes in rates to current and future customers, and address the many financial issues accompanying a dramatic change in rate structure.

Cablevision also contends that adoption of the proposed physical location requirement would impose substantial transaction costs upon the industry as a whole and require a regression in technology. Cablevision states that the resulting costs would be passed on to consumers. Cablevision notes that such effects clearly conflict with the Department's long-standing efforts to increase local competition and undermine the pro-competitive goals of [*44] the Telcom Act. Cablevision May 25, 2001 Comments, pp. 11-16.

Furthermore, Cablevision contends that the draft Decision would allow ILECs to impose new and unnecessary costs on competitors. In those cases where the NPA/NXX of the calling and called parties is the same, Cablevision maintains that there is no difference in cost for the ILEC handing off the call at the POI. Cablevision also maintains that the Telco has offered no evidence to the contrary in this proceeding. Cablevision claims that the draft Decision would allow ILECs to impose originating access charges on the CLEC where an ILEC end user makes a call to a CLEC virtual FX customer despite the fact that ILECs would incur no additional costs because the call is terminated to a virtual FX customer. Therefore, Cablevision recommends that the Department revise the draft Decision to ensure that carriers are not forced to compensate other carriers for nonexistent costs.

Moreover, Cablevision argues that services that provide for local calling are not intraLATA toll services. While noting that the Telco will route calls to a CLEC virtual FX subscriber over its own facilities, Cablevision contends that the call is not delivered [*45] to the end user's presubscribed intraLATA toll carrier. Cablevision also notes that the draft Decision would allow an ILEC to charge the CLEC offering virtual FX service as if it were acting as an intraLATA toll provider. In the opinion of Cablevision, this creates a false distinction between virtual FX service and other types of local service.

Cablevision claims that under the draft Decision, calls to a CLEC virtual FX customer would be considered intraLATA toll for purposes of intercarrier compensation. However, for all other purposes, the call would remain local (i.e., the ILEC would route the call over local interconnection facilities, handle the call under its end user's local calling plan, and decline to impose toll charges on the customer). Cablevision asserts that the draft Decision's requirement that access charges be assigned is inconsistent with the costs incurred in routing the call and the treatment of the call by the ILEC for its own purposes. Cablevision maintains that there is no distinction between virtual FX service and any other local service in terms of the transport burden on the ILEC. Consequently, there is no economically rational reason to apply originating [*46] access to these calls.

Additionally, Cablevision argues that FGA originating access charges are not applicable to local calls. Originating access charges are to be paid by an interexchange carrier to compensate an exchange carrier for obtaining access to the local facilities to originate or terminate an interexchange call. Cablevision states that the ILEC is not providing an access service by delivering a local call to the POI nor is the CLEC acting as an interexchange carrier simply by virtue of terminating this type of call. The only intercarrier service being provided when an ILEC end user makes a call to a CLEC virtual FX customer is the termination of that call by the CLEC. Cablevision contends that ILECs should not be permitted to charge CLECs for a service they are not purchasing.

Lastly, Cablevision notes that the draft Decision re-classifies as toll, a type of traffic historically viewed as local and would require CLEC's to purchase switched access in order to provide a local service. Such a requirement is not only inconsistent with standard industry practice, but also with FCC rules which provide that a LEC may not assess charges on any other telecommunications carrier [*47] for local telecommunications traffic that originates on the LEC's network. In the opinion of Cablevision, an ILEC has no more right to assess originating access charges on virtual FX calls than it does on any other local call. Cablevision May 25, 2001 Comments, pp. 16-20.

### C. COX CONNECTICUT TELCOM, L.L.C. (COX)

Cox claims that the Telco's continued characterization of the service provided by its competitors as Virtual Foreign Exchange Service is misleading. According to Cox, regardless of whether it is an accurate characterization of CLEC service offerings, one benefit of competition is to bring services to the marketplace which are either completely new or are enhancements of the functions or applications of existing services. In the opinion of Cox, whether these services are worthwhile will be tested in the market and therefore, the Department need not involve itself.

In the event the Department accepts the Request, Cox suggests that innovators will have to account for another set of costs and risks associated with surviving the regulatory gauntlet, which the Company will be able to easily trigger by filing a simple petition with the Department. Accordingly, Cox recommends [*48] that the Department not support the Telco's attempts to dictate the service offerings of its competitors nor allow the Company to control the competitive marketplace.

Cox also disagrees with the Telco's claim that FX service is not a local service. In the opinion of Cox, the Telco has shown no compelling reason to change the classification of such service. Accordingly, Cox recommends that the Department deny the Request. Cox Reply Brief, Docket No. 99-01-15, pp. 3 and 4.

Relative to the Telco's request that CLECs be ordered to use POTS trunks only for the passage of authorized traffic or to allow the Company to block improperly routed traffic, Cox maintains that if approved, such a request would result in calls not being completed if the Telco unilaterally declares the traffic to be of an "unauthorized" type. Cox states that through the Request, the Telco is asking the Department to indemnify Company for blocking traffic and not completing calls. Cox also states that the Telco is unwilling to risk this situation without such indemnification because it is concerned about its obligations under various interconnection agreements.

