According to the Telco, the uncontroverted evidence before the Department demonstrates CLEC abuse of NPA/NXX assignment. The Telco notes that since no carrier responded with complete responses to the data requests issued during this proceeding, it is impossible to determine the degree to which CLECs have been manipulating the mutual compensation [*87] scheme. The Telco also notes that the Department possesses the means to assess the magnitude of this CLEC abuse based upon the detailed internal sampling of traffic the Company documented and provided. However, in the opinion of the Telco, its estimates must be viewed as conservative.

The Company contends that its analysis of Telco-originating traffic data indicates instances of misuse and/or highly likely misuse. In no case does the Telco propose that its sampling results represent the total number of calls that originate on its network and fit this virtual FX scenario. The Company also contends that the results of this analysis also supports a conservative finding that 22% of Telco-originated traffic delivered to CLECs is not local and therefore, not subject to mutual compensation. The Telco claims that its analysis is unrebutted and forms the only evidence before this Department. Therefore, the Telco requests the Department establish 22% as the minimum level of virtual FX traffic inappropriately being billed and/or accounted to the Telco as mutual compensation and what the Company should be billing CLECs FGA access charges.

Additionally, the Telco maintains that CLECs' dumping [*88] of unauthorized traffic on the POTS trunks is also violative of the Department's mutual compensation plan adopted in Docket No. 94-10-02. The Telco states that it has negotiated interconnection agreements and implemented interconnectivity via POTS trunks. The Telco claims that some CLECs are improperly routing four other classifications of traffic to the Telco over the POTS trunk groups. According to the Telco, none of these other call types is authorized to be delivered to the Company over the POTS trunk groups.

The Telco further argues that CLEC motivation for the misrouting of so much traffic is clearly financial because the CLEC can avoid the establishment of trunks, reducing its costs. The CLEC then also avoids the establishment of sufficient dedicated transit trunks to the Telco. The Telco asserts that CLECs have done this in spite of their interconnection agreements that define the transit traffic arrangement available to them from the Telco. Accordingly, the Telco requests the Department order CLECs to use the POTS trunks only for the passage of authorized traffic or have improper traffic immediately blocked. Telco Brief, pp. 18-24.

Accordingly, the Telco requests that the [*89] Department: 1) reaffirm that local mutual compensation is due only for calls that originate and terminate in the same local service area where the originating end user is physically located; 2) find that POTS trunks are to be used for the termination of local traffic as defined above; 3) confirm that virtual FX traffic is not local and not eligible for local mutual compensation but rather is eligible for originating switched access charges; and 4) order CLECs to use the POTS trunks only for the passage of authorized traffic or have improper traffic immediately blocked.

The Telco also requests that carriers be ordered to provide all relevant data necessary for the Company to determine the level of virtual FX incurred since January 15, 1999, so that a true-up of such traffic can be calculated. The Telco further requests that this data be provided to the Company within 10 days of the Final Decision issued in this proceeding. Lastly, the Company recommends that the Department fine AT&T and MCIW for their noncompliance with Department orders. Telco Brief, pp. 28-31.

In response to the Reopening Notice, the Telco states that technology and industry practices have not changed since the [*90] Department opened Docket No. 99-01-15 and thus these practices have not changed relative to the treatment of Virtual FX traffic. According to the Telco, the industry changes that occurred took place in 1994 with passage of Public Act 94-83 n15 and the Department's Decisions implementing the Connecticut Act including inter-carrier compensation schemes. Telco May 25, 2001 Written Comments, p. 12.

n15 An Act Implementing The Recommendations of The Telecommunications Task Force (Connecticut Act).

The Telco also asserts that the ISP Order reaffirms the FCC's previous pronouncements on reciprocal compensation leaving to state commissions the ability to determine local calling areas and therefore, the definition of local service relative to the payment of reciprocal compensation, with one exception. This exception is compensation mechanisms for ISP-bound traffic that otherwise would have been deemed local for mutual compensation purposes. According to the Telco, while the FCC previously held that ISP traffic was interstate in nature and fell within its jurisdiction, it left rate setting to the states. The Telco notes that the Department has previously ruled that, if the traffic [*91] was determined to be local regardless of the type of traffic, reciprocal compensation was required. The Telco also notes that the FCC

has determined that compensation should be based on Section 251(g) of the Telcom Act, which does not mandate reciprocal compensation, and it has developed an alternative rate structure for this type of traffic on a going forward basis. The Telco comments that there is nothing inconsistent between the draft Decision and the ISP Order on the treatment of Virtual FX. In the opinion of the Telco, the ISP Order reinforces the Department's long-standing policy of defining local calls based on the location of the originating and terminating end users (i.e., local is a communication between two parties that reside in the same local calling area); and therefore, the ISP Order supports the Department's draft Decision. Telco May 25, 2001 Written Comments, pp. 15-18.

The Telco also reiterates its argument that since FX calls are not local but interexchange calls, they should be subject to FGA access charges. According to the Telco, the record shows that CLECs are accounting for and/or billing the Telco local mutual compensation for calls that are non-local. CLECs [*92] are unilaterally programming their switches to route calls to end users that are assigned telephone numbers with foreign NPA/NXX codes. The Telco maintains that its switches can only see these calls as terminated in the LCAs associated with the NPA/NXX codes. Accordingly, the Telco neither bills the originating end users for toll calls nor bills the CLECs access charges for the calls, rather it pays the CLECs local mutual compensation. The Telco maintains that it should be charging the CLECs originating access charges pursuant to the Telco's Connecticut Access Service Tariff. Telco May 25, 2001 Written Comments, pp. 25-27.

Additionally, the Telco states that Virtual FX traffic is an abuse of the Department's long-standing inter-carrier compensation rules. According to the Telco, the fact that carriers have been using this scheme to serve their ISP customers does not remedy that abuse. The Telco contends that the ISP Order does not preempt the Department from closing the Virtual FX gap. Carrier claims of total preemption must be corrected and analyzed within the confines of the ISP Order and the Department's previous rulings on inter-carrier compensation. The Telco also contends that [*93] these claims of preemption seriously overstate the breadth of the FCC's ISP Order and must be corrected. In the opinion of the Telco, the ISP Order supports the findings reached by the Department in the draft Decision and that the ISP Order merely removes the Department's discretion to establish new requirements for the compensation for what the Department has previously determined to be "local" ISP-bound calls originating and terminating between customers within the same local calling areas. The Telco concludes that the ISP Order does not preclude the Department from enforcing its previous determinations as to what are "local" and "non-local" calls. Telco June 8, 2001 Reply Comments, pp. 1 and 2.

