LEXSEE 2004 ALA. PUC LEXIS 144

ALL PROVIDERS OF LOCAL AND INTEREXCHANGE TELECOMMUNICATIONS
SERVICES IN THE STATE OF ALABAMA
DECLARATORY RULING CONCERNING THE USAGE OF LOCAL
INTERCONNECTION SERVICES FOR THE PROVISION OF VIRTUAL NXX
SERVICE

DOCKET 28906

Alabama Public Service Commission

2004 Ala. PUC LEXIS 144

April 29, 2004, Done

**PANEL:** [*1] Jim Sullivan, President; Jan Cook, Commissioner; George C. Wallace, Jr., Commissioner

**OPINIONBY:** SULLIVAN; COOK; WALLACE

**OPINION: DECLARATORY ORDER**

**BY THE COMMISSION:**

### I. Introduction and Background

#### A. CenturyTel's Petition for a Declaratory Order

By Petition filed on March 10, 2003, CenturyTel of Alabama, LLC ("CenturyTel") sought a Declaratory Order (the "CenturyTel Petition") from the Commission resolving a dispute between CenturyTel and MCImetro Access Transmission Services, LLC ("MCI") concerning, among other matters, MCI's alleged usage of local interconnection services for the provision of Virtual NXX service ("VNXX"). In particular, CenturyTel represented that on October 1, 2002, MCI opted into CenturyTel's Interconnection Agreement with ICG Telecom Group, Inc. (the "Interconnection Agreement"). CenturyTel asserted that said agreement, by its express terms, applied only to "the transport and termination and billing of local, intraLATA toll, optional Extended Area Service ("EAS") traffic and jointly provided interexchange carrier access. n1 CenturyTel further asserted that the Interconnection Agreement did not apply to interexchange carrier access to CenturyTel's network [*2] in connection with MCI interLATA or interstate services.n2

n1 CenturyTel Petition at p. 2; See Interconnection Agreement at Article IV, § 1.1.n2*Id.*

CenturyTel maintained that in November 2002, MCI attempted to order interconnection services from CenturyTel under the Interconnection Agreement for the sole, noncompetitive purpose of hauling the interLATA, interstate traffic of its affiliate, MCI WorldCom Network Services, Inc. ("MCIW"). More particularly, CenturyTel alleged that MCI sought to have MCIW traffic originating in Dothan and Daleville, Alabama transported to MCI's switch in Montgomery, for ultimate termination in Atlanta, Georgia. CenturyTel alleged that such orders for service were made despite MCI's prior commitment to purchase Transmission Control Protocol/Internet Protocol ("TCP/IP") n3 services from CenturyTel pursuant to CenturyTel's FCC Tariff, n4 and despite the local interconnection service limits of the Interconnection Agreement opted into by MCI. n5

n3 TCP/IP is a networking protocol that provides communications across interconnected networks, between computers with diverse hardware architecture and various operating systems. [*3]

n4 FCC Tariff Number 2-Section 7-specialized FIA or Arrangements, § 7.2.1.n5*Id.*

CenturyTel asserted that MCI was attempting, through the aforementioned service configuration, to implement a VNXX arrangement where toll calls could be dialed in a seven digit fashion without the incurrence of applicable access service charges. CenturyTel maintained that MCI had no known presence, infrastructure or personnel in Dothan or Daleville that would support its claim to be a legitimate CLEC in those areas. CenturyTel alleged that MCI was merely attempting to use the Interconnection Agreement in Dothan, not to compete locally as a legitimate competitor under § 251 of the Act, but to obtain interexchange access at local interconnection rates when the traffic involved was not local in nature. n6

n6*Id.* at p. 3.

CenturyTel asserted that under § 251 of the Telecommunications Act of 1996 n7, local interconnection is for the transmission and routing of locally originated and terminated telephone exchange services, which do not include exchange access for interLATA or interstate calls. CenturyTel asserted that as defined by the Act, local interconnection is not for the purpose of collecting locally dialed calls for transport and termination across LATA and state boundaries in an attempt to escape legitimate access charges. N8 [*4]

n7 Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (the "Act").n8*Id.* at p. 4, Citing 47 U.S.C. § 153 (47).

CenturyTel further argued that MCI should not be allowed to engage in such rate arbitrage by utilizing local interconnection services to provide its interLATA, interstate VNXX services. CenturyTel contended that in providing such interLATA services, MCI should pay interstate access charges to CenturyTel and continue to purchase its contractual TCP/IP services. n9 CenturyTel requested that the Commission determine whether it had the appropriate jurisdiction over the matters discussed in the CenturyTel Petition. In the event of a finding that jurisdiction over such matters existed, CenturyTel sought a determination from the Commission as to whether MCI could terminate its contractual TCP/IP services and use local interconnection services under the Interconnection Agreement for the same noncompetitive purpose. CenturyTel further sought a determination as to whether MCI could order local interconnection services to use as a VNXX service instead of paying for tariffed interexchange carrier local access for originating and terminating MCI's interLATA, interstate traffic discussed herein. [*5]

n9 Id. at p. 4.

### B. MCI's Motion to Dismiss

On or about March 28, 2003, MCI filed a Motion to Dismiss CenturyTel's Petition for a Declaratory Order. MCI based its Motion to Dismiss on a claim that the Interconnection Agreement under which MCI and CenturyTel were presently operating required the parties to resolve disputes such as those presented in CenturyTel's Petition first through negotiations, and then through commercial arbitration. MCI accordingly argued that the Commission was not the proper forum for CenturyTel's disputes and that CenturyTel was, therefore, forum shopping.

With respect to the specifics of CenturyTel's claims, MCI alleged in its March 28, 2003, Motion to Dismiss that its Interconnection Agreement with CenturyTel provided that MCI and CenturyTel would "reciprocally terminate local, intraLATA toll, optional EAS and jointly provided IXC traffic (or other traffic the parties agreed to exchange) originating on each others networks utilizing either direct or indirect network connections." n10 [*6] In order to put

interconnection trunks in place to transport the aforementioned traffic, MCI pointed out that a two step process was involved. First, interconnection facilities must be established between the point of interconnection on CenturyTel's network and MCImetro's switch. Second, MCImetro must order interconnection trunks that ride those facilities so that traffic may be transported. MCImetro argued that it accomplished the first step by establishing interconnection facilities between CenturyTel's central office in Dothan and MCImetro's class 5 local switch in Atlanta. MCI alleged, however, that when it attempted to accomplish the second step of establishing the necessary interconnection trunks to ride the facilities established, CenturyTel refused to provision MCI's orders.

n10 MCI Motion to Dismiss at p. 2; See Interconnection Agreement at Article IV, § 3.1.

