LEXSEE 2001 OHIO PUC LEXIS 712

In the Matter of Allegiance Telecom of Ohio, Inc.'s Petition for Arbitration of Interconnection Rates, Terms and Conditions, and Related Arrangements with Ameritech Ohio

Case No. 01-724-TP-ARB

PUBLIC UTILITIES COMMISSION OF OHIO

2001 Ohio PUC LEXIS 712

October 4, 2001

Swidler, Berlin, Shereff, Friedman, LLP by Eric J. Branfman, Washington, D.C.; and Bricker & Eckler by Sally Bloomfield, Columbus, Ohio, on behalf of Allegiance Telecom of Ohio, Inc.

Porter, Wright, Morris & Arthur, by Daniel R. Conway, Mark S. Stemm and Andrew E. Emerson, Columbus, Ohio; and Jon. F. Kelly and Mary Kay Fenlon, Ameritech Ohio, Columbus, Ohio.

**PANEL:** [*1] Alan R. Schriber, Chairman; Ronda Hartman Fergus; Judith A. Jones; Donald L. Mason; Clarence D. Rogers, Jr.

**OPINION:** ARBITRATION AWARD

The Commission, considering the petition, the evidence of record, the arbitration Panel Report along with the exceptions and replies thereto, and being otherwise fully advised, hereby issues its Arbitration Award.

II. HISTORY OF PROCEEDINGS:

On October 18, 2000, Allegiance Telecom of Ohio, Inc. (Allegiance or petitioner) served upon Ameritech Ohio (Ameritech) a written request for the rates, terms, and conditions for interconnection, resale services, network elements, and related services and arrangements pursuant to Sections 251 and 252 of the Telecommunications Act of 1996 (the Act) to be incorporated into a new interconnection agreement. On March 27, 2001, Allegiance filed a petition with this [*2] Commission for arbitration of 36 issues to establish an interconnection agreement with Ameritech pursuant to Section 252(b) of the Act. Among the issues for which Allegiance requested arbitration are matters relating to the general terms and conditions of the agreement, reciprocal compensation, billing and payment requirements and broadband services. Ameritech filed its response to the petition on April 23, 2001. By entry dated April 27, 2001, the attorney examiner scheduled the arbitration hearing in this case to begin on June 12, 2001. The April 27, 2001 entry also directed the parties to file their arbitration packages by no later than June 5, 2001. Allegiance and Ameritech filed their arbitration packages on June 5, 2001. The arbitration hearing was held on June 12, and 13, 2001. Allegiance presented the testimony of two witnesses: Richard Anderson (Allegiance Ex. 1) and Morton J. Posner (Allegiance Ex. 2). Ameritech presented the testimony of six witnesses: Jennifer Bracken (Ameritech Ex. 6), Linda De Bella (Ameritech Ex. 2), Sherri Flatt (Ameritech Ex. 5), Deborah Fuentes (Ameritech Ex. 3), Bryan Gonterman (Ameritech Ex. 1), and Craig Mindell (Ameritech Ex. 4). The parties filed [*3] initial post hearing briefs on June 29, 2001, and reply briefs were filed on July 13, 2001.

By stipulations filed April 23, June 12, and June 28, 2001, the parties indicated that they had resolved some of the issues initially identified for arbitration in this proceeding. Allegiance and Ameritech indicated resolution of Issues 4, 6-10, 15, 17, 29-32, 34-40, and 42. The remaining issues initially identified for arbitration were addressed in the Panel Report issued August 13, 2001. On August 21, 2001, Allegiance and Ameritech filed their exceptions to the Panel Report. Allegiance took exception to the Panel's recommendation on Issues 2, 3, 5, 16 and 21 and requested clarification

of the Panel Report as to Issue 14. Ameritech filed exceptions to Issues 2, 3, 5, 11, 13, 19, 33 and 41. Allegiance and Ameritech filed replies to the other party's exceptions on August 24, 2001.

This Arbitration Award only addresses those issues to which the parties took exception to the Panel Report. The issues arbitrated to which neither party took exception are discussed in the conclusion section of this Award.

III. ARBITRATION AWARD:

A. Exceptions to Issues Arbitrated

1. Issue 2:

> For [*4] the purposes of reciprocal compensation, should Allegiance be compensated for end-office, tandem, and transport elements of termination (tandem rate) when Allegiance's switch serves a geographic area comparable to the area served by Ameritech's tandem switch?

2. Issue 3:

> Whether Allegiance's switch presently qualifies for the tandem reciprocal compensation rate?

(a) Panel Recommendation

Consistent with the Commission's decision in Case No. 00-1188-TP-ARB, *In the Matter of the AT&T Communications of Ohio, Inc.'s and TCG Ohio's Petition for Arbitration of Interconnection Rates, Terms, and Conditions and Related Arrangements with Ameritech Ohio* (AT&T/Ameritech Arbitration Award) and pursuant to the Federal Communication Commission's (FCC) decision in *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act* CC Docket Nos. 96-98 and 96-68 released April 27, 2001 (ISP Remand Order), the Panel Report noted that two questions must be answered regarding reciprocal compensation. n1 The questions are: 1) what is the criteria that the Commission needs to satisfy in setting reciprocal compensation rates between Allegiance and [*5] Ameritech; and 2) what is the impact of the ISP Remand Order on the applicable compensation rates for transport and termination of local traffic?

---

n1 See pages 11-12 of the AT&T/Ameritech Arbitration Award.

---

The Panel found that the Commission has addressed this issue in numerous arbitration proceedings. n2 FCC Rule 51.711, as well as the Commission's guidelines issued in Case No. 95-845-TP-COI, *In the Matter of the Commission Investigation Relative to the Establishment of Local Exchange Competition and Other Competitive Issues* (Local Service Guidelines) at Section IV.D, require that rates for transport and termination of local traffic be symmetrical. Accordingly, the Panel found that the record demonstrates, consistent with the local service guidelines, that Allegiance's switch will be serving a geographically comparable area to the area served by Ameritech's tandem switch during the term of the interconnection agreement. Therefore, the Panel determined that Allegiance had passed the geographic comparability test. [*6] After considering all arguments raised, and consistent with the ISP Remand Order and the Local Service Guidelines, the Panel recommended that Allegiance be eligible for compensation at the tandem interconnection rate only when it terminates Ameritech-oriented local traffic carried over tandem interconnection facilities. In other words, if Allegiance establishes direct interconnection trunks between its switch and Ameritech's end office switch, it will be compensated for local traffic originated on an Ameritech end office switch and terminated on Allegiance's switch at the end office compensation rate. The end office compensation rate and the tandem interconnection compensation rates were established by the Commission in Case No. 96-922-TP-UNC, *In the Matter of the Review of Ameritech Ohio's Economic Costs for Interconnection, Unbundled Network Elements, and Reciprocal Compensation for Transport and Termination of Local Telecommunications Traffic* (Ameritech's 271 proceeding).

---

n2 See Case No. 97-152-TP-ARB, *In the Matter of the Petition of MCI Telecommunications Corporation for Arbitration Pursuant to Section 252(b) of the Telecommunications Act of 1996 to Establish an Interconnection Agreement with Cincinnati Bell Telephone Company*; Case No. 99-1153-TP-ARB, *In the Matter of the Petition of ICG Telecom Group, Inc. for Interconnection, Rates, Terms, and Conditions with Ameritech Ohio*; and Case

No. 00-1502-TP-ARB, *In the Matter of the Petition of Intermedia Communications, Inc. for Arbitration of Interconnection Rates, Terms, and Conditions, and Related Arrangements with Cincinnati Bell Telephone Company Pursuant to Section 252(b) of the Telecommunications Act of 1996.*

[*7]

With respect to the second question, the Panel recommended, pursuant to the ISP Remand Order, that Ameritech and Allegiance utilize the reciprocal compensation scheme recommended by the Panel only if Ameritech chooses not to offer to exchange traffic contemplated by Section 251(b)(5) of the Act, as well as internet service provider- (ISP-) bound traffic, at the rates set forth in the prior paragraph.

