2 of 2 DOCUMENTS

In the matter of the petition for arbitration to establish an interconnection agreement between TDS METROCOM, INC., and AMERITECH MICHIGAN

Case No. U-12952

MICHIGAN PUBLIC SERVICE COMMISSION

2001 Mich. PSC LEXIS 332

September 7, 2001

**PANEL:** [*1] PRESENT: Hon. Laura Chappelle, Chairman; Hon. David A. Svanda, Commissioner; Hon. Robert B. Nelson, Commissioner

**OPINION:** At the September 7, 2001 meeting of the Michigan Public Service Commission in Lansing, Michigan.

### OPINION AND ORDER

On May 18, 2001, TDS Metrocom, Inc., (TDS) filed a petition seeking arbitration of an interconnection agreement with Ameritech Michigan, pursuant to Section 252(b) of the federal Telecommunications Act of 1996 (federal Act), 47 USC 252(b). The petition identified more than 50 issues and included a statement of position, supporting arguments, and numerous appendices detailing the parties' negotiations.

An arbitration panel was appointed, which included Administrative Law Judge George Schankler and Commission Staff members Louis Passariello and Margaret Wallin (arbitration panel).

On June 12, 2001, Ameritech Michigan filed its response to the petition, which included a double red-lined version of the interconnection agreement and several verified statements from various persons in support of Ameritech Michigan's position on the issues. The parties noted that the same issues had been previously arbitrated in both Wisconsin [*2] n1 and Illinois n2 and that the parties had used a consistent numbering system for issues raised in all three states. In keeping with that convention, the discussion portion of this order will follow the numbering system used by the parties and the arbitration panel.

> n1 The Wisconsin arbitration proceeding is docketed as 05-MA-123. The most recent decision is that of the Wisconsin arbitration panel (Wisconsin panel), issued March 12, 2001. A Commission decision is pending.
>
> n2 The Illinois Commerce Commission issued its Arbitration Decision in 01-338 on August 8, 2001.

The parties met with the arbitration panel on June 19, 2001, at which time the arbitration panel set a schedule for the proceeding and encouraged the parties to settle issues. Pursuant to the directions of the arbitration panel, the parties filed their respective Proposed Decision of the Arbitration Panel (PDAP) on July 13, 2001. At that time, the parties submitted 38 issues for decision, having settled the remainder.

On July 19, 2001, TDS submitted a hearing examiner's Proposed Arbitration Decision for the Illinois arbitration case between the parties as supplemental authority for the arbitration panel to consider. [*3] In response, on August 1, 2001, Ameritech Michigan filed the exceptions to that proposed decision that each party's Illinois affiliate had filed in that proceeding.

On August 6, 2001, the arbitration panel issued its Decision of the Arbitration Panel (DAP). On August 16, 2001, Ameritech Michigan filed its objections to the DAP, contesting the results of 21 of the issues that the arbitration panel decided. TDS filed a statement indicating that it would not be filing objections.

Discussion

Although Ameritech Michigan's introduction indicates its displeasure with the arbitration panel's decision on certain issues, the issues discussed most fully in the introduction do not appear among those issues to which Ameritech Michigan formally objects. Ameritech Michigan asserts that the percentage of issues decided in favor of TDS should lead the Commission to suspect bias against the incumbent local exchange carrier (ILEC). It further states its belief that the arbitration panel did not use the decisions available from Wisconsin and Illinois on an even-handed basis. It argues that the result is a decision that is discriminatory and unfair.

The Commission is not persuaded that the arbitration [*4] panel rendered a decision that is discriminatory or unfair to Ameritech Michigan, regardless of the percentage of issues decided in favor of TDS. Rather, the arbitration panel's decision is generally founded on, and consistent with, principles established in prior Commission orders and on sound reasoning. This order addresses the formally contested issues in the following sections.

Issue TDS-19 Notification of Change in Tariff Provisions

TDS proposed that the interconnection agreement include language that would require Ameritech Michigan to provide TDS two-weeks' advance notice "of any tariff or filing which concerns a tariff referenced in this Agreement." General Terms & Conditions, Section 38.3. TDS pointed out in its PDAP that the Wisconsin arbitration panel had agreed with this language and that Ameritech Michigan had not filed any objections to that finding. The Michigan arbitration panel determined that TDS's position on this issue should be adopted.

Ameritech Michigan objects to the decision of the arbitration panel. It states that although TDS framed the issue as whether notice should be provided for changes to tariffs "incorporated" into the agreement, the language [*5] proposed uses a broader term, "referenced," in the agreement. Ameritech Michigan complains that although the arbitration panel found this provision "only fair," it did not explain why it was fair. Ameritech Michigan suggests that because the arbitration panel did not provide a sufficient rationale for its decision, the Commission should reverse it without further inquiry.

Moreover, Ameritech Michigan argues, TDS's proposed language is not fair or reasonable. It states that the parties' Appendix Resale references Ameritech Michigan's resale tariff, which will change whenever Ameritech Michigan determines to change its retail tariff. Thus, inclusion of this language, argues Ameritech Michigan, will require it to provide notice to TDS every time it amends its retail tariffs. It argues that TDS will be the only competitive local exchange carrier (CLEC) in Michigan getting such notice, making this provision discriminatory.

Ameritech Michigan further argues that to provide advance notice to TDS of changes in Ameritech Michigan's retail rates would prejudice Ameritech Michigan. It argues that if it must notify TDS two weeks in advance of such a change, TDS would be able to begin discounting [*6] resold service to its own customers in advance of Ameritech Michigan's ability to employ the lower rates for its retail customers. It argues that such a scheme would be a deterrent to Ameritech Michigan ever discounting its retail rates.

In Ameritech Michigan's view, the DAP imposes a substantial and unnecessary burden on Ameritech Michigan. Any time the ILEC desired to alter its tariffs in any manner, it argues, it would be required to check the interconnection agreement to see if that tariff is referenced and thereby requires notice. If notice is required, Ameritech Michigan argues, it then may have to delay filing the proposed tariff alteration, even though "most of the filings in question would have no effect on TDS at all." Ameritech Michigan's objections, p. 11.

Finally, Ameritech Michigan argues, if the arbitration panel merely desired to protect TDS from unilateral changes to the contract by virtue of tariff changes, its concern was misplaced. It states that Section 38.2 ensures that Ameritech Michigan may not alter the parties' contractual commitments by virtue of a tariff change.

After reviewing the materials presented during the arbitration, the Commission finds that [*7] the arbitration panel's decision should be upheld. As mentioned above, this issue appeared also in the Wisconsin arbitration. In that proceeding, TDS proposed broader language than it did in the present case. Ameritech Michigan's Wisconsin affiliate objected to including the proposed language, but suggested that if the Wisconsin panel determined that it should adopt TDS's position, it should revise the contract language to require notice be provided only for tariffs referenced in the agreement. The Wisconsin panel awarded TDS the issue, but revised the language as suggested by Ameritech Wisconsin. Ameritech Wisconsin did not object to the resolution of that issue. The issue was apparently settled before

submission in the Illinois arbitration, because it is not addressed in either the Illinois proposed decision or the Illinois Commerce Commission's Arbitration Decision for TDS and Ameritech Illinois.

