# EXHIBIT A

**H**
Briefs and Other Related Documents

United States Court of Appeals,Second Circuit.
GLOBAL NAPS, INC., Plaintiff-Appellant,
v.
VERIZON NEW ENGLAND, INC., f/k/a New England Telephone & Telegraph Co., d/b/a Bellatlantic Vermont, Inc., Vermont Public Service Board, Michael H. Dworkin, John D. Burke and David C. Coen, Solely in their Capacity as Board Members, Defendants-Appellees.
**Docket No. 04-4685-cv.**

Argued: Dec. 13, 2005.
Decided: July 5, 2006.

**Background:** Competitive local exchange carrier (CLEC) brought action under Telecommunications Act seeking review of determination by state public service board requiring it to pay access charges to incumbent local exchange carrier (ILEC) for its long distance calls, and to cease using virtual NXX service (VNXX). The United States District Court for the District of Vermont, William K. Sessions, Chief Judge, 327 F.Supp.2d 290, granted summary judgment in favor of ILEC. CLEC appealed.

**Holdings:** The Court of Appeals, Cudahy, Circuit Judge, held that:

(1) state public service board had authority to determine what geographic areas were "local areas" for purpose of reciprocal compensation obligations under the Telecommunications Act;

(2) board's ruling that CLEC could not use VNXX service was not preempted by Federal Communications Commission (FCC) ruling; and

(3) board's order did not discriminate against CLEC.

Affirmed.

West Headnotes

**[1] Telecommunications 372 855**

372 Telecommunications
372III Telephones
372III(F) Telephone Service
372k854 Competition, Agreements and Connections Between Companies
372k855 k. In General. Most Cited Cases
A major purpose of the Telecommunications Act was to end local telephone monopolies and develop a national telecommunications policy that strongly favored local telephone market competition. Communications Act of 1934, § 251(a)(1), (c)(1), 47 U.S.C.A. § 251(a)(1), (c)(1).

**[2] Telecommunications 372 864(1)**

372 Telecommunications
372III Telephones
372III(F) Telephone Service
372k854 Competition, Agreements and Connections Between Companies
372k864 Reciprocal Compensation
372k864(1) k. In General. Most Cited Cases
Under the provision of the Telecommunications Act requiring reciprocal compensation arrangements, when a competitive local exchange carrier's (CLEC) customer calls an incumbent local exchange carrier's (ILEC) customer located in the same local calling area, the CLEC pays the ILEC for completing the local call. Communications Act of 1934, § 251(b)(5), 47 U.S.C.A. § 251(b)(5).

**[3] Telecommunications 372 866**

372 Telecommunications
372III Telephones
372III(F) Telephone Service
372k854 Competition, Agreements and Connections Between Companies
372k866 k. Pricing, Rates and Access Charges. Most Cited Cases
Pursuant to the Telecommunications Act, "access charges" are charges that long-distance telephone companies are required to pay local-exchange carriers for the use of local network facilities. 47 C.F.R. § 69.2(a).

**[4] Public Utilities 317A 194**

317A Public Utilities
317AIII Public Service Commissions or Boards

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

317AIII(C) Judicial Review or Intervention
      317Ak188 Appeal from Orders of Commission
         317Ak194 k. Review and Determination in General. Most Cited Cases
The Court of Appeals reviews de novo the district court's determination that a state public service board order conforms to federal law.

**[5] Public Utilities 317A ⚷194**

317A Public Utilities
   317AIII Public Service Commissions or Boards
      317AIII(C) Judicial Review or Intervention
         317Ak188 Appeal from Orders of Commission
            317Ak194 k. Review and Determination in General. Most Cited Cases
The Court of Appeals reviews a state public service board decisions as congruent with state law under the arbitrary-and-capricious standard.

**[6] States 360 ⚷18.81**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.81 k. Telecommunications; Wiretap. Most Cited Cases

**Telecommunications 372 ⚷734**

372 Telecommunications
   372III Telephones
      372III(A) In General
         372k733 Preemption; Interplay of Federal, State and Local Laws
            372k734 k. In General. Most Cited Cases

**Telecommunications 372 ⚷864(1)**

372 Telecommunications
   372III Telephones
      372III(F) Telephone Service
         372k854 Competition, Agreements and Connections Between Companies
            372k864 Reciprocal Compensation
               372k864(1) k. In General. Most Cited Cases
State public service board had authority to determine what geographic areas constituted "local areas" for purpose of applying reciprocal compensation obligations between local exchange carriers (LEC) pursuant to Telecommunications Act, and thus competitive local exchange carrier's (CLEC) definition of its own local calling areas for purposes of billing its retail customers did not affect its reciprocal compensation obligations under its interconnection agreement with incumbent local exchange carrier (ILEC); both the language of the Act and the decisions of the Federal Communications Commission (FCC) support determination that the Act did not preempt state commissions' authority to define local calling areas to govern intercarrier compensation. Communications Act of 1934, § 251(b)(5), 47 U.S.C.A. § 251(b)(5).