Additionally, Cox states that the types of traffic, which [*49] can be routed over POTS Trunks and any other type of trunk group, are identified in the Telco/CLEC interconnection agreements. These agreements in the opinion of Cox provide specific avenues of recourse, if either party abrogates the agreement including problem identification, notification, a correction period, subsequent negotiation and arbitration. The agreements also provide the parties the right to appeal to the Department and, if needed, to the FCC or federal court if the dispute resolution procedures contained in the agreement do not lead to resolution. Cox claims that to the best of its knowledge, the Telco has not taken these steps with any party in this docket. Instead, the Telco is attempting to have the Department override approved interconnection agreements through regulatory action. Cox suggests that the Department avoid becoming involved in this issue and instead refer the Telco to the processes contained in its interconnection agreements and dismiss the Request. Cox Reply Brief, pp. 4-6.

In response to the Reopening Notice, Cox states that to the extent the primary problem the instant docket was initiated to resolve (i.e., excessive ISP traffic and resulting large [*50] reciprocal compensation payments to CLECs), the FCC's ISP Order addresses and resolves this issue. The FCC has exercised its exclusive jurisdiction over the issue and established an interim recovery scheme and implemented a transition towards a permanent bill-and-keep recovery mechanism that dramatically curtails ISP-related payments and establishes definitive limits on intercarrier compensation for ISP traffic. Cox therefore concludes that the Department does not need to further address this issue.

Moreover, Cox argues that the draft Decision supports an outdated network design and forces into the inherent constraints of that legacy network the forward-looking technology available today. Therefore, Cox concludes that the draft Decision supports the worst combination of technology and network architecture.

Regarding the status of competition in Connecticut, Cox comments that the CLEC industry as a whole has continued to suffer significant setbacks, both in access to capital and in the marketplace. While Cox has had some success in Connecticut, it claims that it is a challenge when competing with the Telco's existing and ubiquitous network. Cox states that the realities of the new [*51] capital markets, as well as the FCC's recent actions regarding intercarrier compensation and access charges, have hampered the growth of the CLEC industry as a whole across the country. Cox

recommends that the Department bolster, and not minimize as the draft Decision does, its longstanding public policy in favor of the development of sustainable local exchange competition and facilities-based offerings that differ significantly from those of the incumbent.

Additionally, Cox continues to oppose reliance on physical location of the originating and terminating end-users to determine rating and routing of calls. Cox also urges the Department to consider the negative impact of establishing a call rating and billing regime that is contrary to and not supported by longstanding national industry practice as well as the back office operations of virtually all carriers. Cox notes that if the draft Decision is adopted unchanged, it would have unintended but very real negative operational and financial consequences.

Further, Cox urges the Department to reject the application of an access charge regime to FX calls. Cox contends that in do so would defeat the utility to consumers and the specific [*52] benefits of FX service. Access charges are inapposite to this type of local traffic. Cox notes that the Telco does not treat FX calls as appropriate for access charge payments. Therefore, Cox recommends that the Department clarify that it is not trying to superimpose the access charge regime on the local traffic at issue. Cox May 25, 2001 Comments, pp. 3-6.

**D. GLOBAL NAPS, INC.**

Global Naps, Inc. states that the issues in the instant proceeding are affected by recent changes in federal law regarding intercarrier compensation, and by re-affirmations of existing law regarding physical interconnection arrangements. GNAPs suggests that the Department take account of the ISP Order and Compensation Regime Order.

GNAPs also states that ILEC networks have evolved over many decades reflecting the cumulative results of decisions regarding technology deployment, regulatory conditions, and the retail market, all made at times when technology, regulatory and market conditions were very different than they are today. GNAPs notes however, that CLECs entering a market will have little interest in these "legacy" considerations as they will be focused on what technology makes possible today; [*53] what customers want today; and what regulations permit or require today. According to GNAPs, this means that ILECs and CLECs will necessarily approach issues such as those addressed in this proceeding from very different perspectives.

GNAPs maintains that the draft Decision appears to support the Telco's natural, monopolistic effort to force CLECs to conform to the Company's monopolistically established local calling areas by forcing them to establish multiple POI. GNAPs also maintains that the draft Decision would subject CLECs competing with the Telco to draconian measures through the payment of monopolistically priced access charges, any time calls between the Company and CLEC subscribers connect points not within the same Telco local calling area.

GNAPs argues that the only way that a CLEC could compete on the basis of larger inward or outward calling areas would be to establish multiple physical interconnections with the Telco based on its calling areas. GNAPs asserts that the FCC has made clear CLECs are not required to establish more than a single POI per LATA. In that same ruling, the FCC also made it clear that it is the responsibility of the ILEC to get ILEC-originated [*54] traffic to that single, LATA-wide POI.

GNAPs contends that the logic of the draft Decision seems to be that CLECs should pay the Telco for the privilege of having such a statewide POI. In accordance with FCC rules, all traffic bound for CLEC customers from the ILEC will have to be carried by the ILEC to that POI, at the ILEC's expense. In these circumstances, it makes no cost difference whatsoever to the Telco where the customer receiving the incoming call might be. The cost to the Telco of bringing the traffic to the POI is identical if the customer is located across the street from the POI or across the entire state from the POI. GNAPs maintains that despite the lack of any cost difference, the draft Decision would classify this traffic, for intercarrier compensation purposes, radically differently. In some cases, the Telco would owe the CLEC reciprocal compensation; in others, the CLEC would owe the Telco access charges. Charges that radically exceed the Telco's cost of transport.