In response to the parties' comments regarding the ISP Order, the Telco notes that the parties cite to paragraph 82 as support for their claim that the Department is now preempted from completing this investigation. The Telco disagrees and notes that the issue of preemption would be on the question of what "compensation" may be due carriers who currently exchange traffic for ISP-bound traffic. n16 That is, if the Telco chooses to not elect the compensation regime proposed in the ISP [*94] Order, the Department's prior determinations on the eligibility of ISP-bound traffic for payment of reciprocal compensation would continue to control. Thus, ISP-bound calls originating and terminating in the same local calling area where the originating and terminating end users are physically located would be considered local and subject to mutual compensation.

> n16 Various parties disagree. For example, AT&T contends that upon the effective date of the ISP Order, state commissions no longer have authority to address this issue. AT&T states that the FCC has made it clear that ISP-bound traffic is interstate traffic and that the FCC has jurisdiction over this traffic. AT&T maintains that the FCC has made it clear that ISP-bound traffic is interstate traffic; and therefore, the Department does not have jurisdiction over interstate traffic. AT&T June 14, 2001 Reply Comments, p. 2. Cablevision argues that the ISP Order imposes no such limitation upon its pre-emptive effect. Cablevision July 2, 2001 Reply Comments, pp. 2 and 3.

The Telco states that if it elects the compensation regime proposed by the FCC in the ISP Order, those ISP-bound calls formerly considered "local" under the [*95] Department's rules would become subject to the FCC's lower rates and traffic caps and eventually would be compensated on a bill and keep basis. n17 Specifically, those calls would be only those calls subject to local mutual compensation under the Department's current inter-carrier compensation rules, ISP-bound calls originating and terminating in the same local calling area where both the originating and terminating end users are physically located. The Telco also states that what this proceeding has been addressing are Virtual FX calls and whether those calls meet the Department's long-standing definitions of "local" and "non-local" calls. The Telco claims that the Department has correctly determined these types of calls (whether bound to ISPs or other classes of end

users) to be non-local interexchange calls. Therefore, these calls would not be subject to local reciprocal compensation no matter if the Telco elects to participate in the FCC ISP regime or not. Only those ISP-bound calls that meet the requirements of the Department's definition of local calls would be in any way affected by the election.

n17 AT&T maintains that there is no distinction in the ISP Order between "local" and "non local" ISP traffic. Rather, all ISP traffic is "information access" and § 251(g) of the Telcom Act carves out such "information access" from the § 251(b)(5) reciprocal obligation section. AT&T claims that the ISP Order requires traffic subject to reciprocal compensation to now include all telecommunications except the categories excluded by § 251(g) of the Telcom Act. Accordingly, traffic subject to reciprocal compensation will no longer be characterized as "local traffic" but rather as all "telecommunications," with the exception of "exchange access," information access" and "exchange services for such access." In the opinion of AT&T, the Telco seeks to superimpose a paradigm over the FCC's ISP Order, which does not fit. AT&T Reply Comments, pp. 2 and 3. Cablevision concurs and states that the ISP Order imposes no such limitation upon its pre-emptive effect. Cablevision July 2, 2001 Reply Comments. [*96]

Accordingly, the Telco concludes that this proceeding is not moot and the Department retains complete authority to conclude this proceeding based on its ultimate determinations of whether Virtual FX traffic meets the requirements of the Department's inter-carrier compensation schemes for the payment of local mutual compensation. Telco June 8, 2001 Reply Comments, pp. 4 and 5.

## J. NEW YORK TELEPHONE COMPANY D/B/A BELL ATLANTIC - NEW YORK (NOW VERIZON - NEW YORK OR VERIZON)

Verizon supports the Telco's Request. According to Verizon, under both federal and Connecticut law, mutual compensation obligations do not apply to calls that originate in one LCA and physically terminate in a second LCA (even if the customers receiving the calls have been assigned an NXX code associated with the originating LCA). Verizon argues that abuses such as those described by the Telco exist because of the CLEC practice of assigning multiple telephone numbers to certain customers so that they can have a virtual presence in all LCAs even though they are physically present in only one. Verizon also argues that this practice undermines the existing local/toll rate structure because the originating carrier [*97] is forced to bill local calling rates for toll calls. Since CLECs are demanding assignments of NXXs associated with areas in which they do not have a local presence and no customers, Verizon claims that they eventually underutilize their codes, contributing to the problem of NXX exhaust.

Verizon also states that even if this number assignment practice were legitimate, it does not justify CLECs claiming mutual compensation for calls that are not local, but appear local to the originating carrier's switch by virtue of a fictitious NXX assignment. Verizon contends that the FCC has made it clear that the Telcom Act applies only to local traffic, and for purposes of reciprocal compensation arrangements, local telecommunications traffic means traffic that originates and terminates within a local service area established by the state commission. Verizon asserts that traffic which does not terminate within the local service area in which it originated, cannot be considered local. The underlying nature of the call cannot be changed by the telephone number that is dialed.

Additionally, Verizon asserts that the CLEC practice of claiming reciprocal compensation for "pseudo-local" calls, when [*98] they have been represented as local, verges on misrepresentation. Verizon contends that it is the responsibility of the CLEC to advise the incumbent that such calls are not local, and to exclude them from mutual compensation claims. Verizon also states that the issue here does not turn on a technical distinction between toll and local calling. Verizon claims that a pseudo-local call that does not originate and terminate in a single local calling area has different cost characteristics than an actual local call. If the incumbent is required to deliver the call to a remote LCA in which the CLEC's facilities, its customers, and its point of interconnection are located, it will incur additional cost beyond that associated with carriage of a local call. Similarly, the CLEC would avoid the cost associated with transporting what is effectively a toll call from one LCA to another. Verizon maintains that applying mutual compensation to such calls undermines the fundamental premise of such compensation, which is to reflect the costs avoided by the incumbent, and incurred by the CLEC, in terminating local calls. Verizon argues that in the pseudo-local calling situation, it is the CLEC that [*99] is avoiding costs. Meanwhile, the incumbent is incurring cost characteristics of toll calls, collecting only local calling rates from the originating end user, and collecting nothing from the terminating end user, while losing money by making reciprocal compensation payments to the terminating CLEC.