MCI represented that shortly after CenturyTel's refusal to provision its order for interconnection trunks, MCI dispatched a letter to CenturyTel pointing [*7] out that Article III, Section 17.1 of the Interconnection Agreement between the parties contained the following language:

> Except as provided under § 252 of the Act with respect to the approval of this agreement by the Commission, the parties desire to resolve disputes arising out of or relating to this agreement without litigation. Accordingly, except for actions seeking a temporary restraining order or an injunction related to the purposes of this agreement or suit to compel compliance with this dispute resolution process, the parties agree to use the following alternative dispute resolution procedures as the sole remedy with respect to any controversial claim arising out of or relating to this agreement or its breach.

MCI argued that the principal substantive dispute between it and CenturyTel concerned the issue of whether MCI was entitled to order the interconnection trunks in question under the Interconnection Agreement, as well as the issue of whether the trunks MCI was seeking to order would be part of a Virtual NXX arrangement. MCI noted its disagreement with CenturyTel concerning the Virtual NXX allegations, but asserted that said dispute arose under the Interconnection [*8] Agreement and thus should be resolved under its dispute resolution procedure as set forth above.

MCI also alleged that the issues raised by CenturyTel concerning MCI's cancellation of the TCP/IP services order pursuant to CenturyTel's FCC Tariff Number 2 were outside the jurisdiction of the Commission given the federal nature of the tariff in question. MCI concluded that the only issues truly in dispute between MCI and CenturyTel arose out of the Interconnection Agreement between the parties and thus should be addressed under the Interconnection Agreement's dispute resolution process. MCI again alleged that CenturyTel was attempting to engage in forum shopping which was prohibited by the Interconnection Agreement between the parties. According to MCI, the agreement made clear that except as to (i) approval of the agreement by the Commission; (ii) suits for a temporary restraining order or an injunction; and (iii) suits to enforce the dispute resolution provisions of the agreement, disputes under the Interconnection Agreement were required to be resolved through the process of negotiation and commercial arbitration. n11 MCI alleged that none of the aforementioned exceptions applied [*9] to the CenturyTel dispute presented to the Commission and that the Commission should accordingly dismiss the CenturyTel Petition.

n11 MCI Motion to Dismiss at p. 4; Interconnection Agreement at Article III, § 17.1.

**C. CenturyTel's Response to MCI's Motion to Dismiss**

In an April 4, 2003, Response to MCI's Motion to Dismiss, CenturyTel reasserted that the Interconnection Agreement between MCI and CenturyTel applied only to "the transport and termination and billing of local, intraLATA toll, optional EAS traffic and jointly provided interexchange carrier access." n12 According to CenturyTel, the Interconnection Agreement did not apply to interexchange carrier access to CenturyTel in connection with MCI interLATA or interstate services. CenturyTel argued that since the issues raised in MCI's Motion to Dismiss related to traffic that was interLATA and/or interstate in nature, the commercial arbitration clause of the Interconnection Agreement did not apply to the controversies raised in CenturyTel's Motion for a Declaratory [*10] Order.

n12 CenturyTel Response at p. 2, Citing Article 4, Section 1.1 of the Interconnection Agreement.

CenturyTel argued that a determination concerning the classification of the traffic in question was the underlying issue in dispute between CenturyTel and MCImetro. CenturyTel asserted that the Interconnection Agreement between the parties would be applicable only if the Commission concluded that the traffic at issue was local as opposed to interLATA interstate. CenturyTel accordingly argued that it was seeking a determination concerning the jurisdictional classification of the traffic in question so that CenturyTel and MCI would know the appropriate forum for their dispute. CenturyTel accordingly urged the Commission to deny MCI's Motion to Dismiss and to issue the Declaratory Order requested.

### D. The Commission's Decision to Establish this Declaratory Proceeding

After reviewing the arguments advanced by CenturyTel and MCI in light of the dispute resolution clause in the Interconnection Agreement between the [*11] Parties, the Commission concluded that the parties must adhere to the requirements of the Interconnection Agreement with regard to the issue of whether MCI could terminate its contractual TCP/IP services and use local interconnection services under the Interconnection Agreement for the same allegedly noncompetitive purpose. With respect to CenturyTel's request that the Commission determine whether MCI could order local interconnection services to use as a Virtual NXX service instead of paying for tariffed interexchange carrier local access for originating and terminating MCI interLATA interstate traffic, the Commission concluded that CenturyTel's request was sufficiently related to the Interconnection Agreement between the parties such that the resolution of the dispute between CenturyTel and MCI should be in accordance with the procedures set forth in the Interconnection Agreement between the parties. The Commission went on to conclude, however, that the general question of whether a Competitive Local Exchange Carrier ("CLEC"), or any other telecommunications carrier, may order local interconnection services to utilize as a Virtual NXX for the transport and termination of the type [*12] traffic discussed in the CenturyTel Petition was a matter which should be addressed by the Commission on a generic, industry -- wide basis. On May 13, 2003, the Commission indeed entered an Order establishing this Declaratory Proceeding and sought comments from interested parties regarding the issues associated with the provisioning of Virtual NXX Service.

### II. The Initial Comments Received by the Commission

#### A. The Initial Comments of CenturyTel

CenturyTel pointed out in its initial comments in this cause that the VNXX Service offered by CLECs generally involves a carrier's assignment of an NXX to one of its customers that is not physically located in the exchange to which the NXX is rate -- centered. To the extent that carriers utilizing VNXX Service allow said service to be utilized to transport interexchange calls from CenturyTel customers to VNXX carrier customers located outside of the local calling area to which the assigned NXX is rate -- centered, CenturyTel asserted that such traffic would be interexchange in nature since the VNXX calls rely upon and utilize the CenturyTel facilities in exactly the same manner as all other interexchange traffic originating from [*13] that same customer. CenturyTel accordingly argued that its compensation for the use of its facilities in VNXX arrangements should be consistent with the compensation that CenturyTel typically receives for interexchange traffic. CenturyTel in fact maintained that the real purpose of VNXX service offerings is to allow VNXX carriers to provide interexchange calling utilizing Incumbent Local Exchange Carrier ("ILEC") facilities while evading the access charges that would otherwise be associated with the use of those ILEC facilities. n13

n13 CenturyTel Initial Comments at pp. 2-3.

CenturyTel contended that the Commission should not allow carriers to assign NXX prefixes rated for one exchange to customers located in another exchange because such provisioning arrangements are not in the public interest. More particularly, CenturyTel argued that VNXX carriers should not be allowed to carry interexchange traffic over ILEC facilities without properly compensating ILECs for the use of those facilities in the same manner as other [*14] interexchange carriers. CenturyTel asserted that if VNXX carriers were allowed to evade access charges for their interexchange service, it would create an arbitrage situation given that other interexchange carriers who similarly utilize ILEC facilities pay access charges as a condition of their usage of the facilities in question. CenturyTel expressed particular concern with the prospects of Voice over Internet Protocol traffic further compounding that problem. n14

n14 *Id.* at pp. 3-12.