(b) Ameritech's Exception

With respect to Issue 2, Ameritech takes exception to the Panel's conclusion that Allegiance's switch "will be serving a geographically comparable area to the area served by Ameritech's tandem switch during the term of the interconnection agreement." Ameritech believes that FCC Rule 51.711 is clear that a competitive local exchange carrier (CLEC) cannot satisfy the geographic coverage test merely by showing what area its switch will be serving in the future. Rather, according to Ameritech, the FCC rule focuses on the area currently being served by the competing carrier, not the area the competing carrier may in the future serve. Additionally, Ameritech contends that the record does not support the Panel's finding that Allegiance's switch will be serving a [*8] geographically comparable area to the area that Ameritech's switch serves during the term of the agreement.

(c) Allegiance's Reply

Allegiance maintains that Ameritech misconstrues the comparable geographic coverage test established by the FCC and this Commission. Allegiance asserts that FCC Rule 51.711 (a)(3) by its terms requires only that the CLEC switch serve a geographic area "comparable" to the area served by the incumbent local exchange carrier (ILEC) switch -- not the same or identical area as argued by Ameritech. Allegiance further claims that Ameritech's position is clearly inconsistent with the Commission's prior decisions. n3

n3 Case No. 99-1153-TP-ARB, *In the Matter of ICG Telecom Group, Inc. Petition for Arbitration of Interconnection Rates, Terms, and Conditions and Related Arrangements with Ameritech Ohio*, (Arbitration Award issued February 24, 2000) at page 11.

(d) Arbitration Award

The Panel found that Allegiance's switch provides a comparable geographical coverage to Ameritech's tandem [*9] switches and, therefore, is entitled to receive the tandem reciprocal rate when Allegiance interconnects with Ameritech. After considering all arguments raised, and consistent with the ISP Remand Order and the Local Service Guidelines, the Commission finds that Allegiance would be eligible for compensation at the tandem interconnection rate only when it terminates Ameritech-oriented local traffic carried over tandem interconnection facilities. In other words, if Allegiance establishes direct interconnection trunks between its switch and Ameritech's end office switch, it will be compensated for local traffic originated on an Ameritech end office switch and terminated on Allegiance's switch at the end office compensation rate. As pointed out by Allegiance, this decision is consistent with prior Commission decisions in numerous arbitration cases, including the recent AT&T/Ameritech arbitration award. Therefore, the Commission affirms the Panel's decision in this matter and finds that Allegiance has met the geographic comparability test.

(e) Allegiance's Exception

With respect to Issue 3, Allegiance takes exception to what it describes as the imposition of a surrogate functionality [*10] test or symmetry test. Allegiance contends that FCC Rule 51.711(a)(3) clearly provides by its terms that once a CLEC has met the geographic coverage test, it is entitled to the tandem compensation rate. Further, Allegiance maintains that the Commission's Local Service Guidelines at Section IV.D.5 do not include any functional test or any symmetry test. Rather, Allegiance contends this rule simply provides that where the switch of a non-ILEC serves a geographic area comparable to the area served by the ILEC's tandem switch, the appropriate rate for the non-ILEC is the ILECs tandem interconnection rate. Allegiance also argues that this issue is directly affected by Ameritech's conduct under its application filed at the Commission pursuant to Section 271 of the Act. *See* Case No. 00-942-TP-COI,

*In the Matter of the Investigation into Ameritech Ohio's Entry into In-Region InterLATA Service Under Section 271 of the Telecommunications Act of 1996.* Section 271 of the Act specifies a competitive checklist that enumerates the access and interconnection that Ameritech must provide or offer to other telecommunications carriers before the FCC may authorize the company to provide long distance [*11] toll. Allegiance contends that Ameritech violates the Section 271 competitive checklist to the extent it follows the panel recommendation and refuses to pay reciprocal compensation to Allegiance at the tandem where Allegiance has established direct interconnection trunks to an Ameritech end office.

(f) Ameritech's Reply

Ameritech contends that the Commission has addressed this exact issue in several prior arbitration cases and rendered the same conclusion. According to Ameritech, the Commission has concluded that, if a CLEC passes the geographic comparability test, it is eligible for compensation at the tandem interconnection rate only when the CLEC terminates Ameritech-originated local traffic carried over tandem interconnection facilities. Ameritech maintains that Allegiance's exceptions merely rehash arguments against the Commission's policy.

(g) Arbitration Award

As correctly noted by Ameritech, the Commission has addressed this issue in numerous arbitration cases, including the AT&T/Ameritech Arbitration Award. We find that Allegiance has presented no new arguments not previously considered that would justify reversal of the recommendation presented in the Panel Report. [*12] Additionally, the Commission concludes that Ameritech's 271 filing is a separate case and has no bearing on this arbitration proceeding. Therefore, consistent with previous arbitration awards in this matter, the Commission agrees with the Panel Report in this case and concludes that Allegiance would be eligible for compensation at the tandem interconnection rate only when it terminates Ameritech-oriented local traffic carried over tandem interconnection facilities. In other words, if Allegiance establishes direct interconnection trunks between its switch and Ameritech's end office switch, it will be compensated for local traffic originated on an Ameritech end office switch and terminated on Allegiance's switch at the end office compensation rate.

3. Issue 5:

**Whether Virtual NXX calls should be subject to reciprocal compensation and whether the terminating Party should pay for the transport and other costs on the originating Party's side of the Point of Interconnection?**

(a) Panel Recommendation

As determined in the Panel Report, virtual NXX traffic is the generic term used by the parties to describe services that are Foreign Exchange (FX), in nature. The Panel found [*13] that FX/virtual NXX-type services permit customers in one telephone exchange or rate center to have a telephone number in another exchange or rate center. Such services allow customers to place local calls to a FX/virtual NXX customer that would otherwise be a toll call. The Panel determined that the Commission's Local Service Guideline IV.C should govern intercarrier compensation for FX/virtual NXX service. Local Service Guideline IV.C states:

C: Local and Toll Traffic Determination

> As NECs establish operations within individual ILEC service areas, the perimeter of ILEC local calling area, as revised to reflect EAS [extended area service], shall constitute the demarcation for differentiating local and toll call types for the purpose of traffic termination compensation. Any end-user call originating and terminating within the boundary of such local calling area, regardless of the LEC at the originating or terminating end shall be treated as a local call.

Thus, the Panel recommended that, to the extent that a call to a customer utilizing FX/virtual NXX service, provided by either Ameritech or Allegiance, originates and terminates within Ameritech's local calling territory, as [*14] revised to reflect EAS, the call is considered local and reciprocal compensation is due. To the extent the call to a customer utilizing FX/virtual NXX service originates or terminates outside of Ameritech's local calling area, as revised to reflect EAS, the panel found that the call is considered a toll or interexchange call and compensation is due based on the terminating party's access charges. As for the FX/virtual NXX traffic that is considered local traffic pursuant to Local Service Guideline IV.C, the Panel found that the ISP Remand Order applies as set forth in the Panel's recommendation for Issue 1.