In the present case, TDS proposed language similar to that adopted by the Wisconsin panel and not objected to by Ameritech Wisconsin. The arbitration panel found for TDS, thereby adopting the result that was reached in Wisconsin without objection.

The Commission concludes that two weeks' [*8] notice of any change in tariffs that are referenced in the agreement is not unreasonable. It will provide sufficient notice to TDS of coming changes so that it may have an opportunity to deal with them. Nor is the Commission persuaded that this provision places an undue burden on Ameritech Michigan. It is a relatively simple task to compile a list of all referenced tariffs to be cross-checked before a tariff filing. The Commission further rejects Ameritech Michigan's argument that the provision is discriminatory. A provision need not appear in every interconnection agreement within a state to avoid being discriminatory.

The Commission further finds that this provision should not materially affect Ameritech Michigan's ability to compete. Resale tariffs are based on retail tariffs, but do not change for a promotional rate. Thus, Ameritech Michigan may lower its rates as a promotional program, without the need for notifying TDS of a tariff change.

Finally, the Commission finds that this provision does not abrogate Ameritech Michigan's obligation to follow the procedure for tariff changes in the March 7, 2001 order in Case No. U-12540.

Issue TDS-30 Appropriate Limits on Use of [*9] Unbundled Network Elements (UNEs)

Ameritech Michigan acknowledges that the arbitration panel's decision is consistent with Commission precedent. n3 However, to preserve the issue for appellate purposes, the company objects to that decision as being contrary to federal law. Ameritech Michigan asserts that its proposed language is consistent with the Federal Communications Commission's (FCC) limitations that Ameritech Michigan argues prohibit the connection of UNEs with other tariffed services, except collocation.

> n3 Ameritech Michigan cites the Commission's October 24, 2000 order in Case No. U-12460.

The Commission notes that Ameritech lost this issue before both the Wisconsin arbitration panel and the Illinois Commerce Commission.

The Commission finds that the decision of the arbitration panel should be affirmed. Even though Ameritech Michigan was on notice of the Commission's prior decisions on this issue, it continued to propose language that is overly broad and would potentially prohibit combinations that do not violate the federal proscription against a CLEC's providing access service to permit Interexchange carriers (IXCs) to avoid the ILEC's access tariffs. See, Supplemental [*10] Order Clarification in CC Docket No. 96-98, Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, FCC 00-183 (rel'd June 2, 2000). Ameritech Michigan further proposed its language cognizant of the Commission's arbitration procedures. Thus, Ameritech Michigan should not now be heard to complain about losing the issue, having taken that risk knowingly.

Issues 33 through 40 Off-site Adjacent Collocation Access to UNEs

TDS originally sought provisions for this interconnection agreement that would permit it to obtain off-site adjacent collocation access to UNEs consistent with the availability of that service in California. It proposed language that somewhat altered the conditions of the California offering. Ameritech Michigan opposed permitting TDS to utilize off-site adjacent collocation.

During the course of the arbitration proceedings, the arbitration panel met with the parties in an attempt to narrow the issues before it. At that time, the panel noted that Ameritech Michigan had a tariff on file in Michigan for off-site adjacent collocation, and suggested that the parties should be able to settle the issue. Thereafter, TDS notified Ameritech [*11] Michigan and the arbitration panel that it would accept a provision in the contract that permitted it to use the Michigan tariff for off-site adjacent collocation. Noting that the provision had been appealed by Ameritech Michigan, TDS proposed language that also permits Ameritech Michigan to invoke the change of law provision of the contract should the ILEC be successful on that appeal.

Ameritech Michigan opposed permitting TDS to alter its position from that which it took in the petition for arbitration. It stated that if off-site adjacent collocation is permitted at all, it should be limited to the language originally required in California.

Although generally baseball style arbitration requires the choice between the two parties' proposals, the arbitration panel noted that in order to prevent an unjust or unreasonable outcome, it could award something other than one of the parties' initial proposals. Therefore, it determined that to prevent such a result it would adopt TDS's proposal that the agreement include language referencing the Michigan tariff. Moreover, the arbitration panel found that its decision was consistent with the Commission's resolution of a similar issue in Case [*12] No. U-12465, an arbitration of an interconnection agreement between Ameritech Michigan and AT&T Communications of Michigan, Inc. The arbitration panel further found that Ameritech Michigan had engaged in bad faith negotiation because it represented to TDS and the arbitration panel that off-site adjacent collocation was available only in California, under the terms in the master contract in that state.

Ameritech Michigan objects to the arbitration panel's decision and initially argues that the Commission should reverse that decision because "this trumped-up finding of bad faith was the *sole* basis for the DAP on this issue." Ameritech Michigan's objections, p. 17 (emphasis in original).

Further, Ameritech Michigan argues that it responded to TDS's proposed language just as required under the rules of arbitration in Michigan. It states that it provided testimony on the issue of whether TDS should be allowed off-site adjacent collocation under the rules applicable in California. Ameritech Michigan asserts that TDS created the allegation of bad faith to provide the arbitration panel a reason to grant TDS's new position despite the lack of record evidence supporting it. Therefore, [*13] Ameritech Michigan strongly urges the Commission to reverse the arbitration panel's determination that the ILEC acted in bad faith. It argues that the California provisions that TDS sought to incorporate into this agreement are far different from the Michigan off-site adjacent collocation tariff provisions.

Moreover, Ameritech Michigan argues, TDS could have discovered the publicly available collocation tariff had it perused Ameritech Michigan's tariffs with a "modicum of diligence." Ameritech Michigan's objections, p. 20. Ameritech Michigan argues that it cannot be held to have acted in bad faith for its failure to point the CLEC to a tariff for a service that it had no indication that the CLEC desired.

Ameritech Michigan further argues that it did not engage in bad faith when it argued that the arbitration panel should not consider the tariff. It states that it merely took the position that the panel and the parties should stick to the arbitration procedures approved by the Commission.

Finally, Ameritech Michigan argues that the Commission's requirement that Ameritech Michigan file the tariff in question was inconsistent with the federal Act. Ameritech Michigan now invites the Commission [*14] to find that the off-site adjacent collocation tariff is contrary to federal law and thus cannot be included in the interconnection agreement. Moreover, Ameritech Michigan argues, the off-site adjacent collocation arrangements violate state law.

The Commission finds that Ameritech Michigan exhibited bad faith in its negotiations on this issue.

> Bad faith is defined in Black's Law Dictionary, 4th ed, p. 176 as:
>
>> The opposite of "good faith," generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.

Commercial Union Ins Co v Liberty Mutual Ins Co, 137 Mich App 381, 390; 357 NW 2d 861 (1984). Despite Ameritech Michigan's dubious argument that it had no idea that the Michigan tariff would satisfy TDS, and that TDS could have reviewed Ameritech Michigan's tariffs to discover the information, Ameritech Michigan has failed to adequately answer why, when confronted with the available tariff [*15] and TDS's willingness to incorporate that tariff as satisfying its desire to have off-site adjacent collocation available, Ameritech Michigan refused that compromise position. TDS, like any CLEC, has a right to obtain desired services pursuant to the terms and conditions of any Ameritech Michigan tariff. Ameritech Michigan's refusal to provide off-site adjacent collocation pursuant to the tariff it has on file is a "neglect or refusal to fulfill some duty . . ., not prompted by an honest mistake . . ., but by some interested . . . motive."