**[7] States 360 ⚷18.81**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.81 k. Telecommunications; Wiretap. Most Cited Cases

**Telecommunications 372 ⚷734**

372 Telecommunications
   372III Telephones
      372III(A) In General
         372k733 Preemption; Interplay of Federal, State and Local Laws
            372k734 k. In General. Most Cited Cases
State public service board's ruling in arbitration proceeding between local exchange carriers (LEC) that competitive local exchange carrier (CLEC) could not use virtual NXX (VNXX) service was not preempted by Federal Communications Commission's (FCC) ruling that Internet service provider (ISP) bound traffic was inherently interstate in character. Communications Act of 1934, § 253, 47 U.S.C.A. § 253; 47 C.F.R. § 63.

**[8] Telecommunications 372 ⚷870**

372 Telecommunications
   372III Telephones
      372III(F) Telephone Service
         372k854 Competition, Agreements and Connections Between Companies
            372k870 k. Proceedings; Arbitration. Most Cited Cases
State public service board has jurisdiction to review and enforce interconnection agreements between local exchange carriers relating to Internet service provider (ISP) traffic.

**[9] States 360 ⚷18.9**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.9 k. Federal Administrative Regulations. Most Cited Cases
A federal agency may preempt state law only if it is acting within the scope of its congressionally delegated authority and the agency makes its intention to preempt clear.

**[10] Telecommunications 372 855**

372 Telecommunications
372III Telephones
372III(F) Telephone Service
372k854 Competition, Agreements and Connections Between Companies
372k855 k. In General. Most Cited Cases
State public service board's order in arbitration proceeding, which allowed incumbent local exchange carrier (ILEC) to provide foreign exchange (FX) service, but did not permit competitive local exchange carrier (CLEC) to provide virtual NXX (VNXX) service, did not discriminate against CLEC, in violation of Telecommunications Act; the VNXX decision did not constitute a general barrier to entry into the market, and VNXX service was not identical to FX service, because retail customers using FX service purchased foreign exchange line, paying costs of installation and transportation, but VNXX customers did not purchase lines or pay costs. Communications Act of 1934, § § 253, 261(b, c), 47 U.S.C.A. § § 253, 261(b, c).

***92** David John Mullet, David John Mullett, P.C., Montpelier, VT, for Plaintiff-Appellant.
Bruce P. Beausejour and Keefe B. Clemons, Verizon New England, Inc., Boston, MA, for Verizon New England, Inc., Defendant-Appellee.
Sean A. Lev, Scott H. Angstreich and Derek Ho, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC, for Verizon New England, Inc., Defendant-Appellee.
Clifford Peterson, Assistant Attorney General for the State of Vermont, Montpelier, VT, for Michael H. Dworkin, John D. Burke and David C. Coen, Defendants-Appellees.

Before FEINBERG, B.D. PARKER, and CUDAHY,[FN*] Circuit Judges.

FN* The Honorable Richard D. Cudahy, Circuit Court Judge for the United States Court of Appeals for the Seventh Circuit, sitting by designation.

CUDAHY, Circuit Judge.
This telecommunications appeal involves a question about how the prevailing regulatory regime-rooted as it is in legacy technology-applies to products and services far from contemplation at the time the regime developed. The Telecommunications Act of 1996 (the 1996 Act), Pub.L. No. 104-104, 110 Stat. 56 (codified as amended in scattered sections of 47 U.S.C.), which deregulated the industry primarily to promote competition, also took major steps toward updating the law in an attempt to keep pace with technology. The current appeal is a direct fallout from the move toward deregulation, for it involves a competitive local-exchange carrier's (CLEC's) challenge to acquire a portion of the incumbent's market share.

Global NAPs, Inc. (Global), a CLEC in Vermont, challenges two rulings of the Vermont Public Service Board (the Board) that bear on Global's interconnection agreement with Verizon New England, Inc. (Verizon), Vermont's incumbent local exchange carrier (ILEC).[FN1] Specifically, Global contends that the Board erred in concluding that Board-determined local calling areas [FN2] would continue to control whether a call is a toll call or a local call and in prohibiting Global from offering virtual NXX service.[FN3] The district court affirmed these rulings, denied Global's motion for summary judgment, granted Verizon's cross-motion for summary judgment and denied the individual defendants' motion for summary judgment as moot. Because we conclude that the Board properly exercised jurisdiction over these matters and properly applied the 1996 Act, we affirm the judgment of the district court.

FN1. Local-exchange carriers are companies that provide local telephone service. The 1996 Act established two types of local-exchange carriers: incumbents (or ILECs) and competitors (or CLECs). Before the 1996 Act, the ILECs held exclusive local telephone franchises. The 1996 Act, however, preempted local laws establishing the franchises and permitted the CLECs to interconnect their networks to that of the ILECs. *See* 47 U.S.C. § § 251(a)(1); 253 (2006).

FN2. Local calling areas are not defined as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

such in the Code of Federal Regulations or the U.S. Code. In general, however, a local calling area is a region of service for a particular telephone service plan. Both state commissions and retail local service carriers define local calling areas.

FN3. Virtual NXX, or VNXX, refers to telephone numbers assigned to a customer in a local calling area different from the one where the customer is physically located in circumstances where the telephone company assigning the number is not using facilities of its own to transport the call from the calling area associated with the telephone number to the area where the customer is actually located. *See, e.g., Global NAPS, Inc. v. Verizon New England, Inc.,* 444 F.3d 59, 63-64 (1st Cir.2006).