In the opinion of GNAPs, this makes no sense in competitive terms. For competition to flourish the exchange of traffic between LECs should be based on considerations of forward-looking cost and, in cases [*55] where cost responsibility is debatable, of what would do the most to promote the development of competition. GNAPs maintains that this result is fostered by the FCC's rules which contemplate a single CLEC POI per LATA, with cost responsibility on the ILEC to bring CLEC-bound traffic to that POI. GNAPs comments that the assumptions underlying the draft Decision were contrary to those rules. Specifically, the draft Decision assumes that CLECs have cost responsibility for bringing (i.e., should pay the ILEC to bring) ILEC-originated traffic from ILEC-established monopolistic local calling

areas back to the CLEC's network. GNAPs argues that these assumptions cannot be squared with the FCC's rules. GNAPs May 25, 2001 Comments, pp. 2-6.

GNAPs also states that one of the real-world concerns underlying the draft Decision is the treatment for intercarrier compensation purposes of calls end users make to ISPs. According to GNAPs, the FCC has previously ruled that ISP-bound traffic is a new type of service under § 251(g) of the Telcom Act and that compensation for this service is not governed by § 251(b)(5) of that act. Additionally, this is an interstate service and compensation for it is [*56] governed by the FCC, under Section 201. GNAPs therefore concludes that the FCC preempted future exercise of state jurisdiction over this issue and that this has several implications for the draft Decision. For example, since the FCC has ruled that this is interstate traffic, not subject to § 251(b)(5) of the Telcom Act, it would seem unusual for the Department to require carriers engaged in this interstate activity to establish multiple POIs based on entirely intrastate local calling areas, or to incur costs for failing to do so. In this regard, the FCC has held that the rules for physical interconnection under Section 251(c) of the Telcom Act and the rules under which a single POI per LATA is all that is required, still apply to ISP-bound traffic. GNAPs comments that to require multiple POIs for the receipt of ISP-bound traffic seems to fly directly in the face of federal law.

Furthermore, GNAPs contends that the FCC's decision suggests that state commissions may even face some preemption of their authority over reciprocal compensation rates for all other types of traffic where the ILEC avails itself of the FCC's new ISP-bound calling rate caps. GNAPs attributes this to the ISP [*57] Order wherein the FCC adopted a new so-called "mirroring rule" that establishes rate caps for ISP-bound traffic only if an ILEC offers to exchange all traffic subject to section 251(b)(5) of the Telcom Act at the same rate. GNAPs claims that in those cases when an ILEC adopts the rate caps from the ISP Order, the FCC has, in effect, preempted state authority to order any other rates for all other types of traffic. Thus, the price the ILEC must pay for taking advantage of the rate caps is a statewide election to apply these caps to all traffic. Accordingly, GNAPs concludes that because it no longer has authority to address questions of intercarrier compensation for ISP-bound traffic, and because there is at least some question of whether the Department also has authority over other rates (where ILECs have adopted the FCC's rate caps), the underlying policy and factual assumptions of the draft Decision are no longer valid.

Moreover, GNAPs suggests that the FCC's ruling undermines the draft Decision's assumptions about the nature of local calling areas and "local" and "non-local" services because the FCC has ruled that the determination of whether a call is "local" is no longer relevant [*58] to the question of intercarrier compensation. Additionally, the FCC has expressly determined that ISP-bound traffic is a new type of service, so-called "information access," that the Department did not consider in issuing the draft Decision.

On the basic question of what constitutes a local versus a toll call, GNAPs suggests that the distinction is entirely related to retail marketing considerations and has nothing to do with intercarrier compensation and interconnection arrangements between LECs under the Telcom Act. In this regard, GNAPs refers the Department to the definitions of "telephone exchange service" and "telephone toll service" included in *47 U.S.C. § 153*, subsections (47) and (48). GNAPs states that essentially, all that matters is that the service be covered by the exchange service charge, (i.e., the customer pays a local rate for what the customer gets). Conversely, GNAPs claims that "telephone toll service" is simply calling between exchanges for which there is a "separate charge not included in" the charge for "exchange service" (i.e., toll service is any telephone service for which the customer pays a toll charge).

GNAPs believes [*59] that the above definitions properly emphasize the artificial nature of the toll-local distinction (i.e., there is no inherent way to determine that a call should be treated as "local" or "toll"). While acknowledging that in a monopoly environment, this is a regulatory decision, GNAPs suggests however, that in a competitive environment, that distinction should be made by competing carriers on the basis of competitive considerations. That is, the incumbent must not be permitted to impose its view of what constitutes "local" versus "toll" calls on its competitors, either in so many words or by the economically coercive means of imposing monopolistic, non-cost-based access charges on whatever calls it happens to designate as "toll." According to GNAPs, that would have been the effect of the draft Decision. GNAPs May 25, 2001 Comments, pp. 6-10.

Regarding those areas the Department was seeking written comments in the Reopening Notice, GNAPs states that the Department should embrace changes in technology that support a more robust competitive environment in the local exchange market, even if such changes require the withdrawal of its draft Decision. GNAPs cites to the continuing decline [*60] in the cost of fiber transmission that allows carriers to offer ever-greater transmission capabilities is a significant technological change. This has several effects, directly and indirectly relevant to the issues in this proceeding.