Verizon concludes that if extra LCA number assignments are to be permitted, then originating access and not reciprocal compensation provides the appropriate compensation framework for the resulting pseudo-local calls. CLECs should then pass the cost of access payments through to their terminating end user customers. The result would be to impose the cost of toll transport on the party that is causing the costs to be incurred and that is benefiting from their incurrence. Therefore, Verizon recommends that the Request be granted. Verizon Comments, pp. 1-4.

In response to the Reopening Notice, Verizon argues that the ISP Order makes it clear that Internet-bound calls are "information access" under § 251(g) of the Telcom Act, and that they are accordingly exempt from the mutual compensation obligation established under § 251(b) of that act. Verizon states that this ruling is preemptive and [*100] state commissions are affirmatively barred from establishing or leaving in place intrastate compensation regimes that require LECs to "compensate" other LECs for the delivery of Internet traffic to ISPs.

Verizon also argues that contrary to the contentions of some CLECs, the ISP Order does not require the Department to forbear from addressing this issue since the matter of whether virtual FX traffic is eligible for mutual compensation is distinct conceptually and practically from the issue of whether Internet-bound traffic is eligible. According to Verizon, nothing in the ISP Order defines virtual FX traffic as interstate, or limits in any way the Department's jurisdiction over such traffic. To the extent that virtual FX traffic is not Internet-bound, and so long as it originates and terminates within Connecticut, Verizon asserts that the Department has full jurisdiction to set appropriate compensation rules.

Verizon also maintains that the FCC reaffirmed its prior conclusion that Internet traffic "terminates" not at the ISP's modem banks, but at the Web server or other computer that provides the services that the Internet user is seeking to access. Verizon claims that the FCC concluded [*101] that Internet calls are jurisdictionally interstate and that it therefore had the general power to establish a special interstate compensation regime for the exchange of Internet traffic, one that was not constrained by the reciprocal compensation provisions of the Telcom Act. While acknowledging the Compensation Regime Order, Verizon states that the FCC opened this proceeding in order to develop such a regime, and established interim charges that would apply during the pendency of that rulemaking. Verizon contends that the Department's conclusion that its mutual compensation regime should be applied to Internet-bound traffic cannot be sustained.

Verizon notes that the ISP Order recognizes that the FCC-mandated rates can be supplanted by agreement between the parties. Thus, an ILEC and a CLEC could explicitly agree in interconnection negotiations that they will pay each other for the exchange of Internet-bound traffic, and such an agreement would be valid and enforceable notwithstanding the fact that it establishes rates that differ from the FCC's interim interstate rates. Verizon claims that this exception is not relevant here and cannot provide support for the draft Decision's [*102] conclusions concerning Internet-bound traffic, for three key reasons. First, the relevant Department Decisions did not purport to determine that any particular interconnection agreement requires payment for Internet traffic. Rather, the Department concluded as a generic matter that traffic delivered to an ISP should be treated as if it were traffic terminated to a non-ISP customer at the same location (despite the fact that Internet calls continue past the ISP's equipment and do not "terminate" until they reach the server(s) that the Internet user seeks to access). Second, Verizon's interconnection agreements do not generally include a specific compensation rate for Internet-bound traffic and explicitly limit mutual compensation obligations to traffic that originates and terminates in the same local calling area (or, in some cases, LATA). Finally, those agreements also generally include "change of law" clauses. Such clauses recognize that interconnection agreements are entered into solely in order to comply with obligations imposed upon incumbent LECs by existing law, and accordingly the agreements must be amended when regulatory or judicial decisions are issued reducing or eliminating [*103] those obligations. The ISP Order is a clear example of such a change in law. Therefore, even if an agreement contemplated the payment of mutual compensation for Internet-bound traffic, the change of law provision would eradicate this inconsistency with the ISP Order. Accordingly, Verizon recommends that it modify the draft Decision to make it clear that the Department's mutual compensation requirements can no longer apply to Internet traffic. Verizon May 25, 2001 Comments, pp. 3-5; Verizon July 2, 2001 Reply Comments, pp. 2 and 3.

Additionally, Verizon argues that the Department's determination that mutual compensation should not be available for "Virtual FX" calls that terminate to customers physically located outside of the calling party's local calling area remains valid, and should be reaffirmed. Verizon states that the strong policy arguments underlying the draft Decision's analysis concerning virtual FX (as applied to non-Internet traffic) remain compelling. Verizon maintains that CLECs have been abusing the mutual compensation regime by providing customers with numbers associated with all or most of the local calling areas within a LATA, even though neither the CLEC nor its [*104] customers have facilities in those areas. Verizon contends that as a result of this practice, the ILECs are put in the position of: (a) rating calls to such customers as local, even though they do not physically begin and end within a local calling area; (b) bearing the cost of

hauling the calls to a remote CLEC interconnection point; and (c) making mutual compensation payments to the CLEC. Verizon states that this practice forces ILECs to subsidize the LATA-wide inbound local calling services that are offered by CLECs for the benefit of themselves and their customers. which is profoundly anti-competitive.

Verizon also states that nothing in the ISP Order authorizes these practices or makes them any more appropriate. For example, the ISP Order reaffirms the fact that a call is deemed to "terminate" at its ultimate, physical destination, regardless of the number that the calling party dials. Verizon concludes that the FCC regarded Internet-bound calls as jurisdictionally interstate despite the fact that they were made by dialing local numbers assigned to ISPs. Second, although the FCC abandoned the "local call" test for identifying calls subject to reciprocal compensation, in part [*105] because there is no statutory definition for that term, it nevertheless clearly did not intend to make calls that cross local calling area boundaries eligible for such compensation. Verizon comments that the purpose of the ISP Order was to determine that Internet-bound traffic is not eligible for mutual compensation, not to set rules for non-Internet compensation. While Verizon's interconnection agreements and tariffs are generally explicit in limiting mutual compensation to local or intraLATA calls, nothing in the ISP Order limits the enforceability of those provisions in any way.