CenturyTel further argued that regardless of how VNXX service is rated for retail calling purposes, VNXX calls should clearly be rated as interexchange services for intercarrier compensation purposes because VNXX calls originate from one customer in one local calling area and terminate to a customer located in a different local calling area. According to CenturyTel, calls between customers not located in the same calling area are interexchange calls by definition, regardless of how they are dialed. n15

n15 *Id.* at p. 14.

[*15]

CenturyTel asserted that the imposition of access charges on VNXX traffic would have a positive effect on competition because it would place VNXX traffic and more traditional interexchange traffic on a level playing field. CenturyTel further maintained that the effect on consumers would be positive because of the avoidance of an arbitrage scenario and the resulting continued stability of access charges which help support ILEC networks. CenturyTel asserted that the support provided by access charges help to keep local rates low. n16

n16 *Id.* at p. 15.

CenturyTel lastly asserted that VNXX-like service arrangements result in an inefficient use of numbering resources and have a detrimental impact on the implementation of number portability. According to CenturyTel, the widespread use of VNXX service would create an environment where NXXs would begin to lose all meaning and create confusion with respect to customer location and routing. n17

n17 *Id.* at pp. 16-17.

[*16]
B. The Initial Comments of BellSouth Telecommunications, Inc.

In its Initial Comments, BellSouth Telecommunications, Inc. ("BellSouth") asserted that CLECs should not be permitted to disguise interLATA interstate traffic as local traffic through the use of Virtual NXX service. According to BellSouth, CLECs should be permitted to assign NPA/NXXs outside the rate centers to which they are homed only if the CLEC in question can identify the physical end points of the calls to VNXX customers so that the appropriate compensation can be determined by other carriers involved in the completion of such calls. n18

n18 BellSouth Initial Comments at pp. 1-5.

In support of its position, BellSouth pointed out that reciprocal compensation applies only to local telecommunications traffic which is defined as traffic that "originates and terminates within a local service area established by the state Commission." n19 BellSouth accordingly argued that the Commission should not allow compensation to be determined by the NPA/NXX [*17] assigned, but should instead adhere to the long standing practice of determining compensation based on the physical end points of the call in question. n20

n19 *Id.* at p. 2; Citing 47 C.F.R. § 51.701. n20 *Id.*

According to BellSouth, CLECs need only to separately identify any number assigned to a CLEC end-user who is physically located outside the local calling area and provide such information to BellSouth. BellSouth noted that it had built and maintained its own database to ensure that no reciprocal compensation is charged to its competitors for any calls to customers of BellSouth's VNXX equivalent service which has traditionally been called Foreign Exchange or "FX" service. n21

n21 *Id.* at p. 10.

BellSouth also contended that it should be allowed to collect originating access charges on calls to Virtual NXX numbers originating in one [*18] local calling area and terminating in a different local calling area just as it is allowed to collect originating access charges on other toll calls. BellSouth asserted that calls outside the local calling area are toll calls regardless of the numbers a CLEC assigns to its end-users. n22

n22 *Id.* at pp. 8-10.

### C. The Initial Comments of MCI

In its Initial Comments, MCI asserted that it is undisputed that ILECs have a duty to interconnect with CLECs pursuant to § 251(c)(2) of the Act and must permit interconnection for the purpose of transporting VNXX and FX traffic. MCI maintained that the issue in dispute between CLECs and ILECs is the manner in which VNXX traffic should be classified for intercarrier compensation purposes. MCI asserted that the FX traffic of the ILECs and the VNXX traffic of CLECs should be treated as local and thus subject to reciprocal compensation. MCI maintained that jurisdiction of such traffic is properly determined by comparing the rate centers associated with the originating and terminating [*19] NPA/NXXs for any given call, not the physical location of the end-users in question. MCI maintained that such an approach was consistent with the manner in which the jurisdiction of traffic and the applicability of toll charges are determined within the telecommunications industry today. n23 MCI maintained that if the Commission decided to adopt the controversial positions taken by the ILECs, VNXX calls would be treated as if they were long distance. MCI asserted that such a decision would raise the costs of the CLECs to provide their competitive alternative to the FX service of the ILECs to the point that CLECs would effectively be eliminated from the market for FX-like services such as VNXX. n24

n23 MCI Initial Comments at pp. 3-6.

n24 *Id.*

### D. The Initial Comments of AT&T Communications of the South Central States, LLC5n25

n25 ITC DeltaCom Communications, Inc. ("ITC DeltaCom") did not submit initial comments, but did submit notification that it adopted in full the Initial Comments of AT&T.

[*20]

AT&T Communications of the South Central States, LLC ("AT&T") maintained in its Initial Comments that the Virtual NXX service at issue in this proceeding is a competitive service offered by CLECs as an alternative to the Foreign Exchange or FX service which has traditionally been offered by incumbent local exchange carriers. AT&T accordingly referred to VNXX service in its comments as FX-like service. n26

n26 AT&T Initial Comments at p. 1.

AT&T further maintained that FX-like service and the FX service traditionally offered by ILECs provide the same functionality but are provisioned differently due to the different network architectures employed by ILECs and CLECs. In particular, AT&T pointed out that the ILECs have traditionally employed multi -- layered or tiered networks because those networks were largely deployed when there were significant distance limitations on local loop technology. Thus, the traditional ILEC FX service is comprised of a local loop, a dedicated interoffice facility, and local dial tone from [*21] a foreign switch. n27

n27 *Id.* at pp. 2-6.

AT&T maintained that it provides its FX-like services in a much different way than the ILECs due to the fact that its switches serve the same geographic area as multiple ILEC legacy serving wire centers. AT&T therefore pointed out that its service configuration does not require private line arrangements such as those used by the ILECs to connect the wire center serving the FX customer and the wire center serving the foreign NPA-NXX. n28 AT&T again stressed, however, that the differences in provisioning traditional FX service and FX-like services such as VNXX service do not justify different treatment of those services for intercarrier compensation purposes because both services provide the same functionality in the end. n29

n28 AT&T Initial Comments at pp. 1-5. n29 *Id.* at pp. 5-6.

AT&T further asserted that FX services and FX-like services such as VNXX are local service offerings. [*22] AT&T maintained that the incumbent local exchange carriers have been offering their traditional FX service for many years in their tariffs as a local service offering. n30 AT&T asserted that FX-like services should also be treated as local in nature to ensure the furtherance of competition for such services. n31

n30 *Id.* at pp. 6-7. n31 *Id.* at p. 8.

AT&T further pointed out that FX and FX-like traffic consists of two categories of traffic, voice and Internet Service Provider ("ISP") bound traffic which are separately addressed for regulatory purposes. AT&T noted that as a result of the conclusions reached by the FCC in its *ISP Remand Order, n32 traffic delivered to an ISP is predominantly interstate access traffic which is subject to the jurisdiction of the FCC pursuant to § 201 of the Telecommunications Act of 1996. AT&T further stated that the FCC's ISP Remand Order* established an intercarrier compensation mechanism for the exchange of ISP-bound traffic including ISP-bound FX-like traffic which [*23] has been upheld by the United States Court of Appeals for the D.C. Circuit. AT&T thus surmised that ISP-bound traffic, including ISP-bound FX-like traffic, is subject to the FCC's intercarrier compensation mechanism and is not subject to the jurisdiction of state commissions. n33

n32 AT&T Initial Comments at pp. 8-9. n33 AT&T Initial Comments at pp. 8-9.