(b) Allegiance's Exceptions

Allegiance excepts to the Panel's conclusion that virtual NXX or FX calls, including such calls that are also ISP-bound calls, should be subject to access charges. Allegiance believes that this conclusion conflicts with the FCC's ISP Remand Order, other state commission decisions, is unworkable, and is inconsistent with current industry practice. Allegiance avers that, pursuant to the FCC's ISP Remand Order, the Commission is preempted from ruling on any ISP-bound traffic issue. According to Allegiance, the ISP Remand Order does not distinguish between [*15] local or non-local ISP-bound traffic as does Commission Local Service Guideline IV.C, but instead, preempts the authority of the states to address the appropriate intercarrier compensation for all ISP-bound traffic. Furthermore, Allegiance argues that the Panel's recommendation would require carriers to develop a unique and entirely new billing and rating system. According to Allegiance, it is not feasible to segregate and bill traffic based on the physical location of the customer rather than the current practice of billing based on the NPA-NXX of the calling and called telephone numbers. Finally, Allegiance avers that, if the Panel recommendation is upheld, the Commission should clarify that Ameritech should not be permitted to charge its retail customers who call Allegiance's FX/virtual NXX customers toll rates while treating calls to Ameritech's FX service customers as local calls.

(c) Ameritech's Reply

Ameritech replies that the FCC, through its *ISP Remand Order*, did not require the application of its interim compensation scheme for all ISP-bound traffic. Ameritech argues that, if Allegiance is correct, any toll call to an ISP would be removed from the access charge system [*16] of compensation and subject to the interim compensation regime of the ISP Remand Order. According to Ameritech, Allegiance's interpretation of the ISP Remand Order is faulty. Ameritech believes that the FCC was clear in the *ISP Remand Order* that it was addressing intercarrier compensation for calls from an end user to an ISP in the same local calling area, not toll calls to ISPs. Furthermore, Ameritech argues that the Panel appropriately relied on Local Service Guideline IV.C and Allegiance's concern about its billing systems deserve no sympathy because the guideline predates Allegiance's certification by more than two years. Ameritech argues that by offering FX/virtual NXX service to its customers, Allegiance is subverting Local Service Guideline IV.C by allowing the local calling area of such customers to appear larger than Ameritech's and then demanding that Ameritech pay reciprocal compensation for such calls. In essence, Ameritech avers that Allegiance is recommending that the Commission adopt local access and transport area (LATA) wide local calling areas for Ameritech. Finally, Ameritech addresses Allegiance's concern regarding discrimination if the Commission adopts the [*17] Panel recommendation. Ameritech states that the rate that it charges its retail customers for calls to an Allegiance or Ameritech FX/virtual NXX customer does not vary and, therefore, Allegiance's claim of discrimination is without merit.

(d) Ameritech's Exceptions

Ameritech objects to one phrase of the Panel recommendation. Ameritech claims that it is confusing to state that, because FX/virtual NXX calls are considered toll or interexchange, "compensation is based on the terminating party's access charges." Ameritech argues that when Allegiance provides the FX/virtual NXX service, that service is used to carry the interexchange call to and from Ameritech's local calling area. In this instance, according to Ameritech, Allegiance is the interexchange toll carrier and Ameritech provides access service necessary to originate or terminate a FX/virtual NXX call to or from an Ameritech customer. Ameritech avers that calls to 800-type services clearly mimic the compensation arrangement for FX/virtual NXX calls. Thus, Ameritech recommends that the Commission clarify the Panel recommendation such that originating or terminating access is due to Ameritech when a FX/virtual NXX call is originated [*18] by or terminated to an Ameritech customer. Finally, Ameritech stated that it will forgo access charge collection if the parties agree to establish a bill and keep arrangement for such traffic.

(e) Allegiance's Reply

Allegiance replies that FX/virtual NXX calls are not subject to exchange access charges since it does not meet the statutory definition of exchange access. Allegiance argues that exchange access is tied to the offering of telephone toll service and the primary reason that such services exist is to permit callers placing calls to such services to avoid incurring toll charges. Therefore, Allegiance believes that the Commission should find, consistent with other states, that FX/virtual NXX traffic that is not also ISP-bound traffic is not exchange access and is not exempt from reciprocal compensation obligations. Furthermore, Allegiance does not believe that there is a relevant analogy between 800-type services and FX/virtual NXX services due to substantial technical differences between the two types of traffic. Finally, Allegiance is not willing to accept Ameritech's bill and keep proposal because Allegiance is concerned that such a proposal would still require Allegiance [*19] to develop a unique and entirely new billing system.

(f) Arbitration Award

Allegiance is critical of the Panel's recommendation because it believes that the Panel did not appropriately address Allegiance's point that the Commission is preempted from ruling on calls to a FX/virtual NXX service that are also ISP-bound. The Panel agreed with Allegiance that for local ISP-bound calls, the regime found in the ISP Remand Order applies. The Commission believes it necessary to clarify the Panel's recommendation such that all ISP-bound traffic, both local and non-local, is subject to the FCC's regime found in the ISP Remand Order and discussed within the Panel and Commission's analysis for Issue 1 in this case.

Ameritech's reliance on particular paragraphs in the ISP Remand Order that summarize the FCC's actions in its previous ISP declaratory ruling does not convince the Commission that the FCC concluded that non-local ISP traffic should be exempt from the ISP compensation regime established in that order. Specifically, at paragraph 82 of the ISP Remand Order, the FCC states:

> ...Because we now exercise our authority under section 201 to determine the appropriate intercarrier compensation [*20] for ISP-bound traffic, however, states commissions will no longer have the authority to address this issue.

Thus, the Commission finds that the ISP Remand Order created a comprehensive new compensation scheme for inter-carrier compensation of ISP-bound traffic. In fact, at paragraph 1 of the ISP Remand Order, the FCC states:

> Having found, although for different reasons than before, that the provisions of section 251(b)(5) do not extend to ISP-bound traffic, we reaffirm our previous conclusion that traffic delivered to an ISP is predominantly interstate access traffic subject to section 201 of the Act, and we establish an appropriate cost recovery mechanism for the exchange of such traffic.

Thus, as stated previously, the Commission agrees with Allegiance that all calls to FX/virtual NXX that are also ISP-bound are subject to the inter-carrier compensation regime set forth in the ISP Remand Order.

As for calls to FX/virtual NXX that are not ISP-bound, the Commission agrees with the Panel that Local Service Guideline IV.C is applicable and appropriate. As Ameritech points out, this guideline has been in existence since February 1997 and serves as the guiding principle in order [*21] to determine when reciprocal compensation payments are due between carriers. As Allegiance itself points out, the primary reason that FX/virtual NXX service exists is to allow callers to place calls to such services without incurring toll charges. The purpose of Local Service Guideline IV.C is not to constrain the CLEC's establishment of larger local calling areas than the ILEC, but instead, to require that the basis of reciprocal compensation payments between carriers is the ILEC's local calling area, as revised to reflect EAS. The Commission certainly envisioned, at the time the guideline was adopted, that CLECs might choose to adopt larger local calling areas than the ILEC but believed that the ILEC's local calling area was an appropriate demarcation of when reciprocal compensation payments are due between carriers. The Commission also agrees with Ameritech that the Panel recommendation should be clarified such that either originating or terminating access charges are due to the party whose customer originates or receives a non-ISP call to or from the other party's FX/virtual NXX customer outside of Ameritech's local calling area.