Further, Ameritech Michigan's argument that it should not be required to incorporate the terms of an unlawful tariff is frivolous. It has a tariff on file, which is valid until found not to be so in an appropriate forum. That tariff is available to all takers when its conditions are satisfied. Moreover, the language offered by TDS includes language permitting a change should Ameritech Michigan prevail on its appeal of the order requiring the tariff filing. There simply is no just or reasonable basis for excluding off-site adjacent collocation from the contract under the terms available to all through the tariff.

Moreover, the Commission rejects [*16] Ameritech Michigan's invitation to conduct a review of its tariff in the present case. The tariff was filed as a result of the Commission's order in a separate, unrelated case that is currently on appeal. Collateral attack of that decision is not appropriate.

The Commission further finds that, contrary to Ameritech Michigan's arguments, the arbitration panel relied on more than the finding of bad faith to support its decision. The arbitration panel found that this case represented an instance in which choosing one or the other of the parties' original positions would be clearly unreasonable or contrary to the public interest. The Commission agrees. The arbitration panel's determination on this issue is affirmed.

Issue TDS-78 Collocated Equipment Provisions

Ameritech Michigan proposed language that would limit the type of equipment that TDS may collocate. It argued that its proposed language is consistent with the FCC's rules and that it provides important parameters relating to the type of equipment that Ameritech Michigan is required to permit TDS to collocate or that the ILEC has voluntarily agreed to collocate. Ameritech Michigan argued that TDS's proposal to merely reference [*17] the FCC's or the Commission's rules would not provide sufficient clarity to prevent disputes over the type of equipment that TDS may collocate.

TDS objected and argued that Ameritech Michigan's proposed language would limit the equipment permitted to be collocated well beyond the limits established by the FCC. In TDS's view, Ameritech Michigan's language would implement the ILEC's inaccurate view of the FCC's findings with regard to collocated equipment. TDS argued that the result of Ameritech Michigan's proposed language would be to place the burden on TDS to justify a particular piece of equipment, rather than place the burden on Ameritech Michigan to show that the equipment does not meet the requirements of the federal Act.

The arbitration panel found in favor of TDS on this issue, reasoning that inclusion of Ameritech Michigan's proposed language would put the burden on TDS to demonstrate that a particular piece of equipment complied, rather than on Ameritech Michigan to demonstrate that the rejected piece of equipment did not comply with the "necessary" element of 47 USC 251(c)(6), as provided for in 47 CFR 51.323(b) [*18] . The arbitration panel found that Ameritech Michigan's proposed language attempted to circumvent the FCC's process. It further noted that the Wisconsin panel deleted the language to which TDS objected, and concluded that the same result should be reached here. Finally, the arbitration panel noted that its decision would be consistent with the Commission's November 20, 2000 order in Case No. U-12465.

Ameritech Michigan objects to the arbitration panel's resolution of this issue and argues that the basis for that resolution is an erroneous conclusion that allocating the burden of proof between the parties (as to whether a particular piece of equipment meets the standard for collocation) was the crux of the issue. It argues that the proposed language has nothing to do with the burden of proof. Even if the issue could be viewed as a proof issue, Ameritech Michigan argues, the arbitration panel erred in concluding that the FCC intended to place the burden on ILECs to demonstrate to a state commission that a piece of equipment does not meet the statutory test. It argues that the FCC has placed the burden on the ILEC to prove that a particular piece of equipment that meets the federal Act's [*19] eligibility standard for collocation will not actually be used by the CLEC for one of the purposes set forth in that standard. Ameritech Michigan claims that the FCC has never suggested that the ILEC also must bear the burden to prove to a state commission that a piece of equipment does not meet the eligibility standard in the first place.

Ameritech Michigan insists that its proposed language is consistent with the FCC's regulations and the federal Act. It argues that the types of equipment listed in Ameritech Michigan's proposed language for Appendix Collocation, Sections 6.1 through 6.8 are not necessary for interconnection or access to UNEs. It argues that TDS does not point to any portion of the proposed language that it claims is inconsistent with 47 CFR 51.323(b) or (c) or any other rule.

The Commission finds that the decision of the arbitration panel to adopt the language proposed by TDS should be affirmed. The Commission notes that on July 12, 2001, the FCC adopted its Fourth Report and Order in CC Docket No.

98-147, Deployment of Wireline Services Offering Advanced Telecommunications Capability, (rel'd August 8, 2001), in which [*20] the FCC reevaluated provisions of its collocation rules on remand from the United States Court of Appeals for the District of Columbia. n4 In that order, the FCC determined that a piece of equipment is necessary for interconnection or access to UNEs within the meaning of Section 251(c)(6) if, absent deployment, the requesting carrier would, as a practical, economic, or operational matter, be precluded from obtaining "equal in quality" interconnection or "nondiscriminatory access" to UNEs from the ILEC.

> n4 The case was remanded to the FCC in GTE Serv Corp v FCC, 205 F3d 416 (DC, 2000).

The Commission finds that the language proposed by Ameritech Michigan is not consistent with the FCC's July 12, 2001 order. For example, the proposed language for Section 6.2 states that multifunctional equipment is not "necessary" for interconnection or access to UNEs. That statement contradicts the FCC's order at P41, in which the FCC stated in part:

> In finding that in certain circumstances collocation of multi-functional equipment is consistent with the statutory language and purposes, we reject, on the one hand, positions that would result in a blanket prohibition [*21] of multi-functional equipment, and on the other hand, proposals that would result in the adoption of a standard without real limiting principles. Specifically, we reject Bell South's, SBC's, and Verizon's argument that an ILEC must be allowed to preclude collocation of any equipment that includes one or more functionalities whose deployment is "unnecessary" for interconnection or access to [UNEs]. We find this approach to be unreasonably narrow and disconnected from the statutory purposes.

Id.

Further, the Commission finds that there may be some "ancillary equipment" that would meet the standards expressed in the FCC's July 12, 2000 order on this issue. Ameritech Michigan's proposed language states, to the contrary, that ancillary equipment is not necessary, and would, if adopted, negate any duty on Ameritech Michigan's part to permit collocation of that type of equipment.

The Commission finds that the more reasonable alternative here is to adopt TDS's proposed language, which merely incorporates by reference the definition of necessary equipment that is adopted by the FCC.

Issue TDS-90 Application and Construction Intervals

Ameritech Michigan proposed language granting [*22] it longer provisioning intervals when there are multiple applications for collocation space. Generally, an ILEC must accept or deny a collocation application within 10 days. However, Ameritech Michigan argues, the FCC stated that the incumbents "have had ample time since the enactment of Section 251(c)(6) to develop internal procedures sufficient to meet this deadline, absent the receipt of an extraordinary number of complex collocation applications within a limited time frame." Order on Reconsideration, and Second Further Notice of Proposed Rulemaking, CC Docket Nos. 96-98 and 98-147, FCC 00-297, (rel'd August 10, 2000) (Collocation Remand Order), P24. Ameritech Michigan argues that because the 10-day period is part of the 90-day period for provisioning collocation, it follows that the 90-day interval must also be extended by a corresponding amount when TDS submits a large number of applications in a limited timeframe. Ameritech Michigan argues that this is all that its proposed language intends to do. It says that its proposed language has been adopted by state commissions in Kansas, Oklahoma, Texas, California, Connecticut, and Illinois. n5

> n5 The Commission assumes that the reference to Illinois' acceptance of this language is to a case other than the TDS arbitration proceeding. Both the arbitrator and the Illinois Commerce Commission (as well as the Wisconsin panel) awarded this issue to TDS. [*23]

Moreover, Ameritech Michigan argues, the FCC has recognized that longer intervals may be appropriate. Ameritech Michigan asserts that the Collocation Remand Order does not set a fixed interval of 90 days for filling collocation requests, when the order actually holds that states are free to set their own intervals.