## I. BACKGROUND

An elementary knowledge of telecommunications law and terminology is helpful toward understanding what is at stake in this appeal. We accordingly provide a sketch of the services that Global provides and of the regulatory structure framing the issues before analyzing the dispute between Global and Verizon.

### *A. Global's Services*

Global is a CLEC in Vermont with its principal place of business in Quincy, Massachusetts. Global's customer base consists primarily of 20 dial-up Internet Service Providers (ISPs), which in turn serve ***94** about 150,000 dial-up users in Vermont.[FN4] Most of Global's ISPs have chosen to locate their equipment in Global's Quincy facility rather than in each local calling area.

FN4. Although the proliferation of broadband and wireless, among other things, has made Internet traffic via the wirelines seem dated, at the end of 2005, about forty percent of Internet users in the United States still relied on dial-up access. Ken Belson, *Dial-Up Internet Starts to Go the Way of Rotary Phones,* N.Y. TIMES, June 21, 2005, at C1.

Global's system interconnects with Verizon's in Brattleboro, Vermont. Pursuant to their interconnection agreement, Verizon delivers all of Global's traffic to that Brattleboro interconnection point. Global then aggregates the Internet calls it receives from around the region and delivers them to its ISP customers in Quincy. To accomplish this aggregation, Global relies on virtual NXX technology, which uses nongeographically correlated telephone numbers to identify callers. This arrangement spawned the dispute in the present case; Global essentially contends that Verizon is using its relatively more powerful position as the ILEC to prevent it from doing business, while Verizon asserts that Global is forcing Verizon to shoulder the costs of Global's services by taking advantage of Verizon's sunk costs in the infrastructure and offering services just different enough to sidestep the prevailing regulatory regime.

### *B. The 1996 Act*

[1] The basis for Verizon and Global's interconnection agreement-indeed, for Global's very existence-is the 1996 Act, which (as its preamble indicates) represents an effort "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub.L. No. 104-104, 110 Stat. 56 pmbl. A major purpose of the 1996 Act was to end local telephone monopolies and develop a national telecommunications policy that strongly favored local telephone market competition. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 638, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002); *AT&T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999); *Global Naps, Inc. v. Verizon New England, Inc.,* 396 F.3d 16, 18 (1st Cir.2005). Toward this end, the 1996 Act imposes, among other things, a duty on ILECs (such as Verizon) to provide interconnection with their networks and to negotiate in good faith the terms and conditions of the agreements with CLECs (such as Global). 47 U.S.C. § 251(a)(1), (c)(1) (2006). If the parties cannot agree, either party may petition the state commission charged with regulating intrastate operations of carriers to arbitrate any unresolved issues. § 252(b)(1).

The dispute here stands at the crossroads of technology and regulation. Since Global uses the wirelines to serve ISP-bound traffic, we must consider how the wireline-based regulations traditionally addressing voice communications

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

interact with information communications. The dual nature of this traffic means it is subject to a multitude of potential regulations, many of which appear inconsistent, or even contradictory. Resolving these issues requires us to consider the broader themes and trajectory of the regulations, particularly since the 1996 overhaul.

Two prevalent themes of the 1996 Act are emphasis on competition for the benefit of consumers and to further innovation, and a predilection to leave the Internet largely unregulated. The Code of Federal Regulations abounds with rules designed ***95** to open local telephone markets to competition. *See, e.g.,* 47 C.F.R. § 51.305 (2006) (requiring ILECs to interconnect with qualifying CLECs); § 51.307 (requiring ILECs to provide unbundled access); § 59.1 (imposing a general duty on ILECs to share their infrastructure with qualifying CLECs); § 59.2 (explaining the conditions for infrastructure sharing). Those regulations are tempered, however, by a concern that would-be competitors may elect to enter the market not so much to expand competition as to take advantage of the relatively rigid regulatory control of the incumbents. In connection with this concern, the FCC has warned time and time again that it will not permit competitors to engage in regulatory arbitrage-that is, to build their businesses to benefit almost exclusively from existing intercarrier compensation schemes at the expense of both the incumbents and consumers. *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP-Bound Traffic,* 16 F.C.C. Rcd. 9151, 9162, ¶ 21 (2001), *remanded by WorldCom, Inc. v. FCC,* 288 F.3d 429 (D.C.Cir.2002) [hereinafter *"2001 Remand Order"*]. Finally, although no such claims have been made here, we are sensitive to the possibility that state regulators, who have dealt traditionally only with incumbents, may quite unknowingly tend to share their perspectives.

1. reciprocal compensation and access charges

[2] One issue involved here is the requirement of the 1996 Act that interconnecting local exchange carriers establish reciprocal compensation arrangements for transporting and terminating calls. 47 U.S.C. § 251(b)(5); *see also* 47 C.F.R. § 51.703. Reciprocal compensation arrangements are structured so that the carrier whose infrastructure is used in making and terminating (or completing) a call receives compensation from another carrier that is using its network. That is, when a CLEC's customer calls an ILEC's customer located in the same local calling area, the CLEC pays the ILEC for terminating the local call. Likewise, when an ILEC's customer calls a CLEC's customer located in the same local calling area, the ILEC pays the CLEC for terminating the local call. Reciprocal compensation is based on minutes of use and is expressly limited to transportation and termination of local traffic. 47 C.F.R. § 51.701(e)(1), *see also* § 51.707(b)(1).