It is for this reason that GNAPs disagrees with the Telco that there is any significant cost burden associated with delivering traffic from its various local calling areas to a CLEC's single statewide POI. In the opinion of GNAPs, the Telco's arguments to the effect that CLECs should be forced to build new, incremental facilities at great expense to carry (initially) small volumes of traffic when the Telco can carry that traffic efficiently for incremental costs close to zero amount to nothing more than a desire to impose inefficient costs and network arrangements on its competitors. GNAPs suggests that the Department reject any effort to assist the Telco in achieving that goal.

GNAPs also states that the declining cost of fiber transmission makes it inappropriate to charge a CLEC an access charge for traffic exchanged with the Telco. According to GNAPs, access charges have historically been set at levels far above cost in order to provide an implicit [*61] subsidy to local rates. There is no logical policy basis to impose such subsidies on competing carriers under the pro-competitive regime of the Telcom Act, if it is even legal to do so under the mandate of Section 254 of the Telcom Act that subsidies be made explicit and collected in a competitively neutral way.

GNAPs concludes that the Telco has benefited from the major advances in fiber optic technology to the point where the underlying cost of a call that the Telco defines as "local" is virtually identical to that for a call that the Telco defines as "toll." Yet, the Telco has preserved both the local/toll distinction and the preexisting toll price levels in its retail tariffs, denying Connecticut consumers the opportunity to themselves share in the very same technological gains.

GNAPs maintains that competition will correct this situation, if it is allowed to flourish. GNAPs notes however, that the draft Decision if approved, will insulate the Telco from CLEC attempts to compete via different local calling arrangements, by forcing them to conform to the Company's existing retail pricing regime. That is, CLECs can not offer LATA-wide local calling without paying originating access [*62] charges to the Telco, despite the fact that the costs of transporting such calls are no longer related to the geographic calling area boundaries the Telco seeks to maintain. GNAPs claims competitors and Connecticut's consumers are disserved when such protection is afforded uniquely to the Telco.

Accordingly, GNAPs recommends that the Department encourage competitors to develop innovative pricing and service offerings that capture the full extent of the ongoing breakthroughs in fiber optic technology, and by extension, expand the scope of competitive choices available to Connecticut consumers. GNAPs May 25, 2001 Comments, pp. 10-13.

In addition, GNAPs claims that the draft Decision would preclude CLECs from offering the same type of statewide local access currently offered by the Telco. GNAPs states that it is common for ILECs to offer end user customers statewide local calling access to the Internet via the very types of FX-like service arrangements that the draft Decision would economically foreclose CLECs from providing.

GNAPs contends that this is the same type of service arrangement that many CLECs have attempted to offer their ISP customers but would be foreclosed by the draft [*63] Decision. GNAPs states that unless SNET Internet actually maintains a physical presence (e.g., in the form of a server) in each of the thirteen communities in which it maintains a local telephone number, then there will be cases where the physical point of origination of a call to SNET Internet will not physically terminate within the same local calling area as the point of origination. CLECs have been attempting to provide the very same type of FX-like services to its ISP customers that the Telco apparently provides to its own ISP. GNAPs maintains that instead, CLECs are responding to the economic and competitive dictates of the local exchange market and to the Telco's own practices with respect to SNET Internet Service. Specifically, CLECs are trying to offer local calling throughout an entire LATA as a means of offering competitive benefits (and choices) to consumers.

GNAPs further argues that FX-like service offerings are beneficial because they allow a CLEC to offer local calling throughout a LATA without having to install multiple POIs in every local calling area. Using next generation switching equipment, CLECs and ILECs can serve wide geographic areas from a single switch. [*64] CLECs must serve as wide an area as possible from a single switch to obtain the economies of scope and scale necessary to sustain their investment in these new technologies. Because of the greater capabilities of next generation facilities, CLECs can implement network architectures that are far more efficient than networks built ten or even five years ago. Accordingly, these technological advances allow CLECs to offer more services at lower costs. GNAPs May 25, 2001 Comments, pp. 13-15.

Lastly, GNAPs claims that Connecticut continues to trail other nearby states with respect to the extent of CLEC activity. Citing a recent FCC report, GNAPs states that as of December 2000, the Telco served 94% of the end-user lines in Connecticut. The 6% CLEC share of the Connecticut market is well below the 11% extant in Massachusetts or

the 20% in New York. According to GNAPs, the Telco has no specific incentive to affirmatively work to accommodate the needs of its rivals. Therefore, GNAPs recommends that the Department not accede to the Telco's demands that its retail local and toll pricing structure be protected from CLEC encroachment. GNAPs May 25, 2001 Comments, pp. 15 and 16.

### E. LEVEL 3 [*65] COMMUNICATIONS, LLC

Level 3 argues that the FCC ruled in the ISP Order that traffic to ISPs was excluded from the requirements of § 251(b)(5) of the Telcom Act. Level 3 notes however, that in this ruling, the FCC, determined that its decision was prospective only. In the ISP Order, states can no longer address the issue of intercarrier compensation for ISP-bound traffic. Therefore, on a going forward basis, the sole authority to address all questions relating to compensation for the exchange of ISP-bound traffic rests with the FCC. Level 3 also claims that the ISP Order does not distinguish "local" ISP-bound traffic from "non-local" ISP-bound traffic, making the issue of whether ISP-bound traffic using virtual NXX arrangements is "local" or "non-local" moot. All ISP-bound traffic falls within the scope of the FCC's preemption ruling, including traffic to ISPs using virtual NXX arrangements.