According to Verizon, this is not to say that the Department must develop a carrier access regime for non-Internet virtual FX traffic. Rather, any need for the imposition of access charges could be eliminated by: (a) ensuring that no mutual compensation payments are required on virtual FX calls that do not originate or terminate in the same incumbent local calling area; and (b) requiring CLECs to provide interconnection points in each local calling area in which virtual FX calls might originate. n18 Given the ability to hand off virtual FX calls at such interconnection points, Verizon argues that incumbents [*106] will be fairly compensated through local calling charges for the costs that they incur in originating the calls and delivering them to the "terminating" CLEC (provided that there are no additional mutual compensation charges). CLECs and/or their customers will then bear the full costs associated with providing the LATA-wide transport services that they offer to their customers, rather than forcing their competitors to bear those costs. Verizon claims that this will advance the FCC's goal of decreasing reliance by carriers upon carrier-to-carrier payments and increasing reliance upon recovery of costs from end-users.

> n18 Cablevision claims that Verizon is attempting to resurrect its Geographically Relevant Points of Interconnection Proposal (GRIPS) plan. Cablevision also claims that virtual FX traffic imposes no additional costs necessitating compensation. According to Cablevision, Verizon's "cure" to the access charge "problem" is not only unnecessary, but is designed in a highly anticompetitive fashion to require CLECs to mirror the incumbents' LCAs and legacy architecture, thereby undercutting their ability to take advantage of efficiencies provided by their more advanced technology and business structures. Lastly, Cablevision comments that Verizon is again asking the Department to change its long-standing position that CLECs have the right to determine their own local calling areas and that such a right is essential to effective competition in the local exchange market Cablevision July 2, 2001 Reply Comments, p. 5. [*107]

Finally, Verizon reiterates that the eligibility of a call for mutual compensation should be determined on the basis of the incumbent's local calling area boundaries. Nothing in the ISP Order imposes any different requirement. Verizon May 25, 2001 Comments, pp. 5-8; Verizon July 2, 2001 Reply Comments, pp. 4 and 5.

### K. WORLDCOM, INC. (WCI)

WCI argues that the Request seeks broad relief from the Department on the basis of a host of unsubstantiated claims and allegations and should be dismissed as deficient on its face. While the Telco is seeking a ruling from the Department to address a perceived problem that is regularly occurring today, WCI contends that the Company's claims are supported solely by innuendo and references to a number of investigations in other jurisdictions. According to WCI, the Telco has offered no evidence that the activities to which it objects occur in Connecticut. WCI notes that the Telco does not have sufficient evidence as to the extent of the improper billing and accounting of non-local calls. To the extent that any switch-based Connecticut CLEC engages in any of these practices lawfully pursuant to the terms of an interconnection agreement with the [*108] Telco or a tariffed service, WCI suggests that the Request represents an impermissible collateral attack on the agreement or on the tariff. Therefore, WCI comments that complaints with regard to the terms of an individual interconnection agreement are more appropriately addressed in their respective dockets. n19

n19 The Telco disagrees. The Telco states that such a process is lengthy, costly and might result in inconsistent solutions. Instead, the Telco requests that the Department address the application of local mutual compensation in a single proceeding that universally applies to all CLECs. Telco Reply Comments, p. 2.

WCI suggests that the Department view the Request as a request for reconsideration of the Decision in Docket No. 94-10-02. WCI notes that in its Decision in Docket No. 97-05-22, the Department advised the Telco that any formal request to reconsider its mutual compensation plan should be accompanied by detailed evidence that effective competition has been precluded and/or that it is experiencing excessive or unjust or irreparable harm as a direct result of the mutual compensation policy. WCI states that while the Request asks the Department to reconsider the [*109] mutual compensation plan adopted in Docket No. 94-10-02, it provides no evidence the mutual compensation plan has harmed the level of competition existing in the state, nor has it provided any evidence to demonstrate that it is suffering excessive, unjust or irreparable harm as a result of the mutual compensation plan adopted by the Department in Docket No. 94-10-02. Therefore, WCI urges the Department to deny the Request. WCI Comments, pp. 1-3.

In response to the questions contained in the Notice, WCI argues that the Telco's use of the term "non-local," suggests that the Company sees a distinction between non-local and toll calls. A call is either local or toll under the applicable statute or Department rules. WCI contends that the Telco's effort to establish a third discrete classification of calls for the benefit of the Request should be suspect and ignored by the Department as lacking entirely in foundation. WCI also contends that the Telco uses the term "a non-local call" to create the illusion that calls terminating outside of its own compact local service areas are akin to toll and such a characterization misrepresents the nature of these calls. WCI comments that to the extent [*110] that CLECs define their local service areas more extensively than the Telco and define such calls as local, regardless of the Telco's local service area boundaries, the calls to which it refers are local and billed and accounted for accordingly. WCI concludes that such calls are clearly non-local only to the Telco.

WCI reiterates that the Telco has failed to provide evidence that substantiates its claim that the CLEC's billing practice is inconsistent with the Decision in Docket No. 94-10-02. WCI concludes that because the Telco has failed to cite any specific instances of the practices of which it complains, it is exceedingly difficult to determine whether a given CLEC's billing practice is inconsistent with the Department's determination in Docket No. 94-10-02 or contrary to the multitude of interconnection agreements on file with the Department. It is WCI's understanding that CLECs properly account for and bill the Telco local mutual compensation. To the extent that the Telco disputes the amount of compensation owed or due, WCI argues that such disputes are more appropriately addressed pursuant to the terms of the dispute resolution processes provided for in the Telco's interconnection [*111] agreements. In the opinion of WCI, the Request initiates an investigation that is outside of the dispute resolution process and procedures established in many of the interconnection agreements arbitrated through the Department.

Additionally, WCI contends that it is unaware of any carrier improperly accounting and billing for mutual compensation. However, in the event it is occurring, WCI suggests that it is an isolated activity and should be resolved through a dispute resolution process involving the individual carrier and the Telco. Therefore, WCI recommends that the Department deny the Request and require the Telco to resolve disputes related to local mutual compensation pursuant to the terms of its interconnection agreements. WCI Comments, pp. 3 and 4.

Moreover, WCI argues that the Request be dismissed because it is deficient and lacking in merit and the Telco has offered no reliable evidence to support its claims of "improper" CLEC activities. According to WCI, the Telco has failed to provide the Department with any evidence to support the allegations of improper activities by CLECs made in the Request. In the opinion of WCI, the Department must find that the Telco has not met [*112] its burden of proof and dismiss the Request. WCI Brief, pp. 4 and 5.