AT&T further asserted that the typical argument of the ILECs is that FX-like traffic is interexchange in nature and that intrastate access charges should, therefore, apply to such traffic because the calling party and the called party are physically located in different calling areas. At the same time, however, AT&T asserted that the ILECs also advocate that their own traditional FX traffic, which also does not originate and terminate in the same local calling area, is nonetheless local traffic subject to reciprocal compensation. AT&T cautioned that if the Commission were to accept such an argument, one subset of traffic, the CLEC's FX-like service, that competes [*24] with ILEC FX services, would be treated differently for compensation purposes than the FX service of the ILECs. According to AT&T, such a finding would create a structure that would at least limit and most likely eliminate competition in the affected local market segment. AT&T further pointed out that the adoption of such an approach would "fly in the face" of the

historical industry practice of determining traffic type by comparing the NPA-NXXs of the calling and called parties and would impose a significant and unnecessary cost on AT&T and other CLECs. n34 According to AT&T, there is at the present time no viable alternative to the current system under which carriers rate calls by comparing the originating and terminating NPA-NXXs. n35

n34*Id.* at pp. 9-10.n35*Id.*

AT&T further pointed out that any attempt to characterize FX-like traffic as toll and thus subject to access charges would be impossible to square with the law. According to AT&T, the FCC's *ISP Remand Order* establishes that all traffic is [*25] subject to reciprocal compensation unless the traffic falls within the exemptions established in § 251(g) of the Act. n36 AT&T asserted that the D.C. Circuit Court of Appeals determined in *WorldCom v. FCC* n37 that because FX-like traffic did not exist prior to the Act, there was no pre-Act obligation relating to intercarrier compensation for ISP-bound traffic. AT&T accordingly argued that any attempt to place FX-like non ISP-bound traffic within the scope of § 251(g) ignores the limiting application of that section as determined by the District Court. n38 AT&T thus surmised that non ISP-bound FX-like traffic is local in nature and, therefore, subject to reciprocal compensation. n39

n36 ISP Remand Order at p. 46, AT&T Initial Comments at p. 11.n37*WorldCom, Inc. v. FCC,* 288 F.3d 429 (2002).n38 Initial Comments of AT&T at p. 11.n39*Id.* at pp. 14-15.

### E. The Initial Comments of US LEC of Alabama, Inc.

In its Initial Comments, US LEC of Alabama, Inc. ("US [*26] LEC") asserted that in light of the FCC's *ISP Remand Order*, the Commission does not have jurisdiction to revise the intercarrier compensation regime established by the FCC for ISP-bound traffic. US LEC accordingly asserted that for purposes of this proceeding, the APSC's review of intercarrier compensation issues for foreign exchange-like arrangements was limited to those arrangements for customers other than ISPs.n40

n40 Initial Comments of US LEC at pp. 1-5.

US LEC further asserted that non ISP-bound foreign exchange traffic should continue to be treated as local traffic for intercarrier compensation purposes. US LEC pointed out that for purposes of intercarrier compensation, the telecommunications industry has typically rated calls as either local or toll based on a comparison of the NXX codes of the calling and called parties. US LEC contended that the Commission should conclude that the parties must continue to base their intercarrier compensation obligations on the NPA/NXX of the calling and called parties [*27] as opposed to their physical location. n41 Given the fact that FX and FX-like services rely on a comparison of NXX codes to rate calls and are functionally similar in nature, US LEC argued that there is no factual, legal, or policy basis to change the current system. n42

n41*Id.* at p. 6.n42*Id.* at pp. 8-9.

US LEC further asserted that the public interest would benefit from continuing to treat FX and FX-like traffic as local for all purposes, including intercarrier compensation. n43 According to US LEC, such an approach would ensure that consumers continue to receive the benefits resulting from competition between the FX services provided by the ILECs and the FX-like services offered by CLECs such as US LEC. US LEC accordingly urged the Commission to rule that FX-like arrangements such as Virtual NXX services are competitive substitutes for the traditional ILEC FX services and should be regulated in the same manner. More specifically, US LEC argued that the traditional FX service of the ILECs and the FX-like [*28] services of the CLECs, including VNXX service, should be regulated in the same

manner and treated as local traffic subject to reciprocal compensation obligations rather than access charges. US LEC further urged the Commission to clarify that it lacks jurisdiction to revise the intercarrier compensation regime for ISP-bound traffic as established by the FCC. n44

n43 *Id.* at pp. 6-9. n44 *Id.* at p. 19.

### F. The Initial Comments of Level 3 Communications, LLC

In its Initial Comments, Level 3 Communications, LLC ("Level 3") asserted that the FX-like/VNXX services provided by CLECs provide the same functionality and are a competitive response to the FX services that have traditionally been offered by ILECs. n45 According to Level 3, CLECs often utilize a single switch and transport on their network to provide FX-type functionality while ILECs typically utilize an embedded base of multiple switches to support the same service. Level 3 asserted that such network distinctions were invisible to subscribing customers [*29] and irrelevant in determining the nature of the service. Level 3 argued that the critical considerations from a regulatory, operational, economic, and compensation standpoint were the functionality delivered to the customer and the relative responsibilities of each carrier in handling the traffic in question. n46

n45 Level 3 Initial Comments at p. 1. n46 *Id.* at pp. 2-3.

Level 3 further asserted that the FCC's assumption of sole authority over all questions relating to the specific issue of intercarrier compensation for the exchange of ISP-bound traffic in its *ISP Remand Order* precluded the Commission from imposing reciprocal compensation, access charges or any other form of compensation in connection with the exchange of ISP-bound traffic, regardless of whether the traffic is FX, VNXX or otherwise. n47 Level 3 asserted that the Commission's sole jurisdiction was over the relative compensation obligations of carriers with respect to the exchange of non ISP-bound FX and FX-like traffic. n48

n47 *Id. at p. 7.* [*30]

n48 *Id.* at p. 10.

According to Level 3, the Commission should recognize and affirm that FX-like/VNXX calls are generally routed over local interconnection facilities and have been treated by carriers and other regulatory agencies as local traffic. According to Level 3, the routing and/or network expenses associated with the origination of such calls is no different than the costs associated with other local calls. For non ISP-bound traffic, Level 3 asserted that the Commission should determine that such traffic is subject to reciprocal compensation and is not subject to access charges or any other kind of originating compensation. n49

n49 *Id.* at pp. 12-13.