4. Issue 11:

**Should Ameritech retain [*22] a unilateral right to approve assignments and transfers of the agreement?**

(a) Panel Recommendation

The Panel acknowledged that Ameritech requires some period of time to revise its systems to reflect an assignment or transfer, however, the Panel concluded that Ameritech had not supported its request for 90 days to process an assignment or transfer. Accordingly, the Panel recommended that the interconnection agreement provide 45 days notice for an assignment or transfer, as proposed by Allegiance. Further, the Panel found it unnecessary for Ameritech to retain the unilateral right to approve transfers and assignments by Allegiance to a non-affiliated CLEC and recommended only a notice requirement. The Panel believed that Ameritech's primary concern was financial and concluded that there are other adequate means by which Ameritech may attempt to protect itself from financially insecure CLECs. Accordingly, the Panel recommended that the language suggested by Allegiance be incorporated into the interconnection agreement.

(b) Ameritech's Exception

Ameritech takes issue with two aspect's of the Panel's recommendation: (1) the elimination of Ameritech's right to consent to transfers [*23] to non-affiliated CLECs; and (2) the 45-day notice period for the assignment of Allegiance's obligations to a non-affiliated CLEC. Ameritech argues that its interest is more than a financial concern and contends that the transfer to a non-affiliated CLEC can be service-affecting. Ameritech proposes that both Allegiance and Ameritech retain a "commercially reasonable right of consent" to any proposed transfer or assignment. In addition, Ameritech recommends that Allegiance remain the obligor or guarantor under the agreement if Allegiance assigns its rights to a non-affiliated third party.

Regarding the notice period, Ameritech argues that Allegiance's proposal of 45 days is against the weight of the evidence and unsupported by Allegiance. Ameritech argues that it has the experience with such transfers and the company's experience should receive deference over Allegiance's arbitrary proposal. Further, Ameritech proposes that the Commission establish a minimum of 75 to 90 days notice for transfers to affiliates.

(c) Allegiance's Reply

Allegiance reiterates that any CLEC may adopt Allegiance's interconnection agreement by sending such a request to Ameritech pursuant to Section 252(i) [*24] of the Act. Furthermore, Allegiance contends that, under Ohio law, the assignor CLEC remains liable for its obligations under the agreement and, thus, there is no need to add language to the interconnection agreement as proposed by Ameritech. n4 Finally, Allegiance interprets Ohio law to hold a CLEC assigning an agreement to continue to be liable for obligations under the agreement after it assigned to another CLEC. n5

n4 See *Horvath v. Lefton*, 176 N.E.2d 877, 879 (Ohio 1961); *American National Co. v. Thompson Spot Welder, Co.*, 164 N.E. 435, 436 (Ohio 1921).

n5 *Horvath v. Lefton* 176 N.E.2d 877, 879 (Ohio 1961); *American National Co. v. Thompson Spot Welder, Co.*, 164 N.E. 435, 436 (Ohio 1921); Corbin on Contracts, § 866; and Restatement Contracts, § 160(4).

Regarding the notice period for transfers, Allegiance asserts that Ameritech's proposal to give both parties the right to consent is inappropriate at this stage of the arbitration. Allegiance contends that Ameritech failed to demonstrate any justification [*25] for its right to consent and such failure is not overcome by proposing Allegiance have the same right to consent to transfers. As to the notice period, Allegiance posits that it was Ameritech who failed to justify its proposal for a 90-day period. Allegiance acknowledges that it is Ameritech's processes and that Ameritech controlled the relevant information to effectuate a transfer but emphasized that Ameritech's witness on the issue could provide no independent basis on which to justify any particular time period.

(d) Arbitration Award

The Panel appropriately acknowledged that Ameritech as the ILEC has the experience with effectuating transfers. However, the record does not adequately support Ameritech's proposed 90-day notice period to process a transfer or assignment. Ameritech witness De Bella failed to explain Ameritech's need for 90 days to process a transfer and admitted that the processes could be accomplished simultaneously by the various departments (Tr. Vol. 2 at 48-55). Nor does the record support a minimum period of 75 to 90 days notice for transfers or assignments as now proposed by Ameritech. Thus, we find that Ameritech has not presented any arguments not previously [*26] considered by the Panel, that justify revising the notice periods for transfers to an affiliate or assignment to a non-affiliated third party.

The Commission also adopts the Panel's recommendation rejecting Ameritech's unilateral right of consent to transfers. Furthermore, the Commission finds it inappropriate to implement, at this point in the proceeding, a mutual right of consent applicable to non-affiliated transfers as proposed by Ameritech in its exceptions. The record does not support Ameritech's request for consent and no evidence was presented regarding a right of consent on behalf of Allegiance.

Regarding the third aspect of Issue 11, Allegiance concedes that under "Ohio law, the CLEC that assigns an agreement (assignor) remains liable for obligations under the agreement." n6 Allegiance, in passing, reasons that there is no need to add language into the interconnection agreement to the same effect. However, the Commission believes that adding such language, under Ohio law, is of the same effect and operates to clearly state the applicable Ohio law within the agreement itself. Therefore, we find no harm in clearly stating the assignor's obligations within the

interconnection [*27] agreement. Accordingly, the Commission directs that the parties include language in the interconnection agreement reflecting the assignor CLECs continuing liability once the agreement is assigned to a third party.

n6 *Id.*

5. Issue 13:

**Whether the scope of Ameritech's obligations should be limited to the language contained in the agreement?**

(a) Panel Recommendation

The Panel rejected Ameritech's interpretation of *Goldwasser v. Ameritech Corp.*, 1998 WL 60878 (N.D. Ill February 4, 1998), aff'd 222 F.3d 390 (7th Cir. 2000). Ameritech cited *Goldwasser* for the proposition that Ameritech's duty to provide nondiscriminatory access to UNEs pursuant to Section 251(c)(3) of the Act is not a freestanding legal obligation but only exists in the context of an interconnection agreement pursuant to Section 252 of the Act. The Panel found the Goldwasser decision to be limited to a consumer-plaintiff's right to sue for violations of the Act, not authority on the relationship between a CLEC and ILEC [*28] under the Act. Furthermore, the Panel reasoned that the fundamental purpose of the Act is to promote competition in the telecommunications industry. Therefore, the Panel found it unreasonable to prohibit Allegiance from purchasing functions, facilities, products and services or arrangements available to other CLECs via Ameritech's tariff or a statement of generally available terms (SGAT). The Panel reasoned that the product or service may not have been available at the time the interconnection agreement was negotiated and requiring Allegiance to delay purchase of any new product or service, when such is available to other CLECs by effective tariff or a statement of generally available terms, deters competition.

(b) Ameritech's Exception

Ameritech contends that *Michigan Bell Telephone Company d/b/a Ameritech Michigan v. MCI Metro Access Transmission Services, Inc.* 128 F.Supp.2d 1043 (*Ameritech Michigan v. MCI*) (January 22, 2001) provides that allowing a CLEC with an interconnection agreement to use the tariff to "supplement or supplant any term, condition, or prices covered by the agreement violates the Act." Ameritech also argues that the Panel's recommendation raises the [*29] issue of which controls in the event of a conflict, the tariff or the interconnection agreement. Ameritech contends that the language proposed by Allegiance in regards to this issue is broader than the Panel's recommendation. Ameritech also argues that the Panel's recommendation is inconsistent with the Commission's view of ripeness since Ameritech does not have an approved, effective wholesale tariff or SGAT. Therefore, Ameritech requests that the Commission adopt its language in Appendix General Terms & Conditions (GT&C) § 43.1, reject Allegiance's proposed language for Appendix UNE §§ 1.5 and 2.10.5 and clarify that, in the event of a conflict between the tariff and the interconnection agreement, the interconnection agreement governs.