The Commission finds that the decision of the arbitration panel should be upheld on this issue. In the Commission's view, Ameritech Michigan has interpreted the FCC's Collocation Remand Order too broadly. A review of the cited

portions reflects the FCC's acknowledgement that a longer interval might be appropriate if the CLEC submits an "extraordinary number of complex" applications for collocation. However, the order also notes that ILECs have had "extensive experience with handling large numbers of collocation applications on an ongoing basis." Id., P28. Although the FCC order allows states to set a different interval, it concludes that an ILEC should be able to complete "all, or virtually all, physical collocation arrangements in no more than 90 calendar days." Id.

The Commission finds that the burden should be on the ILEC to demonstrate the need for an extension [*24] of time beyond the generally applicable 90-day interval. There is nothing in the submitted materials to suggest that six requests within a five-day period is so extraordinary or necessarily complex that Ameritech Michigan must be granted an additional five days to provision the collocation request. The record provides no insight as to the relationship between the number of requests submitted and the time needed to respond, or the underlying facts to support the alleged relationship. In short, the Commission is not persuaded that Ameritech Michigan should always be granted an extension of the provisioning interval based solely on the number of requests.

Moreover, there is no indication on this record that TDS has engaged in the feared "dumping" of numerous complex collocation requests. However, to prevent any incentive for the CLEC to "dump" requests on Ameritech Michigan, the Commission finds that the parties should include a provision that permits Ameritech Michigan to seek an extension of the provisioning interval in extraordinary circumstances. If the parties cannot agree, they should each submit their last best offer for language, and the Commission will resolve the dispute.
[*25]
Issue TDS-96 Conditions Under Which TDS May Increase the Size of Its Collocation Space

Ameritech Michigan proposed language for Appendix Collocation, Section 10.11 that would limit the CLEC's right to request additional collocation space to circumstances in which the CLEC already uses at least 60% of the collocation space that the CLEC currently rents. TDS, on the other hand, proposed that it should be permitted to increase its collocation space whenever there is space available.

The arbitration panel determined the language proposed by Ameritech Michigan to be arbitrary and potentially problematic and confusing. In its view, whatever problems might occur with the CLEC attempting to "warehouse" space could better be dealt with in the complaint and dispute resolution procedures provided in the agreement.

Ameritech Michigan objects and argues that the FCC has recognized the ILEC's right to impose reasonable restrictions on warehousing of unused space by CLECs, citing 47 CFR 51.323(f)(6) and the FCC's Second Report and Order in CC Docket No. 93-162, Local Exchange Carriers' Rates, Terms, and Conditions for Expanded Interconnection Through [*26] Physical Collocation for Special Access and Switched Transport, (rel'd June 13, 1997), PP330-333. It states that the FCC has specifically approved the type of restriction that Ameritech Michigan offers here. It argues that its proposed language provides a reasonable method to avoid premature exhaust of central office space. In addition, Ameritech Michigan argues that it should not be required to build additional space for the use of other CLECs or itself when there is unused space that would otherwise be available.

Further, Ameritech Michigan argues, the arbitration panel erred when it found that the complaint and dispute resolution processes would be sufficient to guard Ameritech Michigan's interests in having collocation space used efficiently. Ameritech Michigan argues that should it attempt to use the complaint and dispute resolution procedures, TDS would likely defend itself by claiming that it was merely exercising its rights under the contract. Ameritech Michigan insists that a concrete rule as to when TDS may request additional space is necessary to avoid the need for invoking the complaint and dispute resolution processes.

Moreover, Ameritech Michigan argues, the [*27] arbitration panel vaguely alluded to "problems and confusion" that it foresaw if Ameritech Michigan's proposal was adopted. However, it argues, the arbitration panel did not adequately express what those problems might be. It asserts that the only example cited is based on faulty logic and ignores the present record. Contrary to the discussion in the DAP, Ameritech Michigan argues, TDS would not be prevented from obtaining additional space should it submit a number of augment requests within a relatively short period of time. It argues that the proposed language specifically permits a CLEC to begin the application process prior to reaching the 60% utilization rate if the CLEC expects to achieve 60% utilization before the process is complete. Thus, Ameritech Michigan argues, the CLEC can pursue all of its applications, as long as it is using 60% of its space by the time the process to provision its augment request is complete. Ameritech Michigan further notes that TDS did not argue for a lower percentage to be used, but merely argued that no limits should be placed on its ability to obtain additional collocation space.

The Commission finds that the arbitration panel's decision on [*28] this issue should be affirmed. Although the Commission is not opposed to imposing some restrictions on CLEC's obtaining additional collocation space, or provisions that would permit the ILEC to reclaim areas to fill a need when the CLEC is not using its area efficiently, Ameritech Michigan has not adequately explained how it would measure the 60% utilization factor. Nor has it explained why 60% is a relevant number or how many central offices are experiencing anything close to the exhaustion of facilities. There is no evidence that TDS has ever unreasonably warehoused collocation space or that Ameritech Michigan has actually had to build facilities where the need is based only on the failure of CLECs to efficiently use space.

Therefore, the Commission joins the Wisconsin panel and the Illinois Commerce Commission in rejecting Ameritech Michigan's proposed language. The decision of the arbitration panel on this issue is affirmed.

Issues TDS-101 and 102 Notice Requirements for Major Construction Projects, and AC or DC Power Work.

Ameritech Michigan proposed language in Appendix Collocation, Section 17.1 that would require it to provide five business days' notice to TDS before [*29] undertaking a major construction project. It proposed in Section 17.3 to provide 10 business days' notice before any scheduled AC or DC power work or related activity that might cause an outage or power disruption. TDS sought 20 business days' notice for each of these activities.

The arbitration panel determined that TDS had the more reasonable position on both issues.

Ameritech Michigan objects and argues that the arbitration panel relied on language included in the Ameritech Interconnector's Collocation Service Handbook (Handbook) to support its conclusion, without recognizing that the 20 days' notice provided in the Handbook is limited to those instances in which it is feasible to provide it. Ameritech Michigan states that logic dictates that if the Handbook is to be relied upon, the phrase "where feasible" should also appear. However, Ameritech Michigan argues, that was never TDS's position.

Ameritech Michigan further argues that the verified statement of Roy R. Debatz provides record support for the company's claim that 20 days' notice is not always feasible. He stated that the need for major construction can arise within a few days. Ameritech Michigan argues that forcing it [*30] to wait 20 days to begin a necessary project is a disservice to Ameritech Michigan's customers and to other CLECs.