[3] Long-distance calls (referred to variously as interstate or intrastate exchange service or toll service) are subject, in using local infrastructure, to access charges-not reciprocal compensation. 47 C.F.R. § 69.2(a). Thus, access charges are charges that long-distance companies are required to pay local-exchange carriers for the use of local network facilities. The Federal Communications Commission (FCC) has authority over interstate long-distance calls, and the state commissions have authority over (in addition to local service) intrastate long-distance.

These rules governing intercarrier compensation are relatively straightforward when applied to ordinary telephone voice calls. Parties sometimes disagree about the parameters of the agreements, but it is fairly easy to apply the rules in that normal context. Things become far more contentious, however, in the realm of Internet-bound traffic. The FCC has in recent years considered the question whether Internet telecommunications traffic is subject to reciprocal compensation but has never directly addressed the issue of ISP-bound calls that cross local-exchange areas. *See generally 2001* *Remand Order,* 16 F.C.C. Rcd. at 9151.

***96** 2. virtual nxx

The other point of contention in this case surrounds the regulation of virtual NXX technology-telephone numbers unconnected to any particular geographic region. Virtual NXX's geographical disconnect is significant because whether a telephone call is subject to access charges depends on the location of the switches where a call originates and where it terminates. These switches are associated with NXX codes, which are the middle three digits of a ten-digit telephone number.[FN5] A call to a particular phone number identifies the NXX code and accordingly, the location where the call is to terminate.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN5. Accordingly, the NXX code for the telephone number (802)555-6789 would be 555.

Although geographically correlated NXX codes are standard, it is technologically feasible to assign codes so that the designation of a call's point of termination does not identify a physical location but instead a location of the customer's choice. Virtual NXX, then, is similar to foreign exchange or FX service, which allows users in one calling area to obtain a telephone number associated with a different local calling area. The significance of virtual NXX and FX technologies is that they essentially convert, for billing purposes, the caller's long-distance calls into local calls. The difference between virtual NXX and FX, however, is that an FX customer bears the cost of a dedicated facility known as a private line to enable access to a remote local exchange.

Global claims that its ISP customers depend on virtual NXX service, since, unlike Verizon, Global's infrastructure serving Vermont is physically located only in Quincy, Massachusetts. In order to provide Global's ISPs with local dial-up access numbers-which the ISPs and the dial-up users likely would demand-virtual NXX is essential (although we suppose that FX might achieve the same ends, as would moving Global's Quincy facility across the border to Vermont or providing different retail calling plans). Verizon does not dispute that virtual NXX is technically effective; it argues only that it is improper and unfair to allow Global to use infrastructure it acquires without cost (which is the essential point of virtual NXX) to provide dial-up access.

Verizon and Global began negotiating the terms of their Vermont interconnection agreement in January 2001. Unable to agree to all the terms, Global petitioned the Board for arbitration in July 2002. The Board issued its decision on December 26, 2002, concluding in part that Board-determined local calling areas should continue to govern intercarrier compensation in Vermont and denying Global's request to use virtual NXX technology. The district court upheld the Board's ruling, and Global now appeals.

## II. DISCUSSION

[4][5] We review de novo the district court's determination that the Board's order conforms to federal law. *See, e.g., Sw.* Bell Tel. Co. v. Brooks Fiber Commc'ns of Okla., Inc., 235 F.3d 493, 497-98 (10th Cir.2000); *Sw.* Bell Tel. Co. v. Public Util. Comm'n, 208 F.3d 475, 482 (5th Cir.2000). Conversely, we review the Board's decisions as congruent with state law under the arbitrary-and-capricious standard. *Sw.* Bell, 208 F.3d at 482; *accord* Brooks Fiber, 235 F.3d at 498.

### *A. Local Calling Areas*

[6] The first issue for determination is whether the Board overstepped its authority in concluding that Board-determined calling areas govern whether traffic is subject***97** to reciprocal compensation or access charges. Global contends that access charges are appropriate only in circumstances where a carrier imposes separate charges for long-distance calls. Since it does not impose such a separate charge, Global argues, access fees are inappropriate. The determining point here is whether Global's treatment of all calls within Vermont as local for billing purposes affects reliance on the Board-determined local-calling areas traditionally used to determine whether traffic is local or long-distance for the purpose of intercarrier compensation.

The parties here dispute only which calling area (Board-determined or local-carrier-determined) provides the relevant framework for ascertaining compensation. The answer might lead to a further question: whether ISP-bound traffic is subject to access charges. But we are limited here to the questions actually presented: how are the boundaries of local calling areas to be determined for purposes of intercarrier compensation, and what agency is to make that determination? [FN6]