Additionally, Level 3 cites to the Compensation Regime Order wherein the FCC has identified the use of "virtual central office codes" as an issue to be resolved in its rulemaking proceeding on a unified intercarrier compensation regime. Therefore, the issue of the proper regulatory treatment [*66] of virtual central office codes will be addressed by the FCC. Because the FCC is now considering the issues at the heart of this proceeding, and because the FCC has preempted the authority of this Department to issue a ruling regarding intercarrier compensation for ISP-bound traffic, Level 3 suggests that it would be inappropriate for the Department to issue a prospective ruling in this proceeding. Level 3 May 25, 2001 Comments, pp. 2 and 3.

Nevertheless, Level 3 notes that the Department retains the authority to resolve the issue of the payment of reciprocal compensation for ISP-bound traffic using virtual NXX arrangements for the period of time prior to the ISP Order. Level 3 recommends that the Department rule that ISP-bound traffic exchanged previously using virtual NXX arrangements is subject to reciprocal compensation obligations. According to Level 3, the ISP Order supports the conclusion that traffic rated as retail local traffic is eligible for reciprocal compensation in the intercarrier context, as do recent decisions from other states.

Level 3 claims that the FCC viewed in its ISP Order whether ISP-bound traffic should be considered local for purposes of section 251(b)(5) [*67] of the Telcom Act, in light of the enhanced service provider (ESP) exemption, by which the FCC has permitted information service providers at their option to be treated for compensation purposes (but not for jurisdictional purposes) as end users. Level 3 also maintains that the FCC's approach in the ISP Order is consistent with its earlier determination that its policy of treating ISP-bound traffic as local for purposes of interstate access charges would, if applied in the separate context of reciprocal compensation, suggest that such compensation is due for that traffic. Level 3 recognizes that the Department is not revisiting its Decision that reciprocal compensation is owed for ISP-bound traffic where the end user and the ISP are physically located within the same local calling area. Rather, the ISP Order supports a determination that reciprocal compensation for ISP-bound traffic using virtual NXX arrangements is appropriate.

Furthermore, Level 3 maintains that this approach is also consistent with decisions recently reached by other state commissions. Level 3 concludes that these decisions, considered together with the FCC's acknowledgment in the ISP Order that traffic "subject [*68] to local rates" is eligible for reciprocal compensation, are persuasive authority for the Department to rule here that reciprocal compensation is owed for virtual NXX traffic to ISPs exchanged prior to the ISP Order. Level 3 May 25, 2001 Comments, pp. 3-7.

Moreover, Level 3 maintains that the ISP Order and Compensation Regime Order make clear that the FCC seeks to drive all intercarrier compensation rates to cost and eliminate subsidy-ridden access charges. Citing the CALLS Order issued in June 2000, n12 and the reduction in reciprocal compensation rates nationwide, Level 3 contends that it is clear that the trend in the industry is toward low, cost-based intercarrier compensation rates. Level 3 argues that it makes no sense to subject ISP-bound traffic to an antiquated access charge regime. Level 3 also argues that the Telco should not be allowed to impose a rate structure that has nothing to do with the costs it incurs in performing the underlying function at a time when regulators and the industry are taking steps to bring rates closer to cost. In the case of originating virtual NXX calls, there is no additional cost associated with originating a virtual NXX call as opposed to [*69] originating any other locally-dialed call. Level 3 claims that there is no additional cost because the Telco carries the locally-dialed call the same distance (to the POI with the CLEC) and incurs the same costs (in terms of local

interconnection facilities used) regardless of the physical location of the customer to whom the call is placed. The Telco's obligations and costs, according to Level 3, are the same in delivering a call originated by one of its customers, regardless of whether the call terminates at a so-called "virtual" or "physical" NXX behind the CLEC switch. Level 3 therefore concludes that the imposition of additional per-minute charges for originating a locally-dialed call to certain kinds of CLEC customers is arbitrary.

n12 *Access Charge Reform, CC Docket No. 96-262, Sixth Report and Order, 15 FCC Rcd 12962 (2000)* (CALLS Order).

Level 3 also comments that under the Telco's proposal, it would receive access charges from terminating carriers while it would continue to rate virtual NXX traffic as local traffic for retail purposes. Level 3 asserts that there is no rational basis to route virtual NXX traffic as local traffic, rate it [*70] as local traffic for retail purposes, but treat it as interexchange traffic solely for the purposes of compensating the Telco. Level 3 May 25, 2001 Comments, pp. 7 and 8.

Finally, Level 3 recommends that the Department consider the implications of mandating that smaller carriers with fewer resources implement the same kinds of changes to their systems, particularly when the changes would affect only the intercarrier compensation side of the billing environment. Level 3 also counsels that the Department be wary of directing the entire industry to deploy the kinds of changes in billing systems necessary to identify and segregate FX and virtual NXX calls from other locally-dialed calls without a more thorough understanding of the costs and processes and the impact they could have on competitive entry, associated with making such systems changes. Citing to the Compensation Regime Order, Level 3 notes that the FCC is already considering the use of virtual central office codes in its intercarrier compensation proceeding, so whatever changes to carriers' billing systems that could result from that proceeding may have to be undone when the FCC completes its review. Level 3 May 25, 2001 Comments, [*71] pp. 8 and 9.