WCI further argues that the Request is a transparent effort to challenge the Department's prior determinations on mutual compensation and ISP traffic. In the opinion of WCI, the generic remedy that the Telco seeks from the Department is unnecessary, and that the Company must be required to abide by the terms of its interconnection agreements and resolve disputes through the dispute resolution provisions in those agreements.

WCI contends that the issues raised in the Telco's Request are related to its interconnection agreements and should be resolved through the dispute resolution provisions in those agreements. According to WCI, the Telco is attempting to resolve disputes with individual CLECs that arise out of a negotiated or arbitrated interconnection agreement. WCI asserts that carriers make every effort to properly account for and bill the Telco local mutual compensation. To the extent that the Telco disputes the amount of compensation owed or due, such disputes are more appropriately addressed pursuant to the terms of the dispute resolution processes provided for in the Company's interconnection agreements.

[*113]    WCI contends that the Request initiates an investigation that is outside of the dispute resolution process established in many of the interconnection agreements arbitrated through the Department and should not be condoned.

Furthermore, WCI argues that to the extent any switch-based CLEC in Connecticut engages in any of these practices pursuant to the terms of an interconnection agreement with the Telco or a tariffed local exchange service, the Request represents an impermissible collateral attack on the agreement or on the tariff. WCI suggests that complaints relative to the terms of individual interconnection agreements are more appropriately addressed in their respective dockets. WCI also suggests that to the extent the Request is an effort to re-litigate those issues it lost during arbitration proceedings is inappropriate. WCI Brief, pp. 5 and 6; WCI Reply Brief, pp. 11 and 12.

WCI disagrees with the Telco's claim that it is not attempting to do an end run around the Department's Decision in Docket No. 97-05-22. In the opinion of WCI, as the Telco questions the treatment of CLECs' FX offerings, it is also challenging the nature of local exchange traffic to ISPs, particularly [*114] to the extent that CLECs provide such service. WCI also states that the Company intends to challenge the nature of local exchange traffic to ISPs.

WCI notes it provides FX service through its subsidiary to its customers pursuant to a local exchange tariff. To the extent that these services are purchased in conjunction with WCI's local exchange services, the local services remain eligible for local mutual compensation under the interconnection agreement, and not subject to access charges as the Telco has asserted. WCI states that the Telco would prefer to collect originating access on such traffic rather than pay reciprocal compensation. WCI notes however, that the Telco's request for originating access under its Connecticut Access Tariff is not within the Department's authority and is contrary to the FCC's rule that exempts Internet and other information services from interstate access charges. In the opinion of WCI, treating this traffic as local is consistent with the Telco's own tariff language regarding toll traffic (i.e., the tariff specifies that toll telephone rates are applied based on airline distance between rate centers). WCI also notes that the Telco's tariff also includes [*115] a schedule, which specifies initial period station-to-station day rates between all toll rate centers in Connecticut.

WCI maintains that the FX service offered by CLECs is not significantly different from that offered by the Telco. WCI states that the fact the Telco has sought to grandfather this service in the past suggests that its true motivation for questioning the provision of such service by CLECs is not that the provision of such service is improper, but that the Company wishes to hinder CLECs' ability to offer a service that is essentially similar to one being offered by the Telco. WCI Brief, pp. 6-8; WCI Reply Brief, pp. 10 and 11.

Moreover, WCI argues that the Telco's request that CLECs be required to report actual MOUs to the Company be denied because it is anticompetitive and intrusive. WCI also argues that adoption of such a requirement has not been imposed on CLECs in other jurisdictions. Whatever rights the incumbent may enjoy with respect to its own subsidiaries or affiliates, WCI concludes that it is not entitled to receive information resident in non-affiliated CLEC switches or databases merely because it lacks the "definitive" capability to obtain such information [*116] on its own. Therefore, WCI recommends that the Telco's request that CLECs report MOUs be denied because the Company already has the capability to record originating local calls. In the opinion of WCI, the Company's inability to identify these calls is insufficient justification for the Department to impose burdensome and intrusive reporting requirements on CLECs. WCI Brief, pp. 8 and 9.

In light of the ISP Order, WCI concludes that the Department should not continue this proceeding. WCI recommends that only after the appeals of the ISP Order are resolved can the Department determine whether additional proceedings are warranted. To the extent that the Department proceeds in order to resolve compensation issues for non-ISP local traffic carried over foreign exchange facilities, WCI urges the Department to adopt WCI's analysis of the character and compensation for local traffic destined to foreign exchange service subscribers. WCI maintains that the ISP Order does not address FX traffic and that while the FCC's analysis employs § 251(g) of the Telcom Act to justify exempting ISP-bound traffic from reciprocal compensation, FX traffic is not exempted by § 251(g) and thus is subject to [*117] 251(b)(5) of the Telcom Act, which expressly obligates local exchange carriers to arrange for mutual compensation for the exchange of traffic on one another's networks. WCI May 25, 2001 Letter, p. 3.

## IV. DEPARTMENT ANALYSIS

### A. ISP ORDER

In a previous ruling, the FCC determined that traffic delivered to ISPs was interstate traffic and subject to the FCC's jurisdiction pursuant to § 201 of the Telcom Act. n20 Additionally, in its ISP Order, the FCC reaffirmed that conclusion and established an appropriate cost recovery mechanism for the exchange of such traffic. ISP Order, P1. The

FCC also indicated that it was obligated to establish an appropriate cost recovery mechanism for delivery of the ISP-bound traffic and has initiated the Compensation Regime Order to consider among other things, whether the FCC should replace existing intercarrier compensation schemes with some form of what has come to be known as "bill and keep." Id., PP2 and 4.

n20 See Implementation of the Local Competition Provisions in the Telecommunications Act of 1996; Intercarrier Compensation for ISP-Bound Traffic, Declaratory Ruling in CC Docket No. 96-98 and Notice of Proposed Rulemaking in *CC Docket No. 96-98, 14 FCC Rcd 3689 (1999)* (Declaratory Ruling). [*118]