Level 3 pointed out that ILECs do not impose access charges on their own FX or FX-like services and do not incur additional costs in originating FX or FX-like calls as compared to other local calls. Level 3 asserted that ILECs are in fact compensated for originating calls [*31] to CLEC customers through their local rate structure. n50 Level 3 asserted that since ILECs do not impose access charges on their own FX and VNXX services or establish separate facilities just to obtain such traffic, it would be discriminatory to apply access charges to CLEC FX-like services or to require separate facilities for CLEC FX-like services. According to Level 3, if the Commission were to require that CLECs pay

originating access on FX-like calls, it would need to impose that same requirement with regard to the ILECs and their FX traffic. n51

n50 *Id.* at pp. 10-14. n51 *Id.* at p. 13.

### G. The Initial Comments of Sprint Communications Company, L. P.

In its Initial Comments, Sprint Communications Company, L.P. ("Sprint") limited its assessment of Virtual NXX/FX traffic to ISP traffic. Sprint noted support for the use of Virtual NXXs for the delivery of ISP traffic and stated its belief that such service configurations serve the public interest by maintaining affordable, dial-up Internet service [*32] to end users. Sprint further stated, however, that it did not believe that the originating ILEC should be responsible for 100% of the transport costs from the Virtual NXX rate center to the point of interconnection ("POI") when the ILEC is forced to assume transport costs to a distant POI located outside the local calling area. Sprint maintained that if the physical POI is located within the local calling area of the originating end office, the ILEC should be responsible for the cost of transporting its originating traffic to the CLEC POI. However, when the physical POI is not located within the local calling area where the call originates, Sprint asserted that the ILEC should not be forced to absorb lengthy transport costs as the result of the CLEC's network design. Sprint noted its support for a limitation on the distance that ILECs must transport such traffic. In particular, Sprint noted that the ILECs should only be required to assume the cost to transport their originated traffic within the local calling area with the CLEC being required to bear, at TELRIC based rates, the costs of the originating ILEC's transport outside of the originating ILEC's local calling area. n52

n52 Sprint Initial Comments at p. 5.

[*33]

Sprint further stated that it did not support recent ILEC efforts to charge CLECs originating access for VNXX traffic. n53 Sprint discounted the argument that a traditional "end to end" analysis supports the argument that originating access should apply to Virtual NXX traffic. Sprint maintained that such an argument carries less weight in the current environment where carriers are assigning numbers to customers who are not located where the call is actually rated. Sprint further asserted that there is no viable alternative to the current system of utilizing the NPA/NXX codes to rate calls. According to Sprint, rating calls by their geographical end -- points would raise billing and technical issues that have no concrete workable solutions at the current time. n54

n53 *Id.* at pp. 4-5. n54 *Id.* at p. 6.

Sprint also represented that the under-recovery by ILECs of their transport costs would not be resolved by charging originating access to CLECs for Virtual NXX calls or eliminating the use of Virtual NXX service [*34] altogether. Sprint asserted that such a result would clearly be detrimental to end-users. Sprint maintained that the Commission should instead limit the distance that ILEC's must transport originating Virtual NXX traffic to their local calling area and require cost-based compensation to the ILECs for transport beyond the local calling area. Sprint asserted that such an approach would ensure the continued benefits of Virtual NXX service to consumers and would adequately balance the interests of ILECs and CLECs. n55

n55 *Id.* at p. 8.

### III. The Reply Comments received by the Commission

### A. The Reply Comments of CenturyTel

In its Reply Comments, CenturyTel asserted that the commenting CLECs had failed to address many of the deleterious effects of arbitraged VNXX service on Alabama's local telephone network and ILEC revenue streams supporting local service. CenturyTel maintained that the CLECs had instead sought unfounded payments in the form of reciprocal compensation by labeling VNXX calls as local. CenturyTel [*35] further asserted that none of the commenting CLECs had addressed the numbering resource and/or numbering portability issues raised by CenturyTel in its Initial Comments. n56

n56 CenturyTel Reply Comments at pp. 1-3.

CenturyTel also reiterated its position that intercarrier compensation problems arise when VNXX calls cross exchange boundaries without the knowledge of the ILECs and the necessary collection of access charges. More specifically, CenturyTel again asserted that reciprocal compensation for such calls is certainly not due. CenturyTel maintained that the Commission should not allow compensation to be determined by the NPA/NXX assigned, but should instead follow the longstanding practice of determining compensation based on the physical end -- points of the call in question. Without such action by the Commission, CenturyTel asserted that carriers such as MCI could game the system by creating reciprocal compensation obligations out of whole cloth and avoiding toll access charge payments through the simple process [*36] of assigning telephone numbers. n57

n57 *Id.* at pp. 3-4.

CenturyTel asserted that ILECs should be allowed to collect originating access charges on calls to VNXX numbers that originate in one local calling area and terminate in a different local calling area just as they are allowed to collect originating access charges on other toll calls. CenturyTel further represented that the Commission has jurisdiction to assess access charges on VNXX calls crossing exchange boundaries whether such calls are to ISPs or not. CenturyTel maintained that only access charges would adequately compensate CenturyTel for originating VNXX calls crossing exchange boundaries. n58

n58 *Id.* at pp. 7-13.

CenturyTel clarified that it was not proposing that CLECs be precluded from assigning VNXXs. The real issue, according to CenturyTel, pertains to the compensation due for [*37] VNXX calls. n59

n59 *Id.* at p. 10.

**B. The Reply Comments of BellSouth**

In its Reply Comments, BellSouth reiterated its position that CLECs should be permitted to provision Virtual NXX services so long as the CLECs do not manipulate NPA/NXX codes for purposes of avoiding toll charges or to manufacture reciprocal compensation obligations when none are warranted. n60 BellSouth also disputed the CLEC representations that BellSouth treats FX traffic as local in nature. BellSouth asserted that it in fact implemented a system -- wide billing change in February of 2001 to prevent the billing of reciprocal compensation to CLECs on calls from CLEC customers to BellSouth FX customers. n61

n60 BellSouth Reply Comments at pp. 1-2. n61 *Id.* at p. 2.

BellSouth further noted that its FX service is not tariffed as a local service and is not treated [*38] as local in the settlement process between BellSouth and other ILECs. BellSouth noted that FX service is considered to be a toll alternative service from a tariff perspective and from an ILEC to ILEC compensation perspective. According to BellSouth, the customers subscribing to FX, 800, or other FX-like services pay for the FX-like service charges in lieu of the calling party paying toll usage charges. BellSouth maintained that the customer benefiting from the service is the one who pays for the service as should be the case with Virtual NXX calls. n62

> n62 *Id*

BellSouth also disputed the CLEC representations that ILECs are compensated for originating calls to CLEC customers through their local rate structure. BellSouth maintained that local rates are designed to recover the cost of carrying local traffic. BellSouth asserted that VNXX traffic is not local in nature because it originates in one local calling area and terminates in a different local calling area resulting in long distance originating costs to BellSouth. [*39] As is the case when BellSouth originates any other long distance call, BellSouth argued that it is entitled to collect originating access charges when it originates such long distance traffic for other carriers. BellSouth asserted that the CLEC demand that BellSouth pay reciprocal compensation for such traffic only added insult to injury. n63

> n63 *Id.* at p. 3.