(c) Allegiance's Reply

Allegiance responds that Ameritech's affiliates in other states have offered new services by tariff or SGAT. Further, Allegiance reasons that if Ameritech offers new services by tariff or SGAT, Allegiance should be permitted to purchase such new services not covered by the interconnection agreement from the tariff. Allegiance argues that *Ameritech Michigan v. MCI* does not address this issue but is limited to a direct [*30] conflict between the tariff and the interconnection agreement. Allegiance thus, concludes that *Ameritech Michigan v. MCI* provides no justification for prohibiting Allegiance from ordering out of all tariffs, even those that in no way conflict with the interconnection agreement and especially tariffs that cover services not included within the interconnection agreement. Further, Allegiance argues, that there is no record support for Ameritech's first-time speculation that a conflict between the interconnection agreement and Ameritech's tariff will exist and delaying this aspect of the arbitration until Ameritech files a tariff or SGAT imposes needless delay and additional litigation. Finally, Allegiance argues that it is inappropriate, at this time, for the Commission to declare whether the tariff or the interconnection agreement should prevail in the event of a conflict. Allegiance contends that such should be decided if and when a conflict arises.

(d) Arbitration Award

The *Ameritech Michigan v. MCI* decision involved an approved interconnection agreement, which dictated, at MCI's request, that service orders be submitted to Ameritech Michigan electronically. In its tariff, [*31] Ameritech Michigan allowed CLECs to submit service orders by fax. Subsequently, Ameritech Michigan decided to update its electronic interface system, informed MCI of the update and directed MCI to install the necessary changes to its system. MCI elected not to update its electronic interface with the ILEC and instead informed Ameritech Michigan that it would be submitting its service orders by fax as provided in the tariff. The Michigan Public Service Commission (MPSC) entered an order allowing MCI to submit certain resale service orders by fax despite the requirements of the interconnection agreement. Upon a motion for summary judgement, the court held that MCI was bound to the terms of the interconnection agreement although the ILEC's tariff permitted CLECs to submit orders by fax. The court held that the interconnection agreement clearly provided for the service orders to be submitted electronically.

Thus, we agree, as Allegiance asserts, that *Ameritech Michigan v. MCI* involved a direct conflict between the interconnection agreement and the tariff. We also note that the Panel recommendation implies that Allegiance should be permitted to purchase new services and facilities, [*32] not available when the interconnection agreement was negotiated, from the tariff and/or SGAT. While such a clarification of the Panel's recommendation may avoid a direct conflict with the interconnection agreement, we find the Panel's recommendation to be in conflict with the reasoning of *Ameritech Michigan v. MCI*. The district court, in reaching its conclusion, stated:

> Allowing a CLEC that has executed an interconnection agreement to use a tariff to supplement or supplant any term, condition, or price that is covered by the agreement VIOLATES the Act. That is because such a provision would eviscerate the provisions of 251 and 252 of the Act which require that the parties negotiate the terms of an interconnection agreement and arbitrate those terms that they are not able to agree to. As one court stated the issue, permitting CLECs to incorporate non-negotiated tariff provisions into their interconnection agreements 'bypasses the Act entirely and ignores the procedures and standards that Congress has established.' [Quoting *MCI Telecommunications Corp. v. GTE Northwest, Inc.*, 41 F.Supp.2d 1157, 1178 (D. Or. 1999).

According to this court, "there is little incentive for [*33] carriers to negotiate if they can simply opt into a more favorable tariff that the state commission imposes." Thus, applying the Michigan district courts reasoning to this case, the Commission concludes that where Congress has established a method by which the ILEC and CLEC determine the terms and conditions of interconnection, state commissions should not interpret the provisions of the interconnection agreement to circumvent the process provided in the Act. For this reason, we reject the Panel's recommendation and direct the parties to adopt language in their interconnection agreement which limits the scope of their agreement to that stated within the interconnection agreement only and prohibits the CLEC from purchasing services out of the tariff or SGAT until the interconnection agreement is amended.

6. Issue 14:

> Whether Ameritech should combine UNEs with non- § 251(c)(3), or other Ameritech service offerings, in accordance with applicable tariffs and the terms of the agreement.

(a) Panel Recommendation

The Panel determined that Ameritech is required to provision unbundled network elements (UNEs), and not combinations, to Allegiance in order to allow Allegiance [*34] to combine UNEs. The Panel also concluded that, where Ameritech does not currently have facilities or current combinations of facilities there is nothing to separate and nothing to provide. Where a combination of UNEs does exist, the Panel found that Ameritech is required to make them available to Allegiance; and where the separate UNEs do exist Ameritech is required to provide the UNEs in a manner that allows Allegiance to combine them in order to provide service to its end users. The Panel relied on the 8th Circuit Court's decision to vacate 47 C.F.R. Section 51.315(c)-(f) of the FCC rules. n7 Consistent with the courts' rulings, the Panel recommended that the Commission not enforce the vacated provisions of the FCC rules. Finally, the Panel concluded that Ameritech must provide access to UNE combinations based on existing facilities not limited to where customers are being served.

n7 The United States Supreme Court affirmed the 8th Circuit court's decision on July 18, 2000.

The Panel agreed with Allegiance that it [*35] has the right to utilize cross-connects to access UNEs. The Panel also determined that cross-connects are not UNEs but are required to connect UNEs or used in UNE combinations. The Panel found that more commonly required or commonly used cross-connects should be used for UNE combinations.

(b) Allegiance's Exception

Allegiance posits that the central question in dispute is whether Ameritech is required to allow Allegiance to combine UNEs with non-section 251(c)(3) products and services. Allegiance believes the Panel Report does not explicitly state that Allegiance's version of the disputed language should be adopted. Allegiance requests that the Commission's arbitration award clarify this aspect of Issue 14.

(c) Ameritech's Reply

In response, Ameritech states the Panel correctly determined that Ameritech is not obligated to combine UNEs, let alone combine a UNE with a non-251 (c)(3) or other Ameritech service offering. Ameritech argues that the Panel outlined exactly what Allegiance is entitled to receive from Ameritech. Ameritech contends that Allegiance mischaracterizes the central question in dispute and believes the Panel Report clearly outlines Ameritech's obligations. [*36]

(d) Arbitration Award

The Commission agrees with the Panel's recommendation on Issue 14. With regards to Allegiance's request to combine UNEs with non-251(c)(3) products and services, the Commission clarifies that Allegiance can combine UNEs with non-251(c)(3) products and services as long as it is for the purpose of providing telecommunication services to Allegiance's customers and will not be used for the purpose of providing non-telecommunication services.

7. Issue 16:

> Whether Ameritech may restrict Allegiance from assuming Ameritech retail contracts for resale where the retail contract expressly prohibits such assumption, and whether Ameritech may deny Allegiance a wholesale discount on any assumed contracts.

(a) Panel Recommendation

Consistent with the Commission's reasoning in Case No. 96-752-TP-ARB, *In the Matter of the Application of AT&T Communications of Ohio, Inc.'s Petition for Arbitration of Interconnection Rates, Terms and Conditions and Related Arrangements with Ohio Bell Telephone d.b.a. Ameritech Ohio* (96-752), the Panel found that the Commission has placed certain restrictions on the resale of contracts. The Panel also noted that the entry [*37] on rehearing in 96-752 clarified the term "similarly situated customer." In 96-752 the Commission defined the term "similarly situated customer" to mean a customer similar to but other than the same customer and clarified that it was not the Commission's intent that any reseller would purchase an existing individual contract (i.e. a contract actually effectuated between Ameritech and an individual customer) at wholesale discount, for the purpose of reselling that exact same contract to the exact same customer.