On the other hand, Ameritech Michigan argues, TDS provided no evidence concerning why it needs 20 business days' notice to implement whatever precautions it finds necessary in response to Ameritech Michigan's scheduled work in the general area of its collocation space. In fact, Ameritech Michigan argues, TDS did not provide evidence that it would need to take any precautionary steps at all. Similarly, Ameritech Michigan argues, TDS did not provide evidence to support its need for 20 business days' notice for power work. Ameritech Michigan points out that the remainder of Section 17.3 requires that Ameritech Michigan provide TDS with an alternate plan to provide power in the case of an outage and make reasonable accommodations to allow TDS to provide alternate power if Ameritech Michigan does not have a plan. Thus, Ameritech Michigan concludes that its proposed language provides ample protection to TDS and its customers in this situation, and it should not be required to provide an additional 10 business days' notice or to incur otherwise unnecessary burdens concerning [*31] scheduling.

The Commission finds that the decision of the arbitration panel should be affirmed. The Commission agrees with the Illinois Commerce Commission that adequate notice for proposed major construction projects and AC or DC power work that might cause an outage is critical to the ability of the CLEC to compete. This is so because the CLEC must be permitted sufficient time to ensure continued service to its customers and to arrange its own scheduling of installations so that it does not interfere with the ILEC's schedule. The Commission finds that 5 business days' notice of major construction projects and 10 business days' notice of AC or DC power work likely will not be sufficient for those purposes. Between the two options, TDS's proposed language is the more reasonable. n6

n6 The Wisconsin panel awarded language providing for a middle ground of 10 days' notice for major construction and 15 days' notice for the power work.

Issue TDS-103 Insurance Provisions for Collocation

Ameritech Michigan proposed language for Appendix Collocation, Section 18, that establishes insurance requirements in addition to those within the General Terms & Conditions of the interconnection [*32] agreement.

Ameritech Michigan took the position that TDS creates special risks in its collocating within Ameritech Michigan's property. Thus, it reasons, TDS should purchase the insurance to cover all such risks to its own property and to hold Ameritech Michigan harmless for any damages to that property. The proposed provisions would also require that TDS agree to make whatever changes Ameritech Michigan's property insurer might recommend for safety or reduction of hazards. The language further requires TDS's insurance to be primary.

TDS opposed the inclusion of Appendix Collocation, Section 18. It argued that the insurance requirements of the General Terms & Conditions sufficiently dealt with insurance needs and this proposed section was unnecessary. Moreover, TDS argued, the proposed provisions are one-sided and discriminatory. For example, Section 18.2 requires TDS to purchase insurance to cover losses occasioned by the negligence of "SBC-13 STATE, its agents, directors, officers, employees, independent contractors, and other representatives," and requires that TDS "waive all right of recovery from SBC-13 STATE or its agents, directors, officers, employees, independent contractors, [*33] and other representatives." TDS argued that no reciprocal provision requires Ameritech Michigan to waive its rights to collect for damages done to its property. TDS further noted that the Wisconsin arbitration panel had found in the CLEC's favor on this issue and that Ameritech Wisconsin had not objected.

The present arbitration panel agreed with TDS, reasoning that Ameritech Michigan was merely seeking to absolve itself of liability and to have TDS pay for damages that Ameritech Michigan might cause. The arbitration panel stated that the insurance requirements are unnecessary in addition to those found in the General Terms & Conditions, and rejected Ameritech Michigan's proposed language.

Ameritech Michigan objects and argues that its proposed Section 18 would establish reasonable insurance requirements given the nature of collocation. It argues that it is required by the federal Act to open its premises to all comers so they can install telecommunications equipment and use that equipment to compete with the ILEC. Moreover, Ameritech Michigan states, it must permit competitors' employees to enter those premises to service the physically collocated equipment. It states: "One CLEC's [*34] equipment is next to another's, and all of it is near the ILEC's." Ameritech Michigan's objections, p. 43.

Ameritech Michigan further argues that none of its proposed Section 18 is repetitious of, or contradictory to, the provisions found in the General Terms & Conditions. Rather, Ameritech Michigan argues, these insurance provisions are specifically tailored to the risks associated with collocation. Ameritech Michigan readily admits that the provisions are one-sided, but defends that characteristic as being a natural consequence of the origin and nature of collocation.

The Commission finds that the decision of the arbitration panel should be affirmed. Generally, the Commission has rejected liability and insurance provisions that attempt to remove an ILEC's liability for its own negligence. These proposed provisions do just that. The Commission is not persuaded that the origin or nature of collocation requires inclusion of these provisions or that the General Terms & Conditions are not adequate with regard to insurance for collocation purposes. Although it may be expected that TDS will provide insurance for its own interests in property and any damage it may cause, the Commission [*35] does not agree that it should be required to waive any right to obtain redress from Ameritech Michigan for damage caused by the ILEC's negligence.

Moreover, the Commission rejects Ameritech Michigan's interpretation of the quoted portion of the transcript from the Illinois arbitration proceeding. Merely because a TDS witness might find reasonable a hypothetical recommendation to spray insulation on electrical connections to reduce fire probability by 40%, does not support a finding that it would be reasonable for TDS to agree to all recommendations of Ameritech Michigan's insurer. Some recommendations might significantly alter either or both sides of the cost/benefit analysis from that of the hypothetical posed to the witness. The Commission is not persuaded that TDS should be required to perform every such recommendation, despite whether it might find the recommendation reasonable. The Commission finds that TDS's interest in preserving its own property should provide sufficient incentive for it to voluntarily take reasonable steps to protect its property and the property around it.

The Commission further notes that not only will these provisions be deleted from the Wisconsin interconnection [*36] agreement (as noted above, the Wisconsin arbitration panel awarded this issue to TDS and Ameritech Wisconsin did not object), but the Illinois Commerce Commission order also awards this issue to TDS.

Issue TDS-107 Reciprocal Compensation for Foreign Exchange (FX) Service

Ameritech Michigan proposed Appendix Reciprocal Compensation, Section 2.7, which would exclude FX calls from reciprocal compensation requirements. Ameritech Michigan argued that reciprocal compensation is due only on

local traffic. It went on to argue that FX traffic is not local traffic because an FX call does not originate and terminate in the same local service area. Ameritech Michigan argued that pursuant to the FCC's recent Order on Remand and Report and Order in CC Dockets 96-98 and 99-68, (rel'd April 27, 2001) (ISP Remand Order), FX calls are not subject to reciprocal compensation because they are exchange access or are subject to intrastate access regulations. In Ameritech Michigan's view, the ISP Remand Order abrogated the Commission's previous findings with regard to this issue.

TDS pointed out that the Commission has decided this issue recently in its January 23, 2001 order in Case No. U-12696, [*37] Ameritech Michigan's application to alter its reciprocal compensation rate structure. In that case, the Commission denied Ameritech Michigan's request to exempt FX service from reciprocal compensation requirements. TDS argued that Ameritech Michigan had not provided a sufficient basis in this case for the Commission to reverse its prior decision, because the FCC order upon which Ameritech Michigan relied related to ISPs, not FX service.

The arbitration panel found in favor of TDS on this issue. In so doing, it rejected Ameritech Michigan's argument that the ISP Remand Order required the Commission to reach a different result than it has in past cases. n7 The arbitration panel further concluded that Ameritech Michigan read too much into the FCC's ISP Remand Order as that order does not address FX service.