FN6. Global challenges this focus, arguing that it appealed the portion of the Arbitration Order relating to access fees and that the district court ruled on it. That is an overstatement. The portion of the arbitration order that Global cites explicitly refers only to virtual NXX. The Board does note that its decision "also applies to [I]nternet-bound traffic.... However, for purposes of local measured service and dialing, the calls are still treated as local. By comparison, an interexchange call to an ISP is still dialed and rated as a toll call. This distinction should continue to apply." *Petition of Global NAPs, Inc. for Arbitration Pursuant to § 252(b) of the*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Telecommunications Act of 1996 to Establish an Interconnection Agreement with Verizon New England Inc., d/b/a Verizon Vermont,* 24, at http://www.state.vt.us/psb/orders/2002/files/6742fnl.pdf (Vt.P.S.B. Dec. 26, 2002) (footnote omitted). The district court initially concluded that ISP-bound traffic was exempt from access charges but later amended its opinion and did not decide the issue. Given Global's carefully worded complaint (which does not address this access fee issue) and careful presentation of the issues, we conclude that the question whether ISP-bound traffic is subject to access fees is not before us. We note, however, that other courts properly presented with the issue have concluded that the FCC did not preempt the state commissions' ability to regulate intercarrier compensation for ISP-bound traffic. *See* Global NAPS, Inc., 444 F.3d at 74-75.

Prior to 1996, the state public service commissions defined the boundaries of all local calling areas. *See In the* Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 F.C.C. Rcd. 15,499, 16,013-14, ¶ 1035 (1996) [hereinafter *"Local Competition Order"*]. With the introduction of competition, however, the state boards were required to consider how to realign the local market to govern competitive entry. The FCC, in its voluminous *Local Competition Order,* explicitly declined to address the issue of carrier-determined local calling areas, noting that the "state commissions have the authority to determine what geographic areas should be considered 'local areas' for the purpose of applying reciprocal compensation ... consistent with state commissions' historical practice of defining local service areas for wireline LECs." *Id.* Importantly, the FCC concluded that it lacked sufficient information to address the issue of expanded local calling area plans but "expect[ed] that this issue [would] be considered, in the first instance, by the state commissions." *Id.* Thus, despite the monumental changes Congress had made in telecommunications law, the FCC early indicated that it intended to leave authority over defining local calling areas where it always had been-squarely within the jurisdiction of the state commissions.

***98** Consistent with this jurisdictional finding, the Vermont Legislature has made it clear that it envisions the Board as having a key role in planning telecommunications for the state. Vt. Stat. Ann. tit. 30 § 202c(b)(1) (2006). In 1999, the Board ruled that its CLECs were free to define their own local calling areas for purposes of billing their retail customers. *Investigation into New England Telephone & Telegraph Company's Tariff Filing re: Open Network Architecture, Including the Unbundling of NET's Network, Expanded Interconnection, and Intelligent Networks* in re: Phase II, Module One, Docket 5713, 192 P.U.R.4th 1, 52-54 (Vt.P.S.B. Feb.4, 1999), *available at* 10 http://www.state.vt.us/psb/orders/document/5713finalph2modl.pdf. The Board explicitly stated, however, that the Board-determined boundaries, which it last established in 1997, would continue to govern intercarrier compensation. *Id.* at 53-54.

Global argues that the 1996 Act does not permit the Board to reserve the authority to define local calling areas for intercarrier compensation purposes. It centers its argument on the "separate charge" language in the statutory definition of "telephone toll services" (which in turn defines exchange access, which in turn determines whether access charges apply). Global reasons that, since the regulations prescribe that a charge separate from the applicable service contracts is necessary to make a call a "toll" call and since Global imposes no separate toll charges, its traffic is not subject to access fees, regardless of how the Board defines local calling areas. This argument attributes far too much significance to the term "separate charge."

The underlying statute (which we must remember was originally drafted in 1934) draws sharp distinctions between services known popularly as "local" and "long-distance." *See, e.g.,* 47 U.S.C. § 153(47)-(48). It seems likely that the "separate charge" language in the statute was written to underscore that "tolls" applied exclusively to long-distance service and were charged separately. But what really mattered in determining whether an access charge was appropriate was whether a call traversed local exchanges, not how a carrier chose to bill its customers. Thus, Global's argument that since it imposes no separate fee, its traffic cannot be considered toll traffic, is beside the point.

Accordingly, we decline to challenge the Board's conclusion that the calling areas it has established are determinative for the purposes of intercarrier compensation. In fact, the FCC has stated "that state commissions have authority to determine whether calls passing between LECs should be subject to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

access charges or reciprocal compensation for those areas where the LECs' service areas do not overlap." *See In the Matter of Petition of Worldcom, Inc. Pursuant to Section 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of the Virginia State Corporation Commission Regarding Interconnection Disputes,* 17 F.C.C. Rcd. 27,039, 27,307, ¶ 549 & n. 1824 (2002). Although much of the *Local Competition Order* has been superseded, we find nothing in the thousands of pages the FCC has issued on topics relating to local calling areas that clearly and consistently indicates that it intended to preempt the state commissions' authority to define local calling areas for the purposes of intercarrier compensation. Our understanding, which is consistent with conclusions that other courts have reached, is that the FCC has not disturbed the states' traditional authority to define local calling areas. *See, e.g., Iowa Network Servs. v. Qwest Corp.,* 385 F.Supp.2d 850, 858-59 (S.D.Iowa 2005); *Sprint-Fla, Inc. v. Jaber,* 885 So.2d 286, 293-94 (Fla.2004). This understanding also appears to be consistent***99** with Congress's intent in the 1996 Act. *See, e.g.,* 47 U.S.C. § 261(b)-(c) ( "[n]othing in this part shall be construed to prohibit any State commission from enforcing regulations prescribed prior to February 8, 1996, or from prescribing regulations after February 8, 1996, in fulfilling the requirements of this part, if such regulations are not inconsistent with the provisions of this part" and "[n]othing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate services that are necessary to further competition in the provision of telephone exchange service or exchange access, as long as the State's requirements are not inconsistent with this part or the Commission's regulations to implement this part").