## F. PAETEC COMMUNICATIONS, INC.

According to PaeTec, ILECs have sought to degrade the competitive carriers' ability to be compensated for ISP-bound traffic in every possible forum, including before Congress, the FCC, and state commissions. PaeTec states that the FCC has sought to address in its ISP Order, certain market concerns under the current intercarrier compensation regime for ISP-bound traffic, while at the same time seeking to avoid a "flash cut" that would upset the legitimate business expectations of carriers and their customers. In so doing, the FCC considered the concerns of the ILECs and competitive carriers, and sought to balance those considerations in promulgating its rules. PaeTec also states that the FCC ultimately decided to issue its Compensation Regime Order to examine the universe of issues related to intercarrier compensation, and to adopt interim reciprocal compensation rules during the pendency of that proceeding.

PaeTec notes that in its ISP Order, the FCC adopted a reciprocal compensation cap on ISP-bound traffic of $ .0015 for the first six months after the effective date of the order, an amount that decreases periodically until it is [*72] ultimately completely phased-out after three years. In addition to the rate cap, the FCC capped the total number of ISP-bound minutes for which a LEC may be compensated and adopted a presumption that traffic delivered to a carrier that exceeds a 3:1 ratio is ISP-bound traffic. PaeTec May 25, 2001 Comments, pp. 2 and 3.

PaeTec also notes that the ISP Order while not preempting any state commission decision regarding compensation for ISP-bound traffic for the period prior to the effective date of the interim regime, rescinds the authority state commissions possessed to address this issue. PaeTec states that the implications of the ISP Order are clear. Specifically, the Department no longer has the authority to adopt a compensation scheme for ISP-bound traffic as such action has been preempted by the FCC. PaeTec states that to the extent that the Department's draft Decision implicates compensation for ISP-bound traffic, it cannot be adopted. PaeTec also contends that the Department does not have the authority to impose access charges on such traffic because of the preemptive action taken by the FCC and its long established access charge exemption on ISP-bound traffic.

Additionally, [*73] PaeTec suggests that the ISP Order, coupled with the Compensation Regime Order may preempt further state action with respect to voice-grade foreign exchange traffic. PaeTec asserts that it is a well settled principle of law that even where there is no express statutory statement ousting state law from a given area there may be an implied preemption and courts should infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the states to supplement federal law. PaeTec states that in this instance, the FCC has delegated authority over these matters and has not only issued an order expressly preempting further state

action with respect to reciprocal compensation for ISP-bound traffic, but has also instituted a rulemaking proceeding to investigate intercarrier compensation issues generally, including voice grade traffic, leaving little if any room for the Department to further regulate in this area. PaeTec suggests that at a minimum, any further regulation by the Department would be unnecessary. PaeTec May 25, 2001 Comments, pp. 3-5.

PaeTec maintains that should the Department adopt any aspect of its draft Decision, it [*74] would clearly be a departure from the its past policies, including the Decisions holding that competitive carriers are free to define their own local calling areas and that reciprocal compensation must be paid on ISP-bound traffic. n13 PaeTec states that it is well settled that any decision by an administrative agency affecting the substantive rights of a party may have prospective effect only. CLECs such as PaeTec have designed their networks and business plans around the rules and regulations of the Department. Foreign exchange traffic has always been treated as local traffic by the Department and by the Telco in the past, and CLECs for several years have relied on the Department's decision that they are free to define their local calling areas in the manner they see fit. PaeTec argues that if the Department were to now deny it compensation, which it has expected, PaeTec could incur a substantial loss that neither PaeTec nor its investors and shareholders have anticipated.

> n13 Verizon asserts that nothing in the draft Decision precludes CLECs from setting any local calling area boundaries that they wish to set for purposes of determining the usage charges to be paid by their own retail customers for calls that those customers originate. Specifically, the draft Decision does not prevent any carrier, if it wishes to do so, from continuing to allow its customers to call ISPs (or any other virtual FX customers) on a local, flat-rated basis. Verizon July 2, 2001 Reply Comments, p. 3. [*75]

Furthermore, in citing to the ISP Order, PaeTec argues that the FCC went to great lengths to ensure that the reasonable business expectations of competitive carriers were not upset by the FCC's change of course on reciprocal compensation. According to PaeTec, the reason the FCC adopted its three year transition period was to ensure that carriers that have relied on the FCC's past decisions have time to adjust their business plans to accommodate for the new reciprocal compensation rules, and to allow new entrants to modify their business plans accordingly. PaeTec May 25, 2001 Comments, pp. 5 and 6.