Moreover, the FCC indicated a need for immediate action with respect to ISP-bound traffic and has implemented an interim recovery scheme. ISP Order, P7. According to the FCC, this interim compensation regime will apply as carriers re-negotiate expired or expiring interconnection agreements. The FCC does not intend to alter existing contractual obligations, except to the extent that parties are entitled to invoke contractual change-of-law provisions. Additionally, the ISP Order does not preempt any state commission decision regarding compensation for ISP-bound traffic for the period of time prior to the effective date of the interim regime adopted in that order. However, because the FCC has exercised its authority pursuant to § 201 of the Telcom Act to determine the appropriate intercarrier compensation for ISP-bound traffic, state commissions have been preempted from addressing this issue on a prospective basis. For this same reason, carriers are no longer permitted to invoke § 252(i) of the Telcom Act to opt into an existing interconnection agreement with regard to the rates paid for the exchange of ISP-bound traffic. The FCC noted that § 252(i) of the Telcom Act applies only to [*119] agreements arbitrated or approved by state commissions pursuant to § 252 of the Telcom Act. It has no application in the context of an intercarrier compensation regime set by the FCC pursuant to § 201 of the Telcom Act. ISP Order, P82.

Therefore, in light of the above, the Department finds that intercarrier compensation for ISP-bound traffic is within the jurisdiction of the FCC and that on a going forward basis, the Department has been preempted from addressing this issue beyond the effective date of the ISP Order. Nevertheless, the ISP Order does not preempt state commissions from addressing compensation for ISP-bound traffic for the period of time prior to the effective date of the interim regime adopted by the FCC. ISP Order, P82. Consequently, the following analysis and resulting orders will apply to the ISP-bound traffic carried over FX facilities prior to the effective date of the ISP Order.

## B. MUTUAL COMPENSATION

The Telcom Act requires that telecommunications carriers establish reciprocal or mutual compensation arrangements for the transport and termination of telecommunications. *47 U.S.C. § 251*(B)(5). Additionally, the FCC concluded [*120] that reciprocal compensation obligations should only apply to traffic that originates and terminates within a local calling area. The FCC has also permitted the states to determine what geographic areas should be considered "local areas" for reciprocal compensation obligations under *47 U.S.C. § 251*(B)(5), consistent with the state commissions' historical practice of defining local service areas for wireline LECs. Moreover, the FCC concluded that traffic originating or terminating outside of the applicable local calling area would be subject to interstate and intrastate access charges. FCC First Report and Order, In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, CC Docket No. 96-98, and Interconnection Between Local Exchange Carriers and Commercial Mobile Service Providers, CC Docket No. 95-185, (First Report and Order) released August 1, 1996, PP, 1034 and 1036.

Similarly, in its January 17, 1996 Decision in Docket No. 94-10-02, the Department limited the payment of reciprocal compensation to the termination of local traffic. However, the Department indicated in that Decision that [*121] it would not allow the incumbent provider to dictate the definition of local service for these purposes. Rather, local service would be considered the tariffed service that offers a subscriber dial access to a prescribed set of contiguous central office prefixes that would be determined by each respective provider without imposition of any additional charge associated with distance. January 17, 1996 Decision, Docket No. 94-10-02, pp. 71 and 72.

Finally, the Department has determined that there is no difference between an ISP and the Telco's other local exchange customers relative to the payment of mutual compensation. September 17, 1997 Decision, Docket No. 97-05-22, p. 12. The Department also concluded that traffic carried between the Telco's end user customers and ISPs within the same local calling area (emphasis added) is local in nature and should be subject to the mutual compensation arrangements outlined in the January 17, 1996 Decision in Docket No. 94-10-02. Id.

## C. LOCAL EXCHANGE SERVICE TRAFFIC

The Department reaffirms its requirement that traffic between end user customers and ISPs within the same local calling area be subject to the mutual compensation arrangements [*122] outlined in the January 17, 1996 Decision in Docket No. 94-10-02. The Department also reaffirms its requirement that the payment of mutual compensation be limited to local calls that originate and terminate within the caller's local calling area.

Relative to FX service, the Department is of the opinion that it is an interexchange service that is provided from an exchange that is different from one that normally serves the area in which the subscriber is located. In particular, FX service routes calls from one exchange to another. From a subscriber's point of view, FX is a toll substitute affording callers the benefit(s) of a local call. The Department indicated in its January 17, 1996 Decision in Docket No. 94-10-02, that the payment of mutual compensation would be required for all calls that originate and terminate within the same local calling area. While telephone calls made to FX service subscribers allow their customers to call without incurring toll charges, for purposes of payment of mutual compensation, such calls are non-local in nature; and therefore, they are not subject to mutual compensation. The Department recognizes the use of FX service by carriers as an economic [*123] means of serving large areas with a minimum number of switches. The Department is concerned however, when these same carriers then seek compensation for traffic that is clearly outside the boundaries for the payment of mutual compensation established by the FCC in its First Report and Order and the Department's Decisions in Docket Nos. 94-10-02 and 97-05-22.

The Department, by this Decision has not deviated from its earlier ruling that Internet calls be subject to mutual compensation. Rather, this Decision reaffirms the Decisions in Dockets Nos. 94-10-02 and 97-05-22 to ensure compensation for local calls. The Department notes that some of the participants are against its involvement in this matter arguing that Internet calls are interstate calls under the FCC's jurisdiction. See for example, AT&T Comments, p. 4. Not withstanding the ISP Order, the Department disagrees. The Department continues to believe that Internet traffic (when meeting the FCC and Department standards) should be subject to mutual compensation. However, if the Department were to accept carriers' suggestions for a "hands-off" approach in this matter, the Department would be placed in the position of policing the [*124] ISP-subscriber traffic and other FX service subscribers in order to determine what traffic should be subject to mutual compensation. The Department also questions whether non-Internet traffic carried over other subscribers' FX facilities would be subject to compensation or as proposed by the Telco, subject to originating access charges. The Department refuses to be placed in this situation and will require that mutual compensation be due only for those calls that originate and terminate in the same local service area where the originating end user is physically located.