### C. The Reply Comments of Alabama's Rural Local Exchange Carriers

Twenty-nine (29) of Alabama's Rural Incumbent Local Exchange Carriers (collectively the "Rural LECs") identified individually in Appendix A attached hereto also submitted Reply Comments in this matter. The Rural LECs concurred with the positions of BellSouth and CenturyTel and asserted that carriers such as the commenting CLECs should not be allowed to utilize Virtual NXX service to avoid paying access charges. The Rural LECs maintained that Virtual NXXs create a cost recovery anomaly, authorize uneconomic toll bypass, and are simply a means of arbitrage to avoid paying access charges for [*40] interexchange traffic that should be paid. n64 The Rural LECs asserted that where traffic is interexchange in nature, VNXX carriers must not be allowed to avoid the payment of legitimate charges. n65 The Rural LECs urged the Commission not to allow compensation to be determined by the NPA/NXX assigned, but to instead follow the longstanding industry practice of determining compensation based on the physical end -- points of the call other state commissions throughout the country have done with respect to VNXX. n66

> n64 Reply Comments of the Rural LECs at p. 2; Citing Developing a Unified Carrier Compensation Regime, Notice of Proposed Rulemaking, CC Docket No. 01-92, FCC 01-132 (rel. April 27, 2001) ("Unified Carrier Compensation Regime Proceeding"). n65 *Id.* n66 *Id.* at p. 3.

The Rural LECs agreed with BellSouth that while Virtual NXX service is similar to FX service, the two services are not the same. The Rural LECs asserted that Virtual NXX service is a system created for the sole purpose of reclassifying [*41] toll calls as local calls thereby allowing CLECs to avoid the payment of access charges. The Rural LECs concede that FX service also treats calls that would otherwise be considered interexchange as local, but assert that their FX service involves the purchase of an FX line. According to the Rural LECs, the customer purchasing an FX line actually pays for its cost and for transporting traffic in large amounts between the two rate centers involved in the provision of the FX service utilized by ILECs. The Rural LECs maintained that VNXX traffic, on the other hand, depends on an ILEC to provide the service for free since "the ILEC must provide interconnection to carriers providing telephone exchange service and exchange access, and also to carriers providing exchange access only." N67 Put another way, the Rural LECs represented that FX service does not alter the traditional definitions of local and toll, it merely shifts the responsibility for paying the toll charge to the called party. n68 The Rural LECs asserted that Virtual NXX is, therefore, a fiction for turning an interexchange call into a local call so that access charges are avoided and fair

competition is bypassed. The Rural [*42] LECs maintained that FX service, on the other hand, does not alter the traditional definitions of local and toll but merely shifts the responsibility for paying the toll charge to the called party. n69

n67*Id.* at p. 5; Citing the Initial Comments of MCI at p. 4.n68*Id.* at pp. 6-7.n69*Id.*

### D. The Reply Comments of MCI

In its Reply Comments, MCI reasserted that pursuant to existing FCC precedent and industry practice, Virtual NXX traffic should be permitted to be carried over interconnection trunks and should be considered local for intercarrier compensation purposes. According to MCI, the ILEC argument that ILECs are entitled to compensation for the use of their network regardless of the type of traffic they are originating or terminating is unfounded. n70

n70 MCI Reply Comments at p. 1.

MCI represented that intercarrier [*43] compensation rules vary depending on the type traffic originated or terminated. According to MCI, the local carrier is entitled to different levels of compensation and is sometimes required to pay compensation to another carrier involved in handling calls even though the function performed by the local carrier is exactly the same in each instance. n71 As an example, MCI noted that when a local carrier originates or terminates a long distance call, the amount of switched access charges due depends on whether the call is intrastate or interstate. When precisely the same local network facilities are used, and a local call is handed off to a competitive local exchange carrier, MCI pointed out that the originating local carrier is not entitled to compensation for its services, but must instead pay reciprocal compensation to the terminating CLEC. n72 Even then, the amount of reciprocal compensation due may depend on whether voice or Internet traffic is being transported, according to MCI. n73 In short, MCI argued that contrary to the positions taken by the incumbent LECs, the question of intercarrier compensation for VNXX calls turns on how such calls are classified and not merely on the [*44] role played by the incumbent local exchange carrier's network in the completion of the call. n74

n71 MCI Reply Comments at pp. 1-2.n72*Id.*n73*Id.*n74*Id.*

MCI further argued that the commenting ILECs had failed to distinguish differences between the VNXX type services typically offered by CLECs and the traditional FX services offered by incumbent local exchange carriers. MCI in fact argued that the ILEC practice of treating their traditional FX calls as local followed the established industry practice of rating calls according to their NPA/NXX codes rather than the physical beginning and end points of the call. n75 MCI asserted that the real agenda of the ILECs was to prevent competition for FX services. MCI urged the Commission to rule that VNXX calls are to be rated according to NPA/NXX and treated as local. According to MCI, such a ruling would be in accordance with the industry -- wide treatment of VNXX traffic and FCC precedent. MCI further agreed that such a holding would reasonably [*45] accommodate the larger calling areas served by CLEC networks and promote FX competition to the benefit of Alabama consumers. n76

n75*Id.* at p. 3.n76*Id.* at pp. 4-5.

### E. The Reply Comments of AT&T Communications of the South Central States, LLCn77

n77 ITC DeltaCom did not submit Reply Comments but indicated its desire to adopt the Reply Comments filed by

In its Reply Comments, n78 AT&T again asserted that FX-like traffic is not subject to § 251(g) of the Telecommunications Act of 1996 and accordingly should be subject to reciprocal compensation. AT&T also reiterated that the FCC's *ISP Remand Order* clearly removed all ISP-bound traffic, including FX-like traffic that is ISP-bound from the jurisdiction of state commissions. n79

> n78 AT&T submitted its comments one day out of time. AT&T accordingly submitted a Motion for Leave to File its Reply Comments one day out of time. Said Motion is with this Order granted. [*46]

n79 *Id.* at p. 2.

AT&T further explained that FX-like traffic does not meet the definition of "exchange access" and for that reason cannot be classified as traffic subject to access charges pursuant to § 251(g). AT&T accordingly argued that the ILECs' representation that VNXX calls originating in one local calling area and terminating to a customer located in another calling area should be considered toll calls for purposes of intercarrier compensation was incorrect. n80

> n80 *Id.* at p. 3.

According to AT&T, the ILEC proposal to apply originating access charges to FX-like traffic turns the traditional notion of the calling party's network pays upside down. AT&T noted that under such a scenario, the ILECs would not only collect local exchange service revenue from their local exchange customers originating the FX-like calls, but they would also collect originating access from the CLEC and avoid paying the CLEC anything for terminating [*47] FX-like calls. AT&T maintained that carriers terminating a call, whether such calls are local or toll, are always entitled to compensation for call completion and that compensation should come from the carrier that has the billing relationship with the calling party. n81 AT&T surmised that classifying FX-like service as toll would be unlawful and contrary to the public interest because it would be anticompetitive, result in significant customer confusion, and would defeat the very purpose for which it was created -- to enable the subscriber to the FX-like service to establish a local presence in a distant exchange where he/she wants to do business. n82

> n81 *Id.* at pp. 3-4. n82 *Id.* at pp. 4-5.