Based on FCC Rule 47 C.F.R. § 51.607(a), FCC Rule § 51.609(b), the Local Service Guidelines and the decision in 96-752, the Panel found that all LECs must make available for resale all retail telecommunication service contracts. Further, the Panel concluded, the contract should be available for resale only in its entirety to similarly situated customers other than the same customer under the existing LEC contract. The Panel found that ILECs must make these contracts available at the avoided-cost discount. In the case of resale of a contract to the same customer, the Panel recommendation provides for a zero discount.

(b) Allegiance's Exception

Allegiance argues that the Panel [*38] recommendation unlawfully denies Allegiance the right to a discount equal to the costs that Ameritech avoids when Allegiance assumes an Ameritech end-user contract. According to Allegiance, Ameritech's proposed contract language would restrict Allegiance's ability to assume retail contracts by placing language in Ameritech's retail contracts prohibiting such an assumption. Allegiance argues that such a restriction would impede Allegiance's ability to use resale as a vehicle to enter Ameritech's market.

Allegiance believes that when Allegiance assumes a retail contract, it should be provided at the uniform resale discount established by the Commission for resale generally. Allegiance believes the Panel Report improperly carves out an exception when a contract is resold to the same customer rather than to a different, but similarly situated, customer. According to Allegiance the Panel's recommendation is based on an outdated Commission decision in the AT&T arbitration more than four years ago. Allegiance claims that the Commission's ruling in 96-752, conditioning the receipt of the standard wholesale discount on resale on contracts to "similarly-situated customers," is "outdated" and [*39] should no longer be followed. Allegiance argues that Ameritech is not even following this requirement in the replacement agreement it is in the process of finalizing with AT&T. Allegiance states that in CC Docket No. 97-208, *Application of BellSouth Telecommunications, Inc. and BellSouth Long Distance, Inc for Provision of In-Region, InterLATA Services in South Carolina*, Memorandum Opinion and Order, 13 FCC Rcd 539, at P219 (1997) (BellSouth's SC § 271 case) the FCC clarified that wholesale discounts must be applied to customer specific arrangements whether or not they are already discounted. Moreover, Allegiance claims that the FCC has made no exception for customer specific contracts that are resold to the same customer. Allegiance argues that the Panel's imposition of a zero discount for contracts resold to the same customer is flatly inconsistent with the FCC's ruling and would result in discrimination among carriers within Ohio, as well as discrimination among states.

(c) Ameritech's Reply

Ameritech believes the Panel correctly rejected Allegiance's attempt to circumvent the Commission's ruling on resale of end user retail contracts. Ameritech points out that Allegiance [*40] is raising the same two points of disagreement it presented in post-hearing briefs. Ameritech claims it is not avoiding any statutory obligation pertaining to Allegiance's right to resell end user contracts. According to Ameritech, Allegiance persists in confusing "assumption" of end user retail contracts with "resale" by claiming that Ameritech's language proposal could entirely foreclose Allegiance's ability to resell retail contracts. Ameritech argues that the Commission's precedent on resale of end user contracts remains applicable.

Ameritech also claims Allegiance mischaracterizes the FCC's ruling in BellSouth's SC § 271 proceedings. According to Ameritech, the FCC merely restated the general rule that end user contracts must be made available at wholesale discount through either its interconnection agreements or its statement of generally available terms and conditions in South Carolina. Ameritech states that the FCC did not, however, state that CLECs, in turn, could resell contract service arrangements at a wholesale discount to the same end user. Ameritech further points out that Allegiance's reliance on the BellSouth's SC § 271 Order is misplaced because the "similarly situated [*41] end user" restriction was not raised or addressed in that decision. However, in a later BellSouth case, CC Docket No. 98-121, *Application of BellSouth Corporation, BellSouth Telecommunications, Inc. and BellSouth Long Distance, Inc. for Provision of In-Region, InterLATA Services in Louisiana*, Opinion and Order, 13 FCC Rcd 20599, at P316 (1998) ignored by Allegiance, the FCC specifically addressed and found no problem with the "similarly situated" customer requirement.

(d) Arbitration Award

The Commission finds that, consistent with our past determinations in this matter, all LECs must make available for resale all retail telecommunication service contracts. The contract is available for resale only in its entirety, and is available to similarly situated customers other than the same customer under the LEC contract. Further, the Commission finds that Allegiance, in its exceptions to the Panel Report offers no new arguments or any compelling reasons for the Commission to overturn the Panel's recommendation. Thus, we find that the Panel's recommendation is consistent with the Commission's current requirements and we, therefore, agree with the Panel's conclusion for Issue 16. [*42]

8. Issue 19:

**Whether unbundled dedicated transport physical diversity should be priced in accordance to Section 251(d) of the Act?**

(a) Panel Recommendation

The Panel agreed with the parties that, where dedicated transport exists, Ameritech should make those facilities available to Allegiance. Furthermore, since Ameritech provided the original dedicated transport for use by Allegiance, the Panel found Ameritech would be the only party to provide dedicated transport to Allegiance for use in dedicated transport physical diversity. Therefore, the Panel agreed with Allegiance that dedicated transport and dedicated transport physical diversity are UNEs that should be priced at total element long-range incremental cost (TELRIC)

where such facilities exist at the time of the request. Thus, the Panel concluded Allegiance should not be required to utilize Ameritech's bona fide request (BFR) process for existing facilities. Where facilities do not exist to provide dedicated transport physical diversity, the Panel found Allegiance should follow Ameritech's BFR process.

(b) Ameritech's Exception

Ameritech seeks clarification of the Panel's recommendation for Issue 19 regarding [*43] physical diversity. After reviewing the Panel's recommendation and Allegiance's briefs on Issue 19, Ameritech claims that Allegiance's concern and the Panel's recommendation can be met fairly readily. In particular, according to Ameritech, it appears that Allegiance's principal objective is obtaining a commitment in the contractual language that Ameritech will not charge Allegiance any amounts in addition to the TELRIC prices it charges for the unbundled dedicated transport UNE for physical diversity that already exists in the unbundled dedicated transport network. Ameritech does not disagree that the diversity which is inherent in the existing network facilities is part and parcel of, i.e., a feature, function, or capability of, the unbundled dedicated transport (UDT) UNE. Accordingly, Ameritech is willing to include language in Appendix UNE § 12.4 which clarifies that when Allegiance purchases the UDT UNE at the TELRIC rate using Ameritech's standardized and mechanized processes, Allegiance obtains as part of the UNE, at no additional charge, the physical diversity that is inherent with the existing network facilities.

Ameritech believes Issue 19 can be reconciled both with what [*44] Ameritech has proposed, as outlined above, and with what Allegiance requests. Accordingly, Ameritech requests that the Commission clarify the Panel's recommendation of Issue 19 to confirm that what Allegiance is entitled to obtain at TELRIC pricing, and at no additional charge to the UDT UNE price, is the physical diversity that the existing network facilities provide for dedicated transport UNE when Allegiance uses Ameritech mechanized and standardized processes for ordering the UDT UNE. Ameritech also requests that the Commission clarify that, when the existing network facilities do not provide physical diversity as an inherent aspect of the UDT UNE, Allegiance must follow the BFR process that Ameritech has proposed.