> n7 In addition to the case already cited, the Commission has decided this issue consistently in several arbitration cases. See, e.g., the October 24, 200 order in Case No. U-12460 and the August 17, 2000 order in Case No. U-12382.

Ameritech Michigan objects and argues that the previous Commission orders finding that FX calls are subject to reciprocal compensation under 47 USC 251 [*38] (b)(5) did so based on the finding that FX calls are local. That finding, Ameritech Michigan argues, is contrary to current law. It argues that the ISP Remand Order ruled that the question of whether traffic is or is not subject to reciprocal compensation under Section 251(c)(5) does not turn on whether the traffic is local. Rather, Ameritech Michigan argues, the FCC amended 47 CFR 51.701 by deleting the word "local" from the rule and establishing new determinants for whether particular traffic is subject to reciprocal compensation. Although Ameritech Michigan acknowledges that the ISP Remand Order did not specifically discuss the effect of the new rule on FX calls, it argues that the FCC changed the rules and the analysis to be undertaken when determining this issue. It argues that the arbitration panel failed to reconsider the question under the rules that now apply.

Moreover, Ameritech Michigan argues, the DAP makes another fatal error in that it references questions raised in Case No. U-12696 as to whether Ameritech Michigan's proposal to exclude FX traffic from reciprocal compensation was even feasible and that the Commission Staff had noted [*39] that reclassifying these calls for rating purposes would be costly. Ameritech Michigan objects to these references as a violation of its due process rights, because, in its view, the arbitration panel impermissibly reached into the record of a separate proceeding, which cannot lawfully form the basis (or part of the basis) for a Commission decision. Thus, Ameritech Michigan argues, the arbitration panel's rationale must be set aside and Ameritech Michigan's proposed language removing FX traffic from the requirement to pay reciprocal compensation should be included in the interconnection agreement.

The Commission finds that the decision of the arbitration panel should be affirmed on this issue. In the ISP Remand Order, the FCC amended 47 CFR 51.701 Scope of Transport and Termination Pricing Rules, which (as amended) reads in part:

> (a) The provisions of this subpart apply to reciprocal compensation for transport and termination of telecommunications traffic between LECs and other telecommunications carriers.
>
> (b) Telecommunications traffic. For purposes of this subpart, telecommunications traffic means:
> (1) Telecommunications traffic exchanged [*40] between a LEC and a telecommunications carrier other than a CMRS provider, except for telecommunications traffic that is interstate or intrastate exchange access, information access, or exchange services for such access.

Although exempting information access from these requirements takes care of ISP traffic, the Commission does not agree that non-ISP FX traffic is exempt from reciprocal compensation requirements on the basis of the newly amended rule. FX is not intrastate exchange access service as argued by Ameritech Michigan. Exchange access service is defined

by 47 USC 153(16) as "the offering of access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services." Telephone toll service is defined in 47 USC 153(48) as "service between stations in different exchange areas for which there is made a separate charge not included in contracts with subscribers for exchange service." When an end-user dials a number that belongs to an FX customer, there is no separate charge made. Therefore, by definition, FX service is not a toll service and is not [*41] included within the exemption from reciprocal compensation. Moreover, the Commission has consistently held that FX calls are to be treated as local for rating purposes.

Further, the Commission is not moved to reverse its prior orders based on Ameritech Michigan's argument concerning the arbitration panel's mentioning certain facts asserted in Case No. U-12696. First, it is apparent to the Commission that the arbitration panel had a firm basis for its findings without the added concern about the feasibility of altering the compensation scheme for FX service. It properly relied on prior Commission precedent, which has not been abrogated or preempted by anything cited to the Commission. However, to avoid any misunderstanding the Commission affirmatively states that it has not considered the disputed facts in its rendering of a decision on this issue.

Issue TDS-123 Limitations and Liabilities Associated with Use of Electronic Interfaces

In Appendix OSS, Section 3.2.1 n8, TDS agrees to use the electronic interfaces described in that section only for proper purposes. It further agrees to comply with certain security policies and guidelines. Ameritech Michigan proposed language that [*42] would permit the ILEC to summarily terminate TDS's access to the OSS for failure to follow those agreed upon security guidelines. Additionally, Ameritech Michigan sought language imposing liability on TDS for any

> . . . cost, expense or liability relating to any unauthorized entry or access into, or use or manipulation of [Ameritech Michigan's] OSS from [TDS's] systems, workstations or terminals or by CLEC employees or agents or any third party gaining access through information and/or facilities obtained from or utilized by [TDS] and shall pay [Ameritech Michigan] for any and all damages caused by unauthorized entry.

Id. Ameritech Michigan took the position that TDS is in the best position to guard against unauthorized use through its own terminals or workstations and should be held accountable for any damages resulted from such unauthorized use or misuse of the system.

n8 OSS refers to Operations Support Systems, which are systems used for pre-ordering, ordering, etc.

TDS objected to the proposed language and argued that it would vest too much authority with Ameritech Michigan to be permitted to summarily terminate the CLEC's ability to use the electronic interfaces [*43] and to hold it strictly liable for all damages, regardless of whether TDS is at fault. Moreover, TDS argued, the proposed language does not require use of the dispute resolution process or specify a period of time after which access would be restored. It argued that such summary termination would effectively put TDS out of business within Ameritech Michigan's service territory.

Further, TDS argued, there is no need for this added language. In TDS's view, the liability provisions of the General Terms & Conditions are sufficient to ensure that TDS will pay for damage it causes to Ameritech Michigan or its systems.

The arbitration panel found that the language Ameritech Michigan sought to include was overly broad. Based on TDS's agreement to honor the security policies and guidelines, and the additional safeguards embodied in the dispute resolution process, the arbitration panel found the provisions proposed by Ameritech Michigan to be unnecessary.

Ameritech Michigan objects and argues that the proposed language "appropriately makes TDS responsible for any harm suffered by Ameritech Michigan's OSS systems when it is accessed from TDS's systems, workstations or terminals." Ameritech [*44] Michigan's objections, p. 53. In Ameritech Michigan's view, this assignment of responsibility is fair and reasonable in exchange for permitting TDS the right to access Ameritech Michigan's OSS. It argues that the rationale that TDS should not be held liable for damages not its fault should be rejected. It states that if harm is caused by someone who gains access to Ameritech Michigan's OSS through TDS's equipment, TDS may not be at fault, but Ameritech Michigan certainly is not at fault. Ameritech Michigan argues that in situations like that, it is fair to impose liability on the one in the best position to avoid harm, which would be TDS.

The Commission finds that the decision of the arbitration panel should be modified on this issue. There are essentially two issues embodied in the two disputed sentences. The first sentence reads: "Failure to comply with such security guidelines may result in forfeiture of electronic access to OSS functionality." The Commission agrees with the arbitration panel that this sentence is overly broad for the protection that Ameritech Michigan may reasonably seek. The Commission notes that Ameritech Michigan's objections make it appear that this sentence [*45] is not a matter of dispute. However, the PDAPs and the DAP make it clear that this is the biggest source of objection for TDS. Should Ameritech Michigan determine (based on unknown, unlisted criteria) that a problem has arisen with access gained through TDS, this sentence might appear to give the ILEC the right to summarily terminate TDS's access to OSS. Taking such an action would effectively foreclose the CLEC's ability to serve new customers or market its services within Ameritech Michigan's service territory. The Commission finds that the first disputed sentence should be stricken from the interconnection agreement. The Commission notes that the Illinois Commerce Commission and the Wisconsin arbitration panel reached the same conclusion.