Allowing the state-commission-determined local calling areas to govern intercarrier compensation also makes good practical sense. Carriers may prescribe markedly different local calling areas in accordance with marketing considerations. This diversity may promote consumer choice and ultimately be beneficial to consumers. But, if carriers were free to define local calling areas for the purposes of intercarrier compensation, the door would be open to overweening conduct by the CLECs. ILECs are currently fixed in state-commission-imposed regimes and, in that framework, provide the infrastructure for CLECs. Local calling areas defined by CLECs would permit such areas to be so broad as to eliminate all intercarrier compensation for ILECs. Permitting CLECs to define local service areas and thereby set the rules for the sharing of infrastructure would eventually require ILECs to absorb all the costs and allow CLECs to reap all the profits.

The significant factor added to the considerations under discussion-namely the ISP-bound nature of the traffic-requires attention to the *2001 Remand Order.* The ultimate conclusion of the *2001 Remand Order* was that ISP-bound traffic *within a single calling area* is not subject to reciprocal compensation. *See* Brief for FCC as Amicus Curiae, *Global Naps, Inc. v. Verizon New England, Inc.,* 444 F.3d 59 (1st Cir.2006), at 10-11 (March 14, 2006) ("[T]he [*2001 Remand Order*] also indicates that, in establishing the new compensation scheme for ISP-bound calls, the [FCC] was considering only calls placed to ISPs in the same local calling area as the caller. The [FCC] itself has not addressed the application of the [*2001*] *Remand Order* to ISP-bound calls outside a local calling area."). Although the *2001 Remand Order* states explicitly that ISPs are exempt from reciprocal compensation for intra-local calling area calls, it sheds little light on inter-local calling area calls or access fees.

We can find no authority to clarify this issue, and we are accordingly unable to conclude that the *2001 Remand Order* strips state boards of their jurisdiction over ISP-bound traffic. As has been demonstrated, state boards have authority to define local calling areas with respect to intercarrier compensation. Whether they have authority to impose access fees on ISP-bound traffic is for another day and for clarification by the FCC.

*B. Virtual NXX*

The second question that Global presents is whether the Board had the authority to prohibit virtual NXX. Answering this query involves two questions: (1) whether the Board had the authority to ban virtual NXX; and (2) whether banning virtual NXX was justifiable in the present instance. Since this issue involves the complete prohibition of what is arguably a telecommunications technology, it requires ***100** searching consideration of state commission jurisdiction.

[7][8] Global, to support its view that the FCC intended to preempt state commissions with respect to ISP-bound traffic, relies on language in the *2001 Remand Order* that classifies ISP-bound traffic as interstate traffic. Since federal law generally governs interstate communication, Global continues, states lack jurisdiction over ISP-bound traffic. This

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

argument, which other courts have analyzed and found wanting, is unpersuasive. *See, e.g., Sw. Bell Tel. Co.,* 208 F.3d at 480 (noting that the Supreme Court "has recognized that the [1996] Act cannot divide the world of domestic telephone service 'neatly into two hemispheres,' one consisting of interstate service, over which the FCC has plenary authority, and the other consisting of intrastate service, over which the states retain exclusive jurisdiction.... Rather, observed the Court, 'the realities of technology and economics belie such a clean parceling of responsibility.' ") (citation omitted) (quoting *La. Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 360, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986)); *see also* *Global NAPS, Inc.,* 444 F.3d 59.

[9] While Global is correct that, in the *2001 Remand Order,* the FCC declared ISP-bound traffic to be a form of interstate communication, the Order also explicitly reserves state commission authority in certain relevant matters. The *2001 Remand Order* acknowledges, for example, that state commissions have, and should continue to have, a role in arbitrating, reviewing and enforcing interconnection agreements relating to ISP-bound traffic. *2001 Remand Order,* 16 F.C.C. Rcd. at 9187, ¶ 79 (stating that a carrier may rebut presumptions regarding the amount of traffic that is ISP-bound traffic by providing evidence "to the appropriate state commission"). The *2001 Remand Order* also leaves intact ILECs' ability to seek relief from their state commissions from certain cost recovery mechanisms. *Id.* at 9188, ¶ 80 n. 151 (quoting *Access Charge Reform Order,* 12 F.C.C. Rcd. at 16,134 ¶ 346) ("To the extent that some intrastate rate structures fail to compensate incumbent LECs adequately ... incumbent LECs may address their concerns to state regulators."). Finally, as the district court noted, the *2001 Remand Order* expressly states that access services remain subject to FCC jurisdiction or, to the extent they are intrastate services, they remain subject to the jurisdiction of state commissions. 16 F.C.C. Rcd. at 9169, ¶ 39. We would have to ignore these provisions (and more) if we were to conclude, as Global urges, that the *2001 Remand Order* preempts the states with respect to all ISP-bound traffic issues.[FN7]

FN7. Moreover, a federal agency may preempt state law only if it is acting within the scope of its congressionally delegated authority and the agency makes its intention to preempt clear. *La. Pub. Serv. Comm'n,* 476 U.S. at 374, 106 S.Ct. 1890; *Hillsborough County v. Automated Med. Labs., Inc.,* 471 U.S. 707, 718, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985); *see also* *Global NAPS,* 444 F.3d at 70-71. Here, Congress adopted the 1996 Act, expressly giving states jurisdiction over certain interstate matters under 47 U.S.C. § 252. The fact that the FCC has since promulgated rules governing jurisdiction over compensation for ISP-bound traffic cannot override Congress's clear intent to preserve state jurisdiction over such interstate matters.