PaeTec states that it is one of the few facilities-based CLECs operating in Connecticut and has no guarantees that it will succeed in the Connecticut market. PaeTec claims that if the draft Decision is adopted by the Department, not only will it be unable to recoup some of its enormous up-front capital expenditures it incurred in deploying its telecommunications infrastructure, but it would also be required to pay the Telco originating access for foreign exchange traffic. Such an approach in the opinion of PaeTec, would fly in the face of the Department's stated objective of promoting [*76] competition in the Connecticut local exchange market. PaeTec maintains that given the additional costs that it will incur, it is unclear whether PaeTec will continue to be able to compete in price with the Telco, and thus be able to attract customers successfully. Moreover, adoption of the draft Decision would certainly deter future new entrants from entering the Connecticut local exchange market, as they would be facing an insurmountable barrier to entry. PaeTec concludes that adoption of the draft Decision could eviscerate competition in Connecticut. PaeTec May 25, 2001 Comments, pp. 6 and 7.

### G. PRISM OPERATIONS, LLC (PRISM)

Prism maintains that the Request is based on unsubstantiated allegations and is an attempt to revisit the Decision in Docket No. 97-05-22 that mutual compensation applies to ISP traffic. Accordingly, Prism urges that the Department reject the Request because it is without merit and contrary to the public interest.

Prism also states that the Telco has failed to provide specific instances of the alleged improper billing and accounting practices of switch-based CLECs. According to Prism, the Telco's request that it be entitled to originating access under [*77] its Connecticut Access Tariff is not within the Department's authority and is contrary to the FCC rule that exempts Internet and other information services from interstate access charges. Moreover, to the extent that the Telco has concerns with carriers regarding mutual compensation, Prism argues that such disputes are more appropriately addressed through the dispute resolution process or through procedures established under carriers' interconnection agreements. For these reasons, Prism urges the Department to reject the Request and await the FCC's rulemaking on inter-carrier compensation for ISP-bound traffic. Prism March 26, 1999 Letter, pp. 1 and 2.

### H. RCN TELECOM SERVICES OF CONNECTICUT, INC. (RCN)

RCN argues that the Telco wants the Department to address whether the practice of obtaining local exchange service numbers associated with numerous local calling areas and then assigning those local numbers to ISPs is acceptable to the Department. RCN contends that the practice is not only acceptable, it is lawful, reasonable, and encourages the development of local competition and promotes the interests of consumers. For these reasons, RCN recommends that the Department deny [*78] the Request.

RCN notes that none of the scenarios used by the Telco to describe what it believes is a problem in Connecticut actually explains the principal issue raised by the Request. According to RCN, these scenarios are actually nothing more than distractions to the principal issue in this case. RCN concludes that the Telco is as as culpable as CLECs for whatever improprieties that the Company contends CLECs have perpetrated, and any examination of CLEC practices must also include an examination of the Telco's practices. RCN Comments, pp. 2-4.

RCN also argues that the practice of providing ISPs with local telephone numbers in numerous local calling areas, aggregating that traffic at a single switch, and then transporting and terminating that traffic to a single point of presence, is completely legal and proper. All such traffic originated by the ISPs' end users is appropriately classified and treated as local traffic and subject to all obligations of local traffic, including the payment of reciprocal compensation by the originating carrier to the terminating carrier. RCN concurs with the Telco that the key to determining whether a call is local or toll is an examination of the [*79] NXX of the called number. If the called number bears an NXX associated with a particular local calling area, calls to that NXX from within the local calling area are local calls. RCN maintains that the critical issue is whether the call is to a number with an NXX associated with a local calling area. Other factors, such as the geographic location of the particular customer equipment that actually answers the call, are not part of the inquiry. In the opinion of RCN, local exchange calls to numbers with NXXs associated with the caller's local calling area are local calls. RCN Comments, pp. 4 and 5.

Additionally, RCN maintains that each of the Telco's arguments supporting the Request is lacking in substance, reason, and legal basis. RCN also disagrees with the Telco suggestion that the practice of providing telephone numbers for locations where an ISP does not have a physical presence imposes costs on the originating carrier that are unrecouped, and as a consequence, network infrastructure suffers. RCN assumes that under every interconnection agreement with CLECs that the Telco has an obligation to deliver all traffic placed by one of its subscribers and directed to an end user served [*80] by a CLEC to a point of interconnection with the CLEC. According to RCN, the CLEC has the obligation to transport the traffic handed to it by the Telco and terminate the traffic to the end users the CLEC serves. As a result, the Telco has installed trunks from its tandem switch, or from high volume end offices, directly to the point of interconnection with the CLEC. RCN states that all traffic, regardless of the actual geographic location of the called party, is handled in exactly the same fashion whether the call terminates next door to the calling party or 50 miles from the calling party. Therefore, RCN concludes that the costs that the Telco incurs to transport the traffic to the CLEC are identical whether the call is local or toll, and that the Telco's costs are not relevant at all in this proceeding. RCN Comments, pp. 6 and 7.

RCN also disagrees with the Telco's argument that the practice of providing telephone numbers for locations where an ISP does not have a physical presence blurs the boundaries between local traffic and toll traffic. RCN understands the Telco's argument to mean that the distinction between local and toll is blurred by a CLEC providing a local exchange service [*81] to an ISP that supplants an existing toll service. According to RCN, that argument has no merit because if ISP end users were required to make a toll call to access its ISP, the typical consumer simply would not make the call. Instead, end users would find another ISP that had a local calling number. Therefore, no toll traffic is displaced by the CLEC service in question. Rather, it augments a consumer's local exchange service options and provides for more efficient operations of competitive ISPs. RCN Comments, p. 7.