The Department also notes that the record of this proceeding is replete with statements by CLECs indicating that they not be held to the same local calling areas as the Telco. See for example Cablevision Comments, p. 2; MCIW Comments, p. 3; AT&T Brief, pp. 7-10; RCN Comments, p. 9. All CLECs have been afforded the opportunity to establish their own local calling areas in Connecticut. The Department recognizes the economic factors underlying the CLECs decisions against deploying facilities and defining their own local calling areas. n21 Nevertheless, most, if not all CLECs have not established their own local calling [*125] areas and instead, have chosen to mirror the Telco's LCAs. n22 In the opinion of the Department, these CLECs have made a decision to mirror the Telco's LCAs and offer their subscribers large local calling areas via FX service. The Department takes no issue with the carriers' use of FX service in this matter. However, the Department finds the carriers' requests for compensation in these cases unsupportable in light of the FCC and Department rulings (including the ability to define their own local calling areas) and their decision against deploying facilities that would make these calls truly local and eligible for mutual compensation. The purpose of mutual compensation is to compensate the carrier for the cost of terminating a local call on their respective network. The Department is of the opinion that since these calls are not local, they will not be eligible for mutual compensation. Therefore, the Department will require, through the effective date of the ISP Order, for those cases where a CLEC chooses to mirror the Telco's LCA, and offers to provide the FX service in a larger "local" calling area, that such FX service calls be ineligible for compensation.

---

n21 The Department concurs with the ISP Order is on point. Specifically, carriers will always prefer to recover their costs from other carriers rather than their own end-users in order to gain competitive advantage. Additionally, carriers have every incentive to compete, not on basis of quality and efficiency, but on the basis of their ability to shift costs to other carriers and the resulting outcome that prevents market forces from distributing limited investment resources to their most efficient uses. ISP Order, P4. [*126]

n22 See for example, MCImetro Access Transmission Services Connecticut D.P.U.C. Tariff No. 4, p. 50.1.1; Sprint Communications Connecticut DPUC Tariff No. 1, p. 70; and AT&T Communications of New England, Inc. D.P.U.C. Tariff No. 8, Section 3, p. 2.

In Written Exceptions and during Oral Argument PaeTec and WCI argued that the draft Decision violated federal law by abrogating binding interconnection agreements. PaeTec Written Exceptions, pp. 5-7; WCI Written Exceptions, pp. 13-17; Tr. 01/23/02, pp. 13, 19 and 20. The Department notes that the instant Decision does not supersede any terms and conditions specifically addressing compensation for local traffic (i.e., compensation for local calls provided over foreign exchange facilities) that may be addressed in existing ILEC/CLEC interconnection agreements. The Department is of the opinion that if this issue has been addressed in existing ILEC/CLEC interconnection agreements, then the parties are bound by the terms and conditions of those agreements and this Decision would not apply. However, in the event that the agreements are silent regarding this issue, then the provisions of this Decision will apply.

Additionally, in the March [*127] 29, 2001 Draft Decision, the Department required that interexchange traffic not subject to mutual compensation be subject to the payment of originating switched access charges to the ILEC. March 29, 2001 Draft Decision, p. 21. Cablevision states that ILECs should not be permitted to charge CLECs for a service that they are not purchasing. Cablevision April 20, 2001 Written Exceptions, p. 10. Cablevision also states that FGA involves the telephone number assignment of an ILEC and provides for optional features from a specific end office. Further, Cablevision states that just like the Telco, and unlike an interexchange carrier, when a CLEC provides FX service, it does so as a local provider, assigning its own NXX to the end user. n23 Id. Finally, Cablevision claims that unlike an IXC purchasing FGA, a CLEC has its own local switch and therefore does not rely on the ILEC local switch to provide additional features. Id. Moreover, WCI maintains that it is entitled to recover the costs associated with terminating calls that originate on the Telco's network from the Telco. In the opinion of WCI, if the calls in question are interexchange in nature, then CLECs have the right to bill [*128] the Telco terminating access charges. WCI April 20, 2001 Written Exceptions, p. 22. Lastly, AT&T argues that imposition of access charges would place long distance carriers in the unpalatable position of charging end users for toll calls which today are local calls in order to recoup their access expenses. Moreover, AT&T argues that any attempt to collect toll charges from such users is further exacerbated where the carrier in question may not have a clear customer/carrier relationship with the end users originating these calls. AT&T April 20, 2001 Written Exceptions, pp. 9-14.

n23 Citing WCI's October 16, 2000 Reply Brief, p. 10.

The CLECs points in this matter are well taken. While the Department believes that it is inappropriate that calls of this nature be subject to mutual compensation, the imposition of access charges on these calls is similarly improper. In the opinion of the Department, imposition of access charges on these calls would clearly not be in the public interest due to the level of customer confusion that would most likely be generated as well as the costs incurred by the CLECs in resolving those complaints. In addition, if the ILECs are permitted to impose [*129] originating access charges for these calls, fairness would dictate that the CLECs also be permitted to apply terminating access charges as well. The public interest clearly would not be served. Accordingly, the Department will deny the Telco's request to impose FGA access charges on the carriers for these calls.

Finally, the Department reaffirms its requirement that all provisions of Telco/CLEC interconnection agreements be adhered to, or if necessary, modified when mutually agreed to by the parties. The Department notes that the Telco has requested that the Scope of this proceeding be broadened to address some of the CLECs' improper routing of traffic over POTS trunk groups. See the Telco's August 19, 1999 Written Comments, pp. 9-11, Telco Brief, pp. 22-24. According to the Telco, its Interconnection Agreements clearly identify the use of the POTS trunk in questions and that the terms and conditions of these interconnection agreements have been violated by CLEC's unauthorized routing of certain calls. Id. In the opinion of the Department, the Telco and CLECs have agreed to these provisions in approved Interconnection Agreements. Consequently, such provisions must be adhered [*130] to until they are either modified or superseded. Absent any changes, the provisions of these agreements (i.e., POTS trunks are to only be used for the termination of traffic), must be adhered to by the respective parties. Alleged deviations by either party should be resolved following the procedures outlined in the agreements and ultimately by the Department if appropriate.