According to AT&T, the appropriate treatment of FX-like traffic is to categorize such traffic as local with the terminating carrier being paid reciprocal compensation. AT&T maintained that such a practice would be consistent with the local classification that ILECs utilize with their own FX service and would recognize [*48] the historical industry -- accepted standard of determining traffic type based on the NPA/NXXs of the calling and called parties. AT&T asserted that continuing this traditional practice would avoid the imposition of significant additional costs associated with implementing a new, unique process for comparing the physical locations of the calling and called parties. AT&T represented that a contrary ruling would be inconsistent with numerous authorities ruling that terminating carriers must receive reciprocal compensation for terminating FX-like traffic. n83

> n83 *Id.* at pp. 7-8.

AT&T further maintained that CenturyTel's representations that the Commission could assert jurisdiction with regard to VNXX traffic bound to ISPs was unfounded. AT&T represented that such a conclusion would be contrary to the ruling set forth in the FCC's *ISP Remand Order*. n84

n84 *Id.* at pp. 9-10.

[*49]

AT&T further asserted that neither CenturyTel nor any other party had provided detailed information outlining a current tangible numbering resource problem related to the provision of the FX-like services provided by CLECs. AT&T asserted that accepting CenturyTel's unsupported claim that FX-like services would somehow jeopardize numbering resources without a demonstration of actual problems would be inappropriate and would result in the misguided effort to solve a problem that does not exist. n85

n85 *Id.* at pp. 11-13.

AT&T concluded that FX-like service is a competitive alternative to the FX service offered by ILECs and thus is in the public interest. AT&T maintained that the ILEC proposal to levy originating access charges on the terminating carrier in VNXX scenarios would fly in the face of the calling party pays regime and would have the practical result of eliminating a competitive alternative from the marketplace. AT&T urged the Commission to advance the public interest by confirming that FX-like traffic is [*50] local in nature and should result in the payment of reciprocal compensation to the terminating carrier. AT&T urged the Commission to reject CenturyTel's argument that ISP-Bound FX-like traffic is within its jurisdiction and instead find that such traffic is subject to the intercarrier compensation regime established by the FCC in its *ISP Remand Order*. n86

n86 *Id.* at pp. 13-14.

### E. The Reply Comments of US LEC of Alabama, Inc.

In its Reply Comments, US LEC reasserted its previous position that the Commission lacks jurisdiction to address intercarrier compensation issues related to ISP-Bound traffic. US LEC maintained that the Commission's review of intercarrier compensation for foreign exchange -- like arrangements was limited to those arrangements for customers other than ISPs. n87

n87 US LEC Reply Comments at pp. 1-3.

US LEC further asserted [*51] that non ISP-Bound foreign exchange traffic should continue to be treated as local traffic for intercarrier compensation purposes. US LEC maintained that the insignificant volumes of non ISP-Bound Virtual NXX traffic would not justify the expenditure of the resources that would be necessary to track and bill such traffic if it were treated as interexchange in nature. n88

n88 *Id.* at p. 3.

US LEC asserted that the Commission should refuse the invitation of the ILECs to deny intercarrier compensation to CLECs and make CLECs pay for the privilege of competing with the ILECs with respect to FX-like traffic by imposing access charges on such traffic. US LEC maintained that ILECs should not be compensated for services that they do not provide and for costs they do not incur. According to US LEC, the ILECs only obligation with respect to Virtual NXX traffic is to deliver a call originated by one of their customers to the point of interconnection with the CLEC within the LATA. At that point, the CLEC incurs the entire obligation [*52] to transport and terminate such calls wherever the called party is located. According to US LEC, there is no sensible reason to compensate ILECs such as

BellSouth for work which they do not perform or for costs which they do not incur by imposing access charges on FX-like calls. n89

> n89 *Id.* at p. 5.

US LEC further asserted that Sprint's proposal to require CLECs to incur transport obligations from the boundary of an ILEC's local calling area in foreign exchange arrangements should also be rejected. n90 US LEC contended that Sprint's proposal violated FCC rules permitting CLECs to establish a single point of interconnection per LATA and would in fact require CLECs to establish multiple POIs, one at each local calling area in which a CLEC has homed an NXX code. n91

> n90 Sprint did not file Reply Comments, but did submit a pleading on August 8, 2003 requesting that the Commission schedule workshops or in the alternative, oral argument, concerning the matters raised in this proceeding. Sprint's requests are with this Order denied. [*53]

> n91 *Id.* at p. 5.

### F. The Reply Comments of Level 3 Communications, LLC

In its Reply Comments, Level 3 asserted that there is no additional transport responsibility associated with the exchange of foreign exchange and Virtual NXX calls such that special originating compensation is appropriate or should be required. In particular, Level 3 maintained that ILEC-provided FX service and CLEC-provided Virtual NXX/FX-like arrangements are indistinguishable because both involve transport from wire center to end user and are routed through the switch providing service to the end user. Level 3 further asserted that there is no additional function involved in originating an FX or Virtual NXX call to another carrier such that special originating compensation should be required. Level 3 instead argued that any additional transport to the distant FX or Virtual NXX customer is handled solely on the terminating carrier's network and creates no additional burden on the originating carrier when compared to any local call placed by one of its customers. n92 Level 3 noted that BellSouth does not treat its FX [*54] service as long distance in nature such that it pays originating access to the carrier whose customer may have originated the calls. n93 Level 3 represented that most state commissions to consider Virtual NXX issues had rejected the imposition of an originating access charge compensation structure for such traffic. n94

> n92 *Id.* at pp. 1-5. n93 *Id.* at p. 6. n94 *Id.* at pp. 7-14.

Level 3 lastly asserted that FX-like/Virtual NXX services do not raise any numbering resource concerns because FX-like services place no greater strain on numbering resources than the traditional FX service provided by ILECs and other local telecommunications services. n95 Level 3 also argued that FX-like/Virtual NXX services should not raise any number portability concerns. Level 3 in fact noted that FX services have been deployed for decades while FX-like services have been deployed since at least 1996-1997. Level 3 maintained that, to its knowledge, no carrier had ever demonstrated that FX-like services complicate or interfere [*55] with number portability because each telephone number assigned remains associated with the given rate center regardless of the FX or non-FX nature of the service being purchased by the customer. n96

> n95 *Id.* at pp. 14-18. n96 *Id.* at pp. 18-19.