(c) Allegiance's Reply

According to Allegiance, the principal area of dispute is whether, when ordering dedicated transport between two points, Allegiance may order at TELRIC rates a second, preexisting circuit between those same two points to provide physical diversity. According to Allegiance, Ameritech suggests that if the subsidiary issue is resolved in a manner satisfactory to Allegiance, there is no need to address the principal issue. Allegiance disagrees [*45] with Ameritech's position. The subsidiary issue, argues Allegiance, is whether Allegiance is entitled to benefit from the diversity that is inherent in Ameritech's network without placing an order for it and without paying an additional charge for such diversity. Further, Allegiance argues the principle point in dispute relates, however, to diversity that is not inherent. The parties have agreed that diversity that is not inherent must be ordered and paid for but have disagreed as to whether the charges should be based upon TELRIC, as Allegiance contends, or should be on an individual contract basis as Ameritech argues. According to Allegiance, the fact that Ameritech is amenable to provisioning inherent diversity at no charge is no reason for the Commission to deny Allegiance the right to purchase diversity that is not inherent at TELRIC rates.

(d) Arbitration Award

The Commission agrees with the Panel recommendation for this issue. The Panel found that where dedicated transport physical diversity exists it should be provided as a UNE and priced at TELRIC. There appears to be some confusion as to whether dedicated transport physical diversity is an UNE where such facilities do [*46] not exist. The Commission points to the FCC's Third Order on Reconsideration in CC Docket 96-98, released August 18, 1997 which states:

> We, therefore, clarify that ILECs must offer only *dedicated transport*, and not shared transport, between their switches, or serving wire centers, and requesting carriers' switches, as set for in the *Local Competition Order*. We also note that the *Local Competition Order* expressly limited the requirement to provide unbundled interoffice transport facilities to *existing* incumbent LEC facilities. (Emphasizes included).

*(12 FCC Rcd 12,478, P28)*

Thus, the Commission agrees with the Panel's recommendation that where such facilities do not exist they are not UNE's and would not be priced at TELRIC. Accordingly, Ameritech's BFR process should be used on an individual case basis to determine the prices for such a request.

9. Issue 21:

**Whether Allegiance should strictly be liable for unspecified costs and expenses incurred by Ameritech as a result of inaccurate ordering or usage of Ameritech's OSS.**

(a) Panel Recommendation

The Panel Report concluded that the contract submitted by Allegiance and Ameritech at Appendix [*47] GT&C § 14.2 contains proposed contractual indemnification and limitation of liability language. This language was agreed to by both parties. Appendix Operational Support Systems (OSS) § 3.4 contains additional indemnification language for OSS not agreed to by the parties. Further, the Panel noted that Ameritech witness De Bella stated that Appendix OSS § 3.4 only applies to significant errors or misuse of the OSS that prevent other CLECs access or significantly impair the OSS, not day-to-day minor errors. The Panel interpreted the language in Appendix OSS § 3.4 to be more broadly written than suggested by Ameritech's own witness. Thus, the Panel recommended that Appendix OSS § 3.4 be revised to reflect the testimony of Ameritech's witness De Bella. In other words, the contract should be amended to exclude minor, insignificant errors that Allegiance may cause as a result of using Ameritech's OSS.

(b) Allegiance's Exceptions

Allegiance disagrees with the Panel's recommendation on Issue 21. According to Allegiance, the Panel Report fails to clarify that the existence of indemnity provisions of the GT&C section of the agreement make the indemnity language in Appendix OSS unnecessary. [*48] Allegiance is satisfied with the Panel Report's resolution with respect to the liability issues, but seeks clarification regarding indemnity issues. Allegiance disputes the additional sentence proposed by Ameritech to be included in Appendix OSS § 3.4, as unreasonably broad and unnecessary in light of the agreed indemnity language in GT&C section of the agreement. Allegiance asserts that the indemnity language in Appendix OSS § 3.4 would require Allegiance to indemnify Ameritech against claims by third parties relating to Allegiance's use of Ameritech's OSS even though Allegiance was without fault and even if the claims resulted from Ameritech's gross negligence.

(c) Ameritech's Reply

Ameritech agrees that the Panel correctly recognized the need for an OSS provision-specific indemnification clause. Ameritech notes that the parties agreed to adopt the Panel's recommendation to modify the language proposed by Ameritech in § 3.4 of Appendix OSS to exclude from liability those minor, insignificant errors that Allegiance may cause during its day-to-day use of Ameritech's OSS. Ameritech further argues that the Panel clearly understood the intent of the provision and chose to recommend [*49] only one modification of Appendix OSS § 3.4.

(d) Arbitration Award

The Commission finds it reasonable, as implied by the Panel's recommendation, that the interconnection agreement include general indemnity and limitation of liability language in the GT&C section as well as the service-specific indemnity and limitation of liability language in OSS § 3.4. As stated by the Panel, Ameritech's indemnity language should be modified to exclude minor, insignificant errors that Allegiance may cause as a result of using Ameritech's OSS. With that clarification, the Commission concurs with the Panel's recommendation for Issue 21 of the arbitration.

10. Issue 33:

**What obligations should Ameritech retain with respect to the provision of broadband services in the event of regulatory developments?**

11. Issue 41:

**Should additional service termination language be included in Section 16.2 of the Broadband Service Agreement?**

(a) Panel Recommendation

The Panel affirmed the Attorney Examiner's May 30, 2001 decision to retain as part of this arbitration Issues 33 and 41 and the other broadband-related service references in Issues 25-28. The Panel also found the language [*50] in § 16.2 of the Broadband Service Agreement, as proposed by Ameritech, would allow Ameritech to change, modify and/or withdraw broadband service as a result of a change in law or "regulatory developments" at Ameritech's sole discretion. Therefore, the Panel recommended that § 16.2 of the Broadband Agreement be amended to require Ameritech to provide Allegiance with at least 45 days notice in the event that Ameritech permissibly elects or is ordered as a result of the final non-appealable decision of the court or FCC to change, modify or withdraw the Broadband Agreement service offering, unless such order dictates a different notice period.

(b) Ameritech's Exceptions

Ameritech reasserts that Section 251 of the Act does not impose upon Ameritech the duty to offer the Broadband Agreement service offerings. Thus, Ameritech argues that the terms and conditions under which Ameritech offers such voluntary wholesale broadband services are not subject to arbitration, as provided under Section 252 of the Act.

Further, Ameritech relies on the testimony offered by its witnesses Bracken and Flatt. Ameritech contends it is the uncontradicted testimony of Ameritech witnesses Bracken and Flatt [*51] that establish that the Broadband Agreement is not an unbundled network element or a combination of UNEs. Further, according to Ameritech, Ms. Bracken's testimony confirmed that Ameritech does not offer the broadband services at retail to customers that are not telecommunications carriers. Ameritech believes that the Panel's reliance on *WorldCom* is misplaced as the Court of Appeals "found that the unbundling obligations [of § 251(c)(3)] apply to all qualifying network elements...." Ameritech also argues that the wholesale service at issue in the *WorldCom* case was not Ameritech's Broadband Agreement. Ameritech admits that the FCC has not determined that Ameritech's Broadband Agreement service offering, including the Project Pronto network facilities that support the service, is a UNE or a combination of UNEs. Thus, Ameritech reasons that it is inappropriate for the Panel to recommend a notice period for its voluntary Broadband Agreement service offering. At a minimum, Ameritech argues the Panel's recommended contract language should be amended to trigger notice from the effective date of the change in law rather than the date of a final, non-appealable decision.