However, the Commission is not persuaded that Ameritech Michigan should be precluded from seeking recovery from TDS for damages incurred due to access gained through TDS. It appears to the Commission that TDS is in the best position to ensure that its equipment and access to the OSS are not abused or misused. Even if a situation arose in which unauthorized access could not be said to be TDS's direct fault, if the access is gained through TDS's [*46] equipment or personnel, TDS should be responsible for the damages that may result. The Commission notes that its decision on this portion of the issue does not match either the Illinois Commerce Commission or the Wisconsin arbitration panel's resolution. n9

> n9 Because Ameritech Wisconsin did not object to this issue in Wisconsin, it is likely that TDS's position will prevail in the final order in that state.

Issues TDS 153 and TDS-155 Terms for Use of Ameritech Michigan's Operator Services n10 (OS)

> n10 As defined by Appendix OS, the services provided under this agreement would include, for example, the ability to obtain operator assistance in placing a call, automated systems for using a credit card to place a call, or billing to called or third party, the ability to reach emergency services by dialing "O", and the ability to check functioning of a line that has a busy signal.

TDS proposed language in Appendix OS, Section 8.1 that would permit it to terminate use of these services on 30 days' notice to Ameritech Michigan. Ameritech Michigan proposed language for that section that would require TDS to choose Ameritech Michigan for its sole provider of OS for TDS's local [*47] serving areas. Ameritech Michigan further proposed that if TDS should terminate its use of Ameritech Michigan's OS before the term of the agreement expires, TDS should pay the charges that would have been imposed for the remainder of the term of the agreement in addition to charges for services already rendered.

The arbitration panel found in favor of TDS on this issue. It reasoned that, in a competitive market, TDS should be free to choose another OS provider, as long as it provided reasonable notice to Ameritech Michigan. It further found Ameritech Michigan's proposed payment on premature termination to be an unreasonable penalty provision. Therefore, the arbitration panel adopted the language proposed by TDS and rejected that proposed by Ameritech Michigan.

Ameritech Michigan objects and now argues that terms for providing OS are not properly subject to arbitration pursuant to the federal Act. Ameritech Michigan argues that nothing in the federal Act, FCC regulations, or any other source of law requires Ameritech Michigan to provide OS to TDS. Ameritech Michigan argues that the FCC found "significant evidence of a wholesale market in the provision of OS/DA [Operator Services and [*48] Directory Assistance] services and opportunities for self-provisioning" these services. FCC Order 99-238, Third Report and Order and Fourth Notice of Proposed Rulemaking, Docket No. 96-98, (rel'd November 5, 1999) (UNE Remand Order). Ameritech Michigan further states that the FCC held that ILECs are no longer required to provide OS or directory assistance (DA) on an unbundled basis under the federal Act. Because there is no duty to provide OS as a UNE, Ameritech Michigan argues, the Commission may not properly undertake to resolve these disagreements about Appendix OS. According to Ameritech Michigan, the Illinois Commerce Commission and the Wisconsin arbitration panel agreed with the ILEC on this issue.

Ameritech Michigan acknowledges that it did not raise this argument with the arbitration panel. However, it argues that this is a jurisdictional issue that may not be waived by the parties.

The Commission finds that the decision of the arbitration panel should be affirmed. In the March 19, 2001 order in Case No. U-12622, the Commission rejected Ameritech Michigan's request to discontinue providing OS/DA on an unbundled basis at rates based on total service long run incremental cost [*49] (TSLRIC). The Commission agreed with the administrative law judge's findings concerning the infeasibility and limited usefulness of the customized routing proposed by Ameritech Michigan. The Commission specifically found that Ameritech Michigan's proposed alternative "would be costly, inefficient, and burdensome." Id., p. 21. The Commission further found that it had authority under the Michigan Telecommunication Act, MCL 484.2101 et seq., to require OS/DA to be offered on an unbundled basis and to ensure reasonable access to competitive alternatives.

The Commission further stated:

> Ameritech Michigan has interpreted the customized routing conditions of the UNE Remand Order as requiring less of it than the FCC intended. The justification that the FCC provided for changing its approach was that competitive OS/DA had become widely available on a national basis and could be readily accessed if the ILEC provided appropriate customized routing arrangements. However, the FCC did not suggest that an ILEC could arbitrarily implement any form of customized routing it desired, without regard to whether that arrangement provided meaningful access [*50] to competitive OS/DA alternatives. The FCC emphasized instead that "customized routing is necessary to access alternative sources of OS/DA for competitors not deploying their own switches," and that "lack of a customized routing solution that enables competitors to route traffic to alternative OS/DA providers would therefore effectively preclude competitive LECs from using such alternative providers." UNE Remand Order, 15 FCCR at 3902, para. 462.
>
> * * *
>
> The Commission finds that Ameritech Michigan must continue to offer OS/DA as a UNE at TSLRIC-based rates. The obligation to provide unbundled OS/DA will continue in effect until Ameritech Michigan provides reasonable accommodations for the problems presented by dedicated end-office trunking and other technological issues that inflate the CLECs' cost of obtaining access to competitive OS/DA services. When Ameritech Michigan believes that it meets the requirements relating to providing access to competitive OS/DA services, it may file an application for authorization to remove OS/DA from its list of UNEs. However, it may not remove OS/DA from UNE status without prior Commission authorization.

March 19, [*51] 2001 order, Case No. U-12622, pp. 21-22.

Ameritech Michigan has not yet obtained Commission authorization and, therefore, it is still bound to provide OS/DA services on an unbundled basis. Thus, Ameritech Michigan must still list OS/DA as a UNE, and the issue is properly within the purview of this arbitration case.

As to the arguments concerning the proposed contract language, the Commission agrees with the arbitration panel that TDS's proposed language is more reasonable than that proposed by Ameritech Michigan. Should an alternative OS provider actually become feasible, TDS should have the opportunity to take advantage of that option, without undue penalties to deter it from doing so. Moreover, the Commission finds that Ameritech Michigan's attempt to establish the full remaining contract price as the payment for ending the OS contract before the interconnection agreement ends is not reasonable, as it does not take into account any savings that the ILEC may incur by not actually providing the service after termination. Therefore, the decision of the arbitration panel should be affirmed.

Issue TDS-158 Use of the Joint SONET for the CLEC's Portion of the Signaling Links

TDS [*52] proposed language in Appendix SS7, Section 2.5, that would permit TDS to provide its portion of the signaling links using the joint SONET when it purchases SS7 services from Ameritech Michigan. Ameritech Michigan objected to this language, claiming that it would actually require a portion of the cost of providing the link to be assumed by Ameritech Michigan. Moreover, Ameritech Michigan argued, the parties had already agreed to the permissible uses for the joint SONET, and signaling links was not one of those purposes.

The arbitration panel adopted the language proposed by TDS. In so doing, it rejected Ameritech Michigan's contention that the parties' agreed language in Appendix NIM, Section 3.4.2 precluded provisioning signaling links over the joint SONET. Rather, the panel opined that the signaling links, being similar to ancillary services, for which use of the joint SONET is permitted, should also be included in the permissible uses of the SONET.