The *2001 Remand Order*'s preemptive effect is further limited by the fact that the FCC promulgated this order specifically to address only the issue of reciprocal compensation for ISP-bound traffic. Unlike the technology involved in reciprocal compensation, virtual NXX involves calls originating out of and extending into different local calling areas and transforms what ***101** would otherwise be toll calls into local calls. Virtual NXX's potential compensation arrangement (which would possibly involve toll and access charges) would differ from that contemplated in the *2001 Remand Order,* since that directive is limited to disparities in reciprocal compensation between the ILECs and CLECs for ISP-bound traffic. Moreover, although the FCC recently had an occasion to examine the proper application of reciprocal compensation to virtual NXX traffic, the FCC noted the lack of clear precedents and rules governing such compensation. *In the Matter of Application by Verizon Maryland Inc., et al., for Authorization to Provide In-Region, InterLATA Services in Maryland, Washington, D. C., and West Virginia,* 18 F.C.C. Rcd. 5212, 5301-02, ¶ 151 (2003).

Given this context, a more reasonable interpretation of the *2001 Remand Order* is not that the FCC has preempted the field relating to ISPs, but only that it intended to reserve jurisdiction over intercarrier compensation issues with respect to ISP-bound traffic on matters that would conflict with the FCC's specific directives about reciprocal compensation. The FCC is faced with a difficult task in working out a regulatory regime that accommodates new technologies.[FN8] The fact that traffic is ISP-bound should not be a basis for avoiding regulation. As former FCC Chair Michael Powell commented: "[t]o allow a carrier to avoid regulatory obligations simply by dropping a little IP in the network would merely sanction regulatory arbitrage and would collapse the universal service system virtually overnight." *In the*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Matter of Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services are Exempt from Access Charges,* 19 F.C.C. Rcd. 7457, 7475 (2004) (Separate Statement of Michael K. Powell). Accepting Global's interpretation of the jurisdictional arrangement would allow carriers to operate entirely outside the compensation scheme so long as they provide some service to an ISP.

FN8. In an April 2004 order, for example, the FCC rejected on narrow grounds a petition from AT&T that would have allowed that company to avoid paying access charges on its VoIP calls. "VoIP" is shorthand for Voice Over Internet Protocol or DigitalVoice. This service allows customers to make voice telephone calls with their computers. *In the Matter of Petition for Declaratory Ruling that AT&T's Phone-To-Phone IP Telephony Services Are Exempt From Access Charges,* 19 F.C.C. Rcd. 7457 (2004). Although AT&T argued that its service met the requirements of information services, a reluctant FCC ruled that AT&T could not escape the regulations defining the service as telecommunications service subject to access charges.

[10] Having determined that the classification of ISP-bound traffic as interstate does not in itself remove ISP-bound traffic from the jurisdiction of the state commissions, did the Vermont Board exercise appropriate authority in this instance? Global argues that, aside from the jurisdictional issue, the Board's actions were inappropriate here because prohibiting virtual NXX violates various federal antidiscrimination statutes by determining which carriers could serve ISPs. Global reasons that such a prohibition would restrict interstate access and circumscribe the use of telephone numbers within the 802 area code to provide interstate service to its customers. The Board, however, did not violate any federal rules or act arbitrarily or capriciously when it prohibited Global from using virtual NXX in Vermont.

Global first argues that 47 C.F.R. § 63.01 authorizes virtual NXX. 47 C.F.R. § 63.01(a).[FN9] This regulation, however, ***102** which the FCC promulgated in an effort to relieve regulatory burdens for nondominant carriers (which might otherwise face prohibitive costs or incur other inefficiencies that would prevent them from competing) simply authorizes carriers to enter the telecommunications business. *See Rates for Competitive Common Carrier Services and Facilities Authorizations Therefor;* 48 FR 52,452-01, 52,453, ¶ 1 (1983) (stating "[t]his proceeding was instituted to allow us to adjust our common carrier tariff and facilities authorization requirements in light of the entry of new suppliers of interexchange telecommunications services").

FN9. Under 47 C.F.R. § 63.01(a):
[a]ny party that would be a domestic interstate communications common carrier is authorized to provide domestic, interstate services to any domestic point and to construct or operate any domestic transmission line as long as it obtains all necessary authorizations from the [FCC] for use of radio frequencies.

Similarly, the Board's virtual NXX decision here does not constitute a general barrier to entry as proscribed by 47 U.S.C. § 253, since a prohibition of virtual NXX does not necessarily prevent Global from entering the market. In some circumstances, certain state prohibitions may run afoul of § 253(a), even if these prohibitions are not total. *See TCG N.Y., Inc. v. City of White Plains,* 305 F.3d 67, 81-82 (2d Cir.2002).[FN10] But analysis here must proceed on a case-by-case basis, and while a prohibition of virtual NXX might once have been fatal to Global, its counsel conceded at oral argument that such is no longer the case. Contrary to Global's contentions, neither 47 U.S.C. § 253 nor 47 C.F.R. § 63.01 confers blanket authority on carriers to provide any interstate service in any manner unfettered by state regulation.

FN10. Nor does the Board's prohibition of virtual NXX block interstate access or run afoul of our decision in *New York Telephone Co. v. FCC,* 631 F.2d 1059 (2d Cir.1980). That case involved action by the FCC over local exchange service when a carrier discriminated against interstate users by charging them a rate 1600% higher than that paid by intrastate users. *N.Y. Tel. Co.,* 631 F.2d at 1064-65. In *New York Telephone Co.,* this Court cited a footnote in which the FCC stated that "(w)hile the States clearly have the authority to regulate the local exchange service pursuant to Sections 2(b) and 221(b), they cannot in so doing block interstate commerce by prohibiting interstate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

access to foreign exchanges or by discriminating against or among interstate services." *Id.* at 1065 (citing *In the Matter of American Telephone & Telegraph Co. and the Associated Bell System Cos. Interconnection with Specialized Carriers in Furnishing Interstate Foreign Exchange (FX) Service and Common Control Switching Arrangements (CCSA),* 56 F.C.C.2d 14, 20 ¶ 21 n. 5 (1975)).
But here, the Board's decision does not prevent Global from offering other similar interstate services nor does it prevent Global's customers from accessing ISPs. The Board's decision does not determine "who can or cannot serve ISPs" and therefore does not block access to interstate communications. More importantly, *New York Telephone Co.* ultimately involved the FCC's jurisdiction over rates and tariffs for interstate communications. In the present case, the Board made no attempt to set rates or charges for virtual NXX service. Rather, it prohibited virtual NXX altogether. By so doing, the Board narrowly sidestepped encroachment on the FCC's jurisdiction to set rates on interstate communications. *See Ivy Broad. Co. v. Am. Tel. & Tel. Co.,* 391 F.2d 486, 491 (2d Cir.1968) (stating questions concerning the duties, charges and liabilities of telegraph or telephone companies with respect to interstate communications service are to be governed solely by federal law).

Even if prohibiting virtual NXX would be fatal to Global, it is not clear to us that Global's view must prevail. Global wants to use virtual NXX to disguise the nature of its calls-that is, to offer its customers local telephone numbers that cross Verizon's exchanges instead of the traditional long-distance numbers attached to such calls. Virtual NXX is not the only way to accomplish this end although in light of economic realities, it may be the only practical***103** way. But where a company does not own the infrastructure and is not willing to pay for using another company's infrastructure, we see no reason for judicial intervention. Congress opened up the local telephone markets to promote competition, not to provide opportunities for entrepreneurs unwilling to pay the cost of doing business.

Global also argues that virtual NXX is functionally equivalent to FX service and must be treated identically under the North American Numbering Plan (NANPA).[FN11] Under 47 C.F.R. § 52.9(a), when a state does not authorize numbering resources, it may do so only in a manner that does not discriminate against carriers or technologies or block interstate access. But, although virtual NXX and FX share some similarities, there is one fundamental difference: retail customers using FX service purchase a foreign exchange line, paying the costs both of installation of the line and of transportation of bulk traffic between the two points of communication. Virtual NXX customers, on the other hand, do not purchase any lines or pay transportation costs, but rely on the terminating carrier to provide the service without cost. The prohibition of virtual NXX does not necessarily prevent users from obtaining nongeographically correlated numbers; the ban simply requires that someone pay Verizon for use of its infrastructure.

FN11. 47 U.S.C. § 251(e)(1) provides:
[t]he Commission shall create or designate one or more impartial entities to administer telecommunications numbering and to make such numbers available on an equitable basis. The Commission shall have exclusive jurisdiction over those portions of [NANPA] that pertain to the United States. *Nothing in this paragraph shall preclude the Commission from delegating to State commissions or other entities all or any portion of such jurisdiction.*
(emphasis added); *see also* 47 C.F.R. § 52.15(g), (i).

Finally, Global's desired use of virtual NXX simply disguises traffic subject to access charges as something else and would force Verizon to subsidize Global's services. This would likely place a burden on Verizon's customers, a result that would violate the FCC's longstanding policy of preventing regulatory arbitrage. Telecommunications regulations are complex and often appear contradictory. But the FCC has been consistent and explicit that it will not permit CLECs to game the system and take advantage of the ILECs in a purported quest to compete.

III. CONCLUSION

In sum, the judgment of the district court is hereby Affirmed.

C.A.2 (Vt.),2006.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

454 F.3d 91
454 F.3d 91, 38 Communications Reg. (P&F) 1200
**(Cite as: 454 F.3d 91)**

Page 12

Global NAPs, Inc. v. Verizon New England, Inc.
454 F.3d 91, 38 Communications Reg. (P&F) 1200

Briefs and Other Related Documents (Back to top)

• 04-4685 (Docket) (Aug. 27, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.