Additionally, RCN disagrees with the Telco's argument that the provision of a Local Node provides an unwarranted competitive advantage to CLECs. RCN contends that incumbents see unwarranted competitive advantages at every turn. Yet there can be no unwarranted competitive advantage when the Telco provides a substantially similar service as the CLEC. RCN claims that it appears that the Telco would like to reserve for itself any competitive advantage it holds by the provision of Internet Multipath Service to ISPs. RCN also contends that such a result cannot be accepted by the Department. RCN Comments, p. 8.

Moreover, RCN believes that the Telco's argument that CLEC provision [*82] of a Local Node service to ISPs discourages infrastructure enhancements and reduces the public benefits of competition is hard to understand. Noting that the Telco incurs the same costs to transport its portion of Local Node traffic whether the traffic is rated as toll or local, RCN maintains that other than the preservation of toll charge subsidies, the Telco should be indifferent to where

the CLEC terminates the traffic. In the opinion of RCN, if there were a disincentive to enhance the network, the same disincentive would exist for any competitive service provided by a CLEC.

Accordingly, RCN recommends that the Department reject the Request. In the opinion of RCN, CLECs should have no obligation to duplicate the network design of incumbent carriers. RCN also states that a competitive telecommunications policy should encourage the efficient deployment of facilities and services. Local Node represents one such highly efficient service because it permits ISPs to have local calling numbers throughout a region while avoiding the deployment of numerous modem banks and gateway servers. RCN states that in many cases, the Local Node service allows an ISP to provide services in local calling [*83] areas where the number of users or the volume of traffic would not justify the expense of deploying facilities. Additionally, it permits CLECs to aggregate traffic and transport and terminate traffic to ISPs without the deployment of unnecessary trunking facilities. Local Node Service also permits Connecticut residents to have numerous competitive choices between ISPs while ensuring that they will always be able to make a local call to access the Internet. RCN claims that all of these efficiencies have also been recognized by the Telco, resulting in deployment of its Internet Multipath Service. In the opinion of RCN, Local Node service is an efficient, forward-looking, competitive service that provides significant benefits to Internet users in Connecticut. RCN Comments, pp. 8-10.

RCN concludes that the provision of Local Node service to ISPs is an efficient way to maximize the geographic coverage of an ISP's service area while minimizing the cost of facilities to provide that service. RCN contends that the Telco also recognizes these efficiencies, and it has deployed its Internet Multipath Service exclusively to ISPs. RCN maintains that the Department should also recognize the efficiencies [*84] of the Local Node service and reject the Request to order CLECs to cease and desist from providing the service to ISPs. RCN Comments, p. 10.

## I. SOUTHERN NEW ENGLAND TELEPHONE COMPANY

The Telco filed its Request because CLECs in Connecticut are accounting for and/or billing the Company local mutual compensation for terminating non-local calls by unilaterally assigning telephone numbers to end users from NPA/NXX codes that make the calls appear local to the Telco. According to the Telco, CLECs are transporting and terminating calls to CLEC end users located outside of the originating Telco end user's LCA. This billing practice is inconsistent with the Decision in Docket No. 94-10-02 and the interconnection agreements between the Company and CLECs. The Telco states that subsequent to filing its Request, it discovered that CLECs were also misusing the POTS trunks and dumping a variety of other unauthorized traffic. In the opinion of the Telco, both virtual FX and other unauthorized traffic violate the Department's mutual compensation plan.

The Telco argues that when it builds interconnection facilities between itself and a CLEC's switch(es), it expects to recover the cost of the [*85] facilities pursuant to the requirements of the Telcom Act and its interconnection agreements. The Telco also expects and relies on CLECs to follow the provisions of the Telcom Act and interconnection agreements by properly accounting for and/or billing the Company local mutual compensation and complying with its access tariffs. If CLECs do not follow the requirements of the Telcom Act and the interconnection agreements, the Telco asserts that the network infrastructure suffers, the boundaries between local and toll are no longer clearly defined, and CLECs receive an unwarranted competitive advantage by gaming the system.

The Telco also argues that its Connecticut Access Service Tariff requires carriers to pay the Company access charges when a carrier employs a FGA arrangement. While the Telco does not recover its costs for originating FGA calls from its end users, CLECs are permitted to recover their costs for transporting the call to their end users outside of the LCA associated with the NPA/NXX code. Because the carrier has a mechanism to recover its costs from its end user when the Telco does not have the same opportunity, the Company maintains that FGA requires the carrier to [*86] pay the Telco access for originating the call. n14

> n14 MCIW argues that Virtual FX is distinguishable from a FGA arrangement because FGA is a switched access service provided to requesting interexchange carriers (IXC). MCIW also states that FGA involves the assignment of Telco NXX-XXXX to the IXC and provides for a variety of optional features from a specific end office. MCIW contends that the Telco is seeking to require CLECs to purchase switched access service in order to provide local service. This, in the opinion of MCIW, differs from FX service, because when a CLEC provides FX service, it does so as a local service provider, assigning its own NXX to the end user. Additionally, because the CLEC has a local switch, it does not rely on the Telco's local switch to provide additional features an IXC would. MCIW Reply Brief, pp. 10 and 11.