**D. COMPENSATION TRUE-UP**

According to the Telco, it has been improperly billed for local mutual compensation for FX service calls. Request, p. 1. Consequently, the Telco has requested that carriers be ordered to provide all relevant data necessary for the Company to determine the level of virtual FX traffic incurred since January 15, 1999, so that a true-up of such traffic can be calculated. n24 The Telco has also requested that this data be provided within 10 days of issuance of the Decision. The Telco further requests that should CLECs refuse to provide this data, that the Company be authorized to deduct 22% of all MOU recorded and reported by CLECs as local reciprocal compensation from January 15, 1999, and in turn, bill CLECs those same MOU at FGA access rates. In the event that the CLEC refuses to pay [*131] the Telco within 30 days of its invoice, the Company requests that it be permitted to block its traffic. Moreover, in those cases where the CLEC fails to comply on a going-forward basis, the Telco requests that it be permitted to increase the 22% factor by 10% each month until such time as the CLEC fulfills its duty to comply. According to the Telco, this position is necessary and warranted because some CLEC business plans have come to rely solely on virtual FX connections. Telco Brief, pp. 29 and 30.

> n24 The Telco did not specify the data that it believed was necessary to make this determination. Therefore, the Telco will be required below to submit an exhibit detailing its requirements in advance of those CLECs that provide this information to the Company.

As noted above, mutual compensation has been paid by the Telco to carriers in lieu of payment of originating switched access charges for the use of FX arrangements and POTS trunks. The Department concurs with the Telco that a true-up is in order and will require all CLECs accounting for and/or billing the Company for mutual compensation, to no later than March 29, 2002, provide the Department with all data necessary for its [*132] calculations. Such data should be for the period January 15, 1999, through the effective date of the ISP Order. Similarly, the Telco should provide the Department the same information on March 29, 2002 if the Company has accounted for and/or billed CLECs for mutual compensation. Regarding the Telco's remaining requests, the Department finds such requests to be unwarranted. First and foremost, the Telco's interconnection agreements contain provisions to resolve any outstanding disagreements, which should be followed. In the event that CLECs fail to provide the Department with the data necessary for its calculations or the CLECs do not comply with this Decision and the Decisions in Dockets Nos. 94-10-02 and 97-05-22 on a going-forward basis, the Department will, upon notification by the Telco, immediately initiate a process with the Telco and CLEC to resolve the outstanding issues. Accordingly, the Telco's request to deduct a percentage of all MOUs recorded and its remaining requests are hereby denied.

## V. FINDINGS OF FACT

1. The FCC reconsidered the proper treatment of telecommunications traffic delivered to ISPs for purposes of intercarrier compensation in the ISP Order.
[*133]
2. The FCC has modified the analysis, which led to its determination that ISP-bound traffic falls outside the scope of § 251(b)(5) of the Telcom Act and concluded that Congress excluded from the "telecommunications" traffic subject to reciprocal compensation the traffic identified in § 251(g) of the Telcom Act, including traffic destined for ISPs.

3. The ISP Order does not preempt any state commission decision regarding compensation for ISP-bound traffic for the period of time prior to the effective date of the interim regime adopted in that order.

4. Carriers are no longer permitted to invoke § 252(i) of the Telcom Act to opt into an existing interconnection agreement with regard to the rates paid for the exchange of ISP-bound traffic.

5. The FCC reaffirmed its previous conclusion that traffic delivered to an ISP is predominantly interstate access traffic subject to § 201 of the Telcom Act, and established an appropriate cost recovery mechanism for the exchange of such traffic.

6. The FCC will exercise its authority pursuant to § 201 of the Telcom Act for ISP-bound traffic beginning on the effective date of the ISP Order and determine the appropriate intercarrier compensation [*134] for ISP-bound traffic.

7. As of the effective date of the ISP Order, state commissions will no longer have the authority to address intercarrier compensation for ISP-bound traffic on a prospective basis.

8. The Telcom Act requires that telecommunications carriers establish reciprocal or mutual compensation arrangements for the transport and termination of telecommunications.

9. The FCC concluded that reciprocal compensation obligations should only apply to traffic that originates and terminates within a local calling area.

10. The FCC permitted the states to determine what geographic areas should be considered "local areas" for reciprocal compensation obligations under *47 U.S.C. § 251*(B)(5).

11. The FCC concluded that traffic originating or terminating outside of the applicable local calling area would be subject to interstate and intrastate access charges.

12. In the January 17, 1996 Decision in Docket No. 94-10-02, the Department limited the payment of reciprocal compensation to the termination of local traffic.

13. There is no difference between an ISP and the Telco's other local exchange customers.

14. Traffic carried between [*135] the Telco's end user customers and ISPs within the same local calling area is local in nature and should be subject to the mutual compensation arrangements outlined in the January 17, 1996 Decision in Docket No. 94-10-02.

15. FX service is an interexchange service that is provided from an exchange that is different from one that normally serves the area in which the subscriber is located.

16. FX service subscribers allow their customers to call them without incurring toll charges. For purposes of payment of mutual compensation, such calls are non-local in nature and therefore, they are not subject to mutual compensation.

17. CLECs have been afforded the opportunity to establish their own local calling areas.

18. Most, if not all CLECs have not established their own local calling areas and instead, have chosen to mirror the Telco's.

## VI. CONCLUSION AND ORDERS

### A. CONCLUSION

The Telcom Act and FCC and Department Decisions have provided the terms and conditions under which mutual compensation should be provided to carriers for the termination of local calls. By this Decision, the Department reaffirms its previous Decisions in Dockets Nos. 94-10-02 and 97-05-22 relative [*136] to compensation for local calls and calls to Internet service providers respectively. Nevertheless, carriers have been compensated by the Telco for calls originated by the Telco within its LCA and terminated by CLECs outside of that local calling area through the use of FX facilities. FX service is an interexchange service and therefore, all traffic carried over FX facilities shall not be eligible for mutual compensation. Accordingly, the Telco and CLECs shall be compensated for any FX traffic carried since January 15, 1999 through the effective date of the ISP Order, subject to the orders below.

### B. ORDERS

For the following Orders, please submit an Original and five copies of the requested material, identified by Docket Number, Title and Order Number to the Executive Secretary.

1. No later than February 15, 2002, the Telco shall identify and provide to the Department a proposed outline of the necessary data that could determine the level of virtual FX traffic incurred by the Company since January 15, 1999.

2. No later than March 29, 2002, all CLECs accounting for and and/or billing the Telco for mutual compensation, shall provide the Department all data necessary for its [*137] calculations. The Telco shall provide the same information to the Department for any CLECs that it has accounted for and/or billed for mutual compensation.

This Decision is adopted by the following Commissioners:

    Jack R. Goldberg

    John W. Betkoski, III

    Donald W. Downes