### IV. Findings and Conclusion of the Commission

. **The Continued Provision of FX/VNXX Service**

We conclude from the foregoing, that both ILECs and CLECs may continue to assign telephone numbers to end users physically located outside the rate center to which the telephone number they are assigned is homed. n97 Such services allow the purchasing end users to economically establish a local dialing presence in rate centers other than the rate center in which they are physically located and thereby serve the public interest. n98 We find that the record compiled in this cause does not demonstrate that FX and VNXX services have contributed to an exhaustion of available numbering resources at the current time. We further find that the current record does not [*56] demonstrate that the FX and VNXX service offerings discussed at length herein are presently impairing the reliable provisioning of number portability. In the event that there are changes in the circumstances surrounding the provisioning of FX and VNXX services in the future, we will revisit the conclusions reached herein.

> n97 To the extent necessary, we note that nothing in our findings herein should be construed as limiting the access of CLECs or other carriers to the interconnection services and facilities necessary to provision VNXX or any other FX-like service. n98 We herein refer to the traditional Foreign Exchange services provided by the ILECs as "FX" services. We refer to the FX-like services provided by the CLECs as "Virtual NXX or "VNXX" services."

**B. ISP-Bound FX and VNXX Calls**

Having reviewed the foregoing arguments of the commenting parties, the Commission concludes that by virtue of the determinations reached by the FCC in its *ISP Remand Order*, ISP-Bound FX and VNXX calls are predominantly [*57] considered jurisdictionally interstate and subject to the authority of the FCC. n99 This Commission accordingly has no authority to render determinations regarding the ISP-Bound FX/VNXX traffic referenced in this proceeding.

> n99 See ISP Remand Order at P 82

**C. Non ISP-Bound FX and VNXX Traffic**

We further conclude from the arguments presented by the commenting parties that the Virtual NXX service offered by the CLECs is indeed a competitive alternative to the traditional Foreign Exchange or FX service that has been offered by the ILECs for many years. The competing FX and VNXX services ultimately perform the same functionality for end-user customers -- they both allow the assignment of telephone numbers to end users physically located outside the rate center in which the telephone number assigned is homed. The FX/VNXX customers are thereby able to establish a local dialing presence in rate centers other than the rate center in which they are physically located.

While it is undeniable that the FX service offered [*58] by the ILECs and the VNXX service offered by the CLECs are provisioned differently due to variations in the network architecture and the local calling scopes of the ILECs as opposed to the CLECs, we find that those provisioning differences are insufficient to justify a disparate classification of FX and VNXX services for intercarrier compensation purposes. It is our finding that the separate treatment of such similarly situated traffic for intercarrier compensation purposes would be discriminatory and in contravention of the general purposes of the Telecom Act. We accordingly conclude that FX and VNXX traffic should be treated the same for intercarrier compensation purposes.

In light of the undisputed fact that ILECs such as BellSouth, CenturyTel and the Rural ILECs have been providing FX services for many years, we look to the manner in which the ILECs themselves have handled the intercarrier compensation for such traffic. The commenting CLECs contend that the ILECs have traditionally treated their FX traffic as local in all respects including the intercarrier settlement process. BellSouth disputes that claim asserting that its FX service is not purely tariffed as a local service [*59] and is not treated as local in the settlement process between BellSouth and other ILECs.

Our review of the tariff provisions of BellSouth, CenturyTel and certain other representative Rural ILECs reveals that each of those ILECs generally define FX service as a classification of exchange service even though they

apparently consider such service to be a toll alternative. n100 While it is not entirely clear from the record compiled herein as to the specific manner in which the ILECs address FX traffic in their settlement process, it is abundantly clear that the ILECs have not traditionally paid or imposed access charges or reciprocal compensation for FX traffic. This practice appears to have developed in recognition of the fact that FX service has traditionally been treated as something of a hybrid classification of exchange service even though it links customers in different exchanges.

We conclude that the traditional ILEC practice of neither assessing nor paying access charges or reciprocal compensation for FX traffic should be adhered to with respect to the VNXX services provided by the CLECs. We find that this policy will be best perpetuated by the implementation of a bill and keep [*60] regime for FX and VNXX traffic. A bill and keep regime will allow each carrier to keep all revenues associated with FX/VNXX traffic originated on their networks without having to pay the terminating carrier. There will accordingly be no access charges or reciprocal compensation assessed or paid for FX and VNXX traffic. A bill and keep system will allow the parties to sidestep the currently unworkable dilemma resulting from the telecommunications industry practice of determining the jurisdiction of calls based on their end -- points, but rating them according to their NPA-NXXs.

> n100 See General Subscriber Services Tariff of BellSouth, Alltel Alabama, Inc. and Gulf Telephone Company at A9.1.1A, Section 1.D and S3.3 respectively. See also the General Customer Services Tariff of CenturyTel of Southern Alabama at Section S1.D as well as the General Subscriber Services Tariff of CenturyTel of Northern Alabama at Section 1.

We conclude that the bill and keep regime for FX and VNXX traffic implemented herein should remain [*61] in place until such time as there is an affirmative demonstration that there are substantial imbalances in the costs of terminating such traffic or the levels of such traffic which is originated and terminated. We note, however, that carriers are free to enter agreements providing for different methods of intercarrier compensation for FX and VNXX traffic if they see fit to do so.

IT IS SO ORDERED BY THE COMMISSION.

IT IS FURTHER ORDERED BY THE COMMISSION, That jurisdiction in this cause in hereby retained for the issuance of any further order or orders as may appear to be just and reasonable in the premises.

IT IS FURTHER ORDERED, That this Order shall be effective as of the date hereof.

DONE at Montgomery, Alabama, this 29<th> day of April, 2004.

ALABAMA PUBLIC SERVICE COMMISSION

Jim Sullivan, President

Jan Cook, Commissioner

George C. Wallace, Jr., Commissioner

ATTACHMENT

**APPENDIX A**

**The Commenting Alabama Rural Local Exchange Carriers**

ALLTEL Alabama, Inc.
Ardmore Telephone Company
Blountsville Telephone Company, Inc.
Brindlee Mountain Telephone Company, Inc.
Butler Telephone Company, Inc.
Castleberry Telephone Company, Inc.
Farmers Telephone Cooperative, Inc.
Frontier [*62] Communications of Alabama, Inc.
Frontier Communications of Lamar County, Inc.
Frontier Communications of the South, Inc.

Graceba Total Communications, Inc.
GTC, Inc. (formerly the Florala Telephone Company)
Gulf Telephone Company
Hayneville Telephone Company, Inc.
Hopper Telecommunications Company, Inc.
Interstate Telephone Company
Millry Telephone Company, Inc.
Mon-Cre Telephone Cooperative, Inc.
Moundville Telephone Company, Inc.
National Telephone of Alabama, Inc.
New Hope Telephone Cooperative, Inc.
Oakman Telephone Company
OTELCO Telephone LLC
Peoples Telephone Company
Pine Belt Telephone Company, Inc.
Ragland Telephone Company
Roanoke Telephone Company, Inc.
Union Springs Telephone Company, Inc.
Valley Telephone Company