(c) Allegiance's [*52] Reply

Allegiance argues that whether Ameritech's Broadband Agreement service offering is voluntary or not is a legal question and Ms. Bracken, who is not an attorney, is not qualified to provide expert testimony on questions of law. Allegiance interprets the FCC's order in CC Docket No. 98-141, *Applications of Ameritech Corporation, Transferor, and SBC Communications Inc. Transferee, For Consent to Transfer Control of Corporations Holding Commission Licenses and Lines Pursuant to Sections 214 and 310(d) of the Communications Act and Parts 5, 22, 24, 25, 63, 90, 95 and 101 of the Commission's Rules,*'Second Memorandum Opinion and Order, FCC 00-336 (released September 8, 2000) (Project Pronto Order), to require Ameritech to provide the Broadband Agreement service offering and, thus, concludes it is not "voluntary." Allegiance also notes that, as part of the Project Pronto proceeding, Ameritech and its affiliates agreed to "offer all carriers ... an amendment to their interconnection agreements filed with the state commissions to provide access to the Broadband Offering" and Ameritech's parent agreed to resolve price disputes concerning Broadband service "through state arbitration [*53] proceedings conducted in accordance with Section 252." n8 Thus, Allegiance argues, that although Ameritech has agreed to file interconnection agreement amendments with the Commission for its approval and to resolve pricing disputes as a part of arbitration proceedings, Ameritech now contends that the Commission is without authority to review the terms and conditions of the Broadband Service Agreement. Allegiance argues that consistent with the Commission's responsibilities under federal and state law, the Commission would be derelict in its duties if it approved a broadband service agreement without considering the terms and conditions including the effect on end user customers. Allegiance also rejects Ameritech's position that the resale provisions of Section 251(c)(4) of the Act are not applicable to the Broadband Service Agreement. Allegiance asserts that Ameritech sells such services at retail on a bundled basis through an affiliate and, therefore, it is appropriate to require Ameritech to resell such services in accordance with the courts findings in *Association of Communications Enterprises v. FCC*, 235 F.3d 662 (D.C. Cir. 2001).

n8 *Id.* at PP 30 and 25, respectively.

[*54]

(d) Arbitration Award

The Commission agrees with Ameritech that, at this time, neither the FCC nor the federal district court has declared broadband or advanced services UNEs. Nonetheless, the Commission finds that we do not need to reach the issue of whether broadband services are UNEs to allow the Commission to arbitrate disputed Issues 33 and 41 between the parties. Ameritech argues that Section 251 of the Act does not impose upon Ameritech a duty to offer broadband services and, therefore, the Broadband Service Agreement is not subject to arbitration. The Commission finds that Ameritech's Broadband Agreement service offering is subject to the resale requirement of Section 251(c)(4). In reaching this conclusion, the Commission relies, in part, on two recent opinions issued by the D.C. Circuit Court of Appeals: *WorldCom v. FCC*, 246 F.3d 690, 695 (2001) ("the duty of an incumbent LEC under Section 251(c)(4), to offer at wholesale those telecommunications services that it sells at retail, seems unlimited"); and *Association of Communications Enterprises v. FCC*, 235 F.3d 662, 666 (2001) ("to allow an ILEC to sidestep Section 251(c)'s requirements by simply offering telecommunications [*55] services through a wholly owned affiliate seems to us a circumvention of the statutory scheme"). Thus, we reject Ameritech's claim that its Broadband Agreement service offering is strictly a wholesale service offering.

Ameritech's argument also implies that the scope of the Commission's jurisdiction in arbitration cases is limited only to the services listed in Section 252(b) and (c) of the Act. The Commission disagrees and finds that Ameritech is estopped from raising this argument. We believe that the Act permits the Commission to resolve issues related to the terms and conditions of services provided in the proposed interconnection agreement and raised by one or both of the parties. More importantly here, Ameritech (and its parent corporation SBC) agreed as part of the FCC merger proceeding to file interconnection amendments with State commissions relative to the Broadband Agreement service offering and to resolve pricing disputes through state arbitration proceedings conducted under Section 252. n9 Ameritech cannot now circumvent that commitment under the guise of challenging the Commission's jurisdiction.

n9 Project Pronto Order at P 25.

[*56]

Further, as the Panel determined, Ameritech's proposed language in § 16.2 of the Broadband Service Agreement is unreasonable to the extent that it would allow Ameritech to change, modify and/or withdraw broadband service as a result of a change in law or regulatory developments and without notice to Allegiance. Therefore, we adopt the Panel's recommendation to modify § 16.2 to require Ameritech to provide Allegiance with at least 45 days notice in the event Ameritech elects to change, modify or withdraw broadband services. However, for clarity and, thus, the convenience of both Allegiance and Ameritech, the Commission acknowledges that in the unlikely event that Ameritech is affirmatively ordered to discontinue its Broadband Agreement service offering without any advanced notice, then Ameritech's duty to provide Allegiance 45 days advanced notification does not apply.

IV. CONCLUSION:

We adopt all other panel recommendations to which the parties did not file exceptions. Any exceptions raised that were not specifically addressed herein are denied. Based upon the foregoing, Allegiance and Ameritech should incorporate the directives set forth in the Arbitration Award within their [*57] interconnection agreement. Within 14 days of this Arbitration Award, Allegiance and Ameritech shall file in this docket their entire interconnection agreement for our review. If the parties are unable to agree upon an entire interconnection agreement within this time frame, each shall file for Commission review its version of the language that it believes should be used in a Commission-approved interconnection agreement.

V. FINDINGS OF FACT AND CONCLUSIONS OF LAW:

(1) Allegiance filed with the Commission its petition for arbitration with Ameritech on March 27, 2001, pursuant to Section 252(b) of the Act. On April 23, 2001, Ameritech filed its response to the arbitration petition.

(2) On June 5, 2001, the parties timely filed their arbitration packages.

(3) On June 12 and 13, 2001, the arbitration hearing was held. Post-hearing briefs were submitted on June 29, 2001, and reply briefs were submitted on July 13, 2001.

(4) On August 13, 2001, the Panel filed its Panel Report with recommendations on 22 issues requiring arbitration.

(5) On August 21, 2001, Allegiance and Ameritech each timely filed their exceptions to the Panel Report. On August 24, 2001, Allegiance and [*58] Ameritech filed replies to the other party's exceptions.

(6) To the extent set forth in this arbitration award, we adopt the recommendations of the Panel as reasonable and just resolutions of the arbitration issues to which the parties took exception. All other Panel recommendations to which the parties did not take exception should be adopted as just and reasonable resolutions to those issues. Any exceptions raised that we did not specifically address herein are denied. Based upon the foregoing, Allegiance and Ameritech should incorporate the directives set forth in this arbitration award within their interconnection agreement.

VI. ORDER:

It is, therefore,

ORDERED, That Allegiance and Ameritech incorporate the directives as set forth in this arbitration award within their interconnection agreement. It is, further,

ORDERED, That, on or before October 18, 2001, Allegiance and Ameritech file in this docket their entire interconnection agreements for our review. If the parties are unable to agree upon an entire interconnection agreement within this time frame, each party shall file for Commission review its version of the language that it believes should be used in a Commission-approved [*59] interconnection agreement. It is, further,

ORDERED, That, within ten days of the filing of the interconnection agreement, any party or other interested persons may file written comments supporting or opposing the proposed interconnection agreement and that any party or other interested persons may file responses to comments within five days thereafter. It is, further,

ORDERED, That any motions not expressly ruled upon in this arbitration award are denied. It is, further,

ORDERED, That nothing in this arbitration award shall be binding upon this Commission in any subsequent investigation or proceeding involving the justness or reasonableness of any rate, charge, rule or regulation. It is, further,

ORDERED, That this arbitration award does not constitute state action for the purpose of the antitrust laws. It is not our intent to insulate either party to the contract from the provisions of any state or federal law that prohibits the restraint of trade. It is, further,

ORDERED, That this docket shall remain open until further order of the Commission. It is, further,

ORDERED, That a copy of this arbitration award be served upon Allegiance and its counsel, Ameritech and its counsel, and [*60] all other interested persons of record.

THE PUBLIC UTILITIES COMMISSION OF OHIO