Ameritech Michigan argues that the arbitration panel's decision ignores the contradiction created with the plain meaning of the language in NIM 3.4.2, a section to which the parties have agreed. That provision limits the use of the joint [*53] SONET to interconnection trunks and trunks used to provide ancillary services "described in Section 5 of Appendix ITR." Id. Ameritech Michigan states that signaling links are neither interconnection trunks nor trunks used to provide ancillary services. It says that ancillary services include 800/8YY service, E911 services, high volume call-in services, and OS/DA services. Ameritech Michigan states that Section 5 makes no reference to SS7 trunks, because SS7 is not an ancillary service.

The Commission finds that the conclusion of the arbitration panel should be reversed on this issue. After reviewing the cited sections of the interconnection agreement, the Commission concludes that adopting the arbitration panel's decision would create a contradiction within the interconnection agreement between Appendix SS7, Section 2.5, and the previously agreed to Appendix NIM, Section 3.4.2. Although SS7 is mentioned within the text of Appendix ITR, Section 5, as an expected part of providing certain ancillary services, signaling links are generally not part of the trunk or trunk groups. Therefore, they are not "trunks used to provide ancillary services." Nor are signaling links interconnection [*54] trunks. The parties have agreed that those are the only two permissible uses for the joint SONET.

The Commission notes that the parties currently permit signaling over the joint SONET in Wisconsin. And the Wisconsin arbitration panel composed language that would enable those links to remain as they are now, but require future signaling links to be provided outside of the joint SONET. However, Ameritech Michigan points out that in Michigan, TDS has no such arrangement already in place and no saving language is required.

The Commission concludes that the language proposed by TDS should not be included in the interconnection agreement.

Issue TDS-196 Acceptance Testing

TDS proposed language for Appendix DSL, Section 8.2 that would require Ameritech Michigan to verify "the absence of load coils, excessive bridge taps, foreign voltage, grounds, pair gain devices, repeaters and line splitters or other disturbers which would normally be removed in conditioning a loop for xDSL service." Ameritech Michigan objected to this proposal and proposed its own language that would limit acceptance testing to "basic loop metallic parameters, continuity or pair balance."

Ameritech Michigan argued [*55] that the extent of, and procedures for, acceptance testing have already been addressed in detail and resolved in the Commission's recent order in Case No. U-12320. In its view, TDS was attempting to expand "acceptance testing" so that it includes conditioning the loop to provide advanced services. It asserted that conditioning services were already addressed in a separate portion of the interconnection agreement. Ameritech Michigan argued that to approve TDS's proposed language would effectively require the ILEC to perform conditioning services for which there had been no order or payment.

TDS argued that this section applies only to testing of DSL loops, not all loops. Further, it argued, testing does not require conditioning, but will confirm whether conditioning has been done. TDS asserted that it had experienced difficulties with Ameritech Wisconsin not providing conditioning that had been ordered and paid for.

The arbitration panel found that contrary to Ameritech Michigan's arguments, the testing requested by TDS would not require line conditioning without payment, but would confirm if conditioning that had been ordered had been performed. The panel stated that, according to [*56] TDS, the test will merely determine if disturbers are present. Once the results are known, the parties may determine how to deal with it, based on the contract and what was requested and paid for.

Ameritech Michigan objects and argues that TDS's proposed language does not belong in Section 8.2, which deals with acceptance testing. Ameritech Michigan states that it has no objection to performing the indicated tests, but it argues that they cannot be properly performed as part of acceptance testing as defined in Section 8. Further, Ameritech Michigan states, there is no indication that TDS cares when the tests are done, as long as they are done.

Ameritech Michigan explains that when TDS orders a DSL loop from the ILEC, TDS may have Ameritech Michigan condition the loop. It states that conditioning means making a regular, plain old telephone service (POTS) loop suitable for DSL use by removing excessive bridge taps and load coils, among other things. If TDS requests Ameritech Michigan to do the conditioning, it argues, the conditioning is done to TDS's specifications. After the loop is conditioned, but before acceptance testing, Ameritech Michigan says it will verify the absence of [*57] load coils, etc. It argues that acceptance testing comes later, just before turning over the line to TDS.

Ameritech Michigan argues that the procedure for acceptance testing is set forth in detail in the agreed Appendix DSL, Section 8.3. That section, Ameritech Michigan argues, makes no reference to testing for the things contained in TDS's proposed language for Section 8.2. It argues that the testing TDS desires is not part of provisioning the loop to TDS, but is intended to ensure that the conditioning has been done. Therefore, Ameritech Michigan argues, the proposed language does not belong where TDS proposes.

Ameritech Michigan goes on to argue that the placement of TDS's proposed language would suggest that all DSL loops must be tested for the absence of load coils, excessive bridge taps, etc. But actually, Ameritech Michigan argues, only those loops for which TDS has requested conditioning should require testing. Ameritech Michigan argues that if TDS has not requested conditioning, it makes no sense to test to assure that conditioning has occurred.

Ameritech Michigan now proposes that the Commission accept the testing desired by TDS, but order the parties to place the requirement [*58] in some other place in the contract, not in relation to acceptance testing. However, Ameritech Michigan argues, if the Commission finds that its baseball style arbitration rules prevent that resolution, the Commission should reject the proposed language altogether.

The Commission finds that the arbitration panel's resolution of this issue should be affirmed with one modification. Ameritech Michigan has taken a new position with its argument that it may be alright to include the language, but somewhere else. TDS has not had an opportunity to respond to that new position, and the Commission finds it should be rejected. TDS presented testimony that it has had experience with frequently receiving DSL loops for which it has requested conditioning that are not in fact conditioned. Therefore, the Commission finds that it is reasonable to test for conditioning as a part of the acceptance testing at the conclusion of the provisioning process. However, the Commission finds that it is not reasonable for Ameritech Michigan to perform these tests if TDS has not requested conditioning of the loop in question. The Commission therefore concludes that the parties should be permitted to agree to [*59] language that limits this portion of the acceptance testing to those DSL loops for which TDS has ordered and paid for conditioning. In that manner, Ameritech Michigan cannot argue that it has been required to condition lines without payment.

Should the parties be unable to reach agreement concerning the appropriate language to use, they may submit their respective last best offers to the Commission for a decision.

The Commission FINDS that:

a. Jurisdiction is pursuant to 1991 PA 179, as amended, MCL 484.2101 et seq.; the Communications Act of 1934, as amended by the Telecommunications Act of 1996, 47 USC 151 et seq.; 1969 PA 306, as amended, MCL 24.201 et seq.; and the Commission's Rules of Practice and Procedure, as amended, 1992 AACS, R 460.17101 et seq.

b. The decision of the arbitration panel should be affirmed, except as modified in this order.

THEREFORE, IT IS ORDERED that:

A. The decision of the arbitration panel is affirmed, except as modified by this order.

B. Within 60 days of this order, the parties shall [*60] file a signed agreement conforming to the findings of this order.

The Commission reserves jurisdiction and may issue further orders as necessary.

MICHIGAN PUBLIC SERVICE COMMISSION

By its action of September 7